IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

**TURNING POINT USA AT ARKANSAS
STATE UNIVERSITY** and **ASHLYN HOGGARD**,                    **PLAINTIFFS**

**v.**                          Case No. 3:17-cv-00327 (JLH/JTR)

The Trustees of Arkansas State University—
**RON RHODES, DR. TIM LANGFORD,
NIEL CROWSON, STACY CRAWFORD
and PRICE GARDNER**—all individually and
all in their official capacities as members of the
Board of Trustees of the Arkansas State University
System; **CHARLES L. WELCH**, President of the
Arkansas State University System, in his official
and individual capacities; **KELLY DAMPHOUSSE**,
Chancellor of Arkansas State University, in his official
and individual capacities; **WILLIAM STRIPLING**,
Vice Chancellor for Student Affairs of Arkansas State
University, in his official and individual capacities; and
**MARTHA SPACK**, Director of Student Development
and Leadership for Arkansas State University, in her
official and individual capacities,                          **DEFENDANTS**


**BRIEF IN SUPPORT OF
MOTION TO DISMISS OF ALL DEFENDANTS**

    The Freedom of Expression Policy of Arkansas State University ("ASU") fully complies

with the First and Fourteenth Amendments to the U.S. Constitution.  Two recent decisions from

the Eighth Circuit are controlling: *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006) and *Ball v. City

of Lincoln, Neb.*, 870 F.3d 722 (8th Cir. 2017).  Significantly, the *Bowman* decision confirmed the

constitutionality of substantively identical provisions in a policy of the University of Arkansas at

Fayetteville.  Plaintiffs' claims are also barred by sovereign immunity and qualified immunity, and plaintiffs lack constitutional standing.

## I.   ASU's Freedom of Expression Policy.

ASU is a public institution of higher education, and its campus is publicly-owned property. However, ASU's entire campus has not traditionally been held open for the use of the public for expressive activities.  ASU's mission is education.  If a student or member of the general public wants to make a speech or set up a table or other structure on campus to solicit passers-by, ASU has designated free expression areas in different locations in various well-traveled parts of campus and will work with that person to reserve the best spot.  (Doc. 1-3, at 2-3; Doc. 1-1, at 2)  The remainder of campus, however, has not traditionally been used as a wide open, unregulated forum. (Doc. 1-2, at 2; Doc. 1-3, at 2)  Academic buildings are used for research and teaching. Administrative buildings are used to conduct the business and governance of the university. Sidewalks and other open areas encourage and facilitate the passage of students, faculty, staff, and visitors into and out of buildings.

The Freedom of Expression Policy ("the Policy") applies to speeches, demonstrations, distribution of written material, and marches.  (Doc. 1-2, at 2-3; Doc. 1-3, at 2-3)  Nothing in the Policy prohibits, restricts, or regulates casual or everyday conversations.  For speeches and demonstrations, the Policy provides two categories of possible locations: (1) designated free expression areas; and (2) any space outside the free expression areas.  (Doc. 1-2, at 2-3; Doc. 1-3, at 2)  Contrary to plaintiffs' conclusory allegation, the Policy does not limit covered speech only to the free expression areas.

The Policy identifies eight (8) different free expression areas in central, high-traffic sections of campus.[1]  (Doc. 1-1; Doc. 1-3, at 2-3)  Use of those spaces is scheduled through the Director of Student Development and Leadership.  (Doc. 1-3, at 2)  These locations are generally available for free expression purposes between 8:00 a.m. and 9:00 p.m. Monday through Friday. (Doc. 1-3, at 2)

If a person or group wants to use space outside the free expression areas or other times in the free expression areas, they must make a request to one of two ASU administrators at least 72 hours before the event.  (Doc. 1-3, at 2)  The Policy requires that the administrator consider all requests without regard to the content of the speech or demonstration.  (Doc. 1-3, at 2-3)  The Policy gives the administrator authority to place reasonable time, place, and manner conditions on the request, which must relate to the interests of health and safety, preventing disruption of the speech or demonstration, and/or protecting against invading the rights of others.  (Doc. 1-3, at 3) The Policy goes on to list eight more specific factors to guide the administrator's decision, including possible obstruction of vehicular or pedestrian traffic, use of sound amplification, possible obstruction of entrances or exits to buildings, interference with educational activities, disruption of university activities, possible damage to property, clean up efforts, and compliance with applicable state and federal laws, among others.  (Doc. 1-3, at 3-4)

The Policy also provides that no stands, tables, or booths can be used except in the free expression areas and with permission from the Director of Student Development and Leadership. (Doc. 1-3, at 3)

---

[1] For purposes of this motion, the Court is limited to the facts as pled in the Complaint and its exhibits.  However, there are nine (9) free expression areas.  An additional free expression area was created before the events underlying this lawsuit and is located near the Farmers' Market on campus.  The Policy has not yet been updated to reflect this addition.

II.     **Procedural History and Facts.**

Plaintiffs initiated the present lawsuit by filing the Complaint on December 13, 2017, seeking to challenge the constitutionality of ASU's Freedom of Expression Policy.  Plaintiffs are an ASU student, Ashlyn Hoggard, and a national organization she purports to represent, Turning Point USA ("TPUSA").  They attempt to allege claims under 42 U.S.C. § 1983 for violation of the First and Fourteenth Amendments to the United States Constitution.  Specifically, they challenge the following aspects of the Policy: (a) the Policy requires prior approval (Doc. 1, at 16-17 ¶¶145-148); (b) the request must be made at least 72 hours before the event (Doc. 1, at 17 ¶154); and (c) the Policy gives discretion to university administrators in evaluating and approving a request (Doc. 1, at 18 ¶¶158-163).  Defendants include the members of ASU's Board of Trustees and various other ASU administrators.

According to the Complaint, on October 10, 2017, Ms. Hoggard asked if she could reserve a table in the Student Union to promote and solicit membership in TPUSA, which was not a registered student organization.  (Doc. 1, at 12)  An unidentified administrator denied her request stating that those particular tables in the Student Union were available only to registered student organizations.  (Doc. 1, at 12)  The next day, October 11, 2017, Ms. Hoggard and a non-student employee of TPUSA, Emily Parry, set up a table on the sidewalk outside the Student Union to promote and solicit membership in TPUSA.  (Doc. 1, at 12)  They attached two poster boards to the table, and they also had candy to distribute to students.  (Doc. 1, at 12)  Neither Ms. Hoggard nor TPUSA attempted to schedule use of that space or notify ASU in any way before they set up their table on the campus sidewalk.

Shortly after Ms. Hoggard and Ms. Parry set up the table, Elizabeth Rouse, the Student Union Events Coordinator, approached them to explain the ASU policies regarding free expression

and the registration process for student organizations. (Doc. 1, at 12-13)  An ASU police officer also arrived and explained the same policies.  (Doc. 1, at 13)  Ms. Hoggard and Ms. Parry refused to comply with those policies, citing their interpretation of the First Amendment, and initially refused to comply with the request to remove their table.  (Doc. 1, at 13)  Ms. Parry continued to refuse the requests of Ms. Rouse and the ASU officer until the officer issued Ms. Parry (not Ms. Hoggard) a *Persona Non Grata Notice*.  (Doc. 1, at 13; Doc. 1-6)  After issuance of the *Persona Non Grata Notice*, Ms. Hoggard and Ms. Parry removed the table and left the area.  (Doc. 1, at 13)

Plaintiffs do not allege that they sought to schedule a time to set up their table in one of the free expression areas or that they made a request to set up their table in another location on campus. (Doc. 1-3, at 2)  Similarly, plaintiffs do not allege that they submitted the required form to become a recognized student organization.

### III. <u>Plaintiffs lack standing to challenge the constitutionality of the Policy.</u>

Plaintiffs have no standing to challenge the Policy.  Plaintiffs have nothing more than a speculative belief that their request for use of campus space for expressive activities would have been denied.  And, plaintiffs do not challenge the constitutionality of the Policy's prohibition on the use of stands, tables, or booths outside the free expression areas, which plaintiffs admittedly violated.  (Doc. 1, at 12-13; Doc. 1-3, at 3)  A favorable decision for plaintiffs would not afford them any relief.

Standing is a threshold question, and "the party invoking federal jurisdiction . . . has the burden of establishing standing to bring its First Amendment facial overbreadth claim." *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 791 (8th Cir. 2004).  The "irreducible minimum" of constitutional standing is (1) injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to speculative, that the

injury will be redressed by a favorable decision. *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  While self-censorship can constitute injury-in-fact, self-censorship based on mere allegations of a "subjective" chill resulting from a statute is not enough to support standing. *Zanders v. Swanson*, 573 F.3d 591, 593-94 (8th Cir. 2009).  Persons having only imaginary or speculative fears are not plaintiffs with appropriate standing. *Id.*  The relevant inquiry is whether a party's decision to chill his speech in light of the challenged regulation is "objectively reasonable." *Id.* at 594 (citation omitted).

First, plaintiffs have suffered no injury, and their subjective fear of being denied permission is only speculative inasmuch as plaintiffs never submitted a request to Ms. Spack or any other defendant to use any part of campus for expressive activities.  Therefore, there has not been a denial or other injury.  Further, plaintiffs make no factual allegations to support an objectively reasonable and plausible inference that any such request would be denied to their dissatisfaction. To the extent plaintiffs challenge those aspects of the Policy concerning the exercise of discretion or judgment, plaintiffs lack standing and have suffered no injury because they have never given any ASU administrator the chance to exercise discretion.  Plaintiffs' conclusory claim that their efforts are being chilled are therefore objectively unreasonable.

Second, plaintiffs violated the Policy's prohibition on the use of stands, tables, or booths outside the free expression areas, to which they mount no constitutional challenge.  (Doc. 1, at 12 ¶104; Doc. 1-3, at 3)  Thus, even if plaintiffs prevail with respect to the challenged provisions of the Policy, the decision will not authorize or validate their actions. *See Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) ("In this case a favorable decision for [plaintiff] even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other

unchallenged provisions of the sign code like the restrictions on size, height, location, and setback."). Such a favorable decision would not redress plaintiffs' claimed injury.

For these reasons, plaintiffs lack standing to challenge ASU's Policy, both facially and as applied.

### IV. __Plaintiffs' claims are barred by sovereign immunity.__

The Court should dismiss this case because plaintiffs' claims are barred by sovereign immunity. It is well-recognized that sovereign immunity bars claims under § 1983 against individuals in their official capacities, for all types of relief except prospective injunctive relief. *See Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. The United States Supreme Court has expressly held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304 (1989). The *Will* Court stated further, "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." *Id.* 491 U.S. at 71.

The Eighth Circuit has specifically held that sovereign immunity bars claims against ASU officials in their official capacities for all types of relief, except prospective injunctive relief. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *see also Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 447 (8th Cir. 1995) (affirming dismissal of claims against members of

ASU's Board of Trustees based on sovereign immunity).  To the extent plaintiffs seek any relief other than prospective injunctive relief against these defendants, such relief is barred.

### V.      Plaintiffs' claims are barred by qualified immunity.

Plaintiffs' claims against defendants in their individual capacities are barred by qualified immunity and should be dismissed.  Under the doctrine of qualified immunity, ASU officials performing discretionary functions generally are shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).  "Until this threshold immunity question is resolved, discovery should not be allowed."  *Harlow*, 457 U.S. at 818.

A trial court has the discretion to decide whether an alleged constitutional right was "clearly established" before it decides whether the alleged constitutional right existed.  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).  "A right is clearly established, for qualified immunity purposes, if the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Rush v. Perryman*, 579 F.3d 908, 913 (8th Cir. 2009) (citations omitted) (alternation in original).  Further, an inquiry regarding whether an alleged right was "clearly established" is an objective inquiry.  *Harlow*, 457 U.S. at 818-19.  Empty allegations regarding subjective intent or malice should play no part.  *Id.* 457 U.S. at 817-18 (stating that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery").

Application of the "clearly established" standard also requires a determination of "the level of generality at which the relevant 'legal rule is [applied].'"  *Anderson v. Creighton*, 483 U.S. 635,

639, 107 S. Ct. 3034, 3038-39 (1987).  For example, although a person's rights to freedom of speech and due process may be clearly established by the First Amendment and Fourteenth Amendment, such an application of the "clearly established" test at that level of generality would effectively

> convert the rule of qualified immunity . . . into a rule of virtual and unqualified liability simply by alleging a violation of [an] extremely abstract right. . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say an official action is protected by qualified immunity unless the very action in question has been held unlawful, . . . but it is to say that in the light of pre-existing law, the unlawfulness must be apparent.

*Id.* 483 U.S. at 639-40, 107 S. Ct. at 3039-40.  "In other words, '[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'"  *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009) (citation omitted).

In a recent decision, *White v. Pauly*, 137 S. Ct. 548 (2017), the Supreme Court reiterated the exacting standard that a plaintiff must meet to prove the violation of clearly established law. In *White*, an officer arrived late to an ongoing police action, witnessed shots fired by one of several individuals in a house, and without warning shot and killed an armed occupant. *Id.* at 549. Representatives of the victim's estate alleged excessive force and the police officer claimed qualified immunity. The Court held that the officer did not violate a clearly established right and was entitled to qualified immunity. *Id.* at 550.

The Supreme Court explicitly held that "'clearly established law' should not be defined 'at a high level of generality'" and "the clearly established law must be 'particularized' to the facts of the case." *Id.* at 552 (citing *Ashcroft*, *supra*; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Court was resolute that the unlawfulness of a government official's actions must be apparent "in the light of pre-existing law." *Id.* (citing *Anderson*, 483 U.S. at 640). Otherwise, plaintiffs could

turn the rule of qualified immunity into "virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

In *White*, the Supreme Court found that since there was no existing clearly established case with similar facts—where an officer who arrived late to a scene and shot and killed a suspect without warning was found to have violated the Fourth Amendment right to be free from excessive force—there was no violation of clearly established law and the officer was protected by qualified immunity. *Id.* While the cause of action and facts of *White* are different from the instant case, the rule of law and analysis concerning the "clearly established law" standard applies. Following the Court's mandate that "clearly established law must be 'particularized' to the facts of the case," and analyzing the allegations of the Complaint, none of the defendants violated clearly established law.

The Eighth Circuit has applied these same standards to ASU administrators. *Sutton v. Bailey*, 702 F.3d 444 (8th Cir. 2012). "For these purposes, a right is 'clearly established' if the 'contours of the right [are] sufficiently clear that a reasonable official would understand what he is doing violates that right.' . . . Qualified immunity 'depends upon the objective reasonableness of [the alleged misconduct] as measured by reference to clearly established law.'" *Id.* It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 449. The mere possibility that a policy might be unconstitutional is not enough to deny a government official qualified immunity. *Id.*

In *Sutton*, a fired professor sued two ASU administrators claiming that ASU's faculty grievance procedure was constitutionally inadequate. *Id.* at 446. The Eighth Circuit held that the administrators were entitled to qualified immunity because it was reasonable for them to assume that the grievance procedures would comply with the minimum post-termination procedures

mandated by the Due Process Clause.  *Id.* at 449.  The grievance procedure had never been held unconstitutional, and the administrators acted reasonably in light of existing court decisions.  *Id.*  The same conclusion is warranted here because *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006) confirmed the constitutionality of these same provisions years before the events of this case.  As demonstrated below, the ASU defendants did not violate clearly established First or Fourteenth Amendment law.

<strong>A.  <u>Clearly established First Amendment law allows the reasonable time, place, and manner requirements outlined in ASU's Freedom of Expression Policy.</u></strong>

<strong>1.  <u>Forum analysis.</u></strong>

The Eighth Circuit uses a forum analysis for evaluating restrictions of speech on government property, including the campus of a public university.  *Bowman v. White*, 444 F.3d 967, 974 (8th Cir. 2006).  That is, the level and extent of permissible restriction depends on the character of the property at issue.  *Id.*  There are three main types of forum: traditional public forum; designated public forum; and nonpublic forum.  *Id.*  Once a court assigns a forum designation to the property at issue, the court then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster.  *Id.*

- A traditional public forum is a type of property that (1) has the physical characteristics of a public thoroughfare, (2) has the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, and (3) has historically and traditionally been used for expressive conduct.  *Id.* at 975.

- A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain topics.  *Id.*  The government does not create a designated public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse.  *Id.*

  - A designated public forum can be classified as either "limited" or "unlimited."  *Id.* at 976.  A "limited" designated public forum exists where

the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects. *Id.* An "unlimited" designated public forum is a forum designated for expressive conduct by the government but not limited to a particular type of speech or speaker. *Id.*

- A nonpublic forum is government property which is not classified as a traditional public forum or designated public forum. *Id.*

In the public university context, a modern university's grounds—which include offices, classrooms, laboratories, academic medical centers, concert halls, large sports stadiums and arenas, and open spaces—generally cannot be labeled as only one type of forum. *Id.* at 976. In *Bowman*, the Eighth Circuit limited its analysis only to the specific areas at issue in that case. *Id.* at 977. Here, plaintiffs state that they "desire to engage in protected expression <u>on campus</u>— including oral communication and literature distribution—<u>outside of the speech zones</u> without obtaining prior permission of the University . . . " and "<u>in the open, outdoor, generally accessible areas on campus</u> without obtaining prior permission of the University and <u>without being limited to the specific areas designated by the school</u>." (Doc. 1 at, 13) (emphasis added). Thus, this Court's analysis should be limited to the open, outdoor, generally accessible areas on ASU's campus that are outside the designated free expression areas.[2]

Plaintiffs allege that the areas at issue here "are designated—if not traditional—public forums." (Doc. 1, at 15 ¶140)  Even treating this allegation as true, for purposes of this motion, does not distinguish this case from *Bowman*.  The majority opinion in *Bowman* found the subject areas on the University of Arkansas campus to be unlimited designated public forums, and Judge

---

[2] The analysis differs as to the designated free expression areas themselves, because ASU has specifically designated those spaces as areas that may be used for speeches, demonstrations, and other forms of public expression, and placed fewer restrictions on their use.  (Doc. 1-2; Doc. 1-3)  However, plaintiffs expressly state in the Complaint that they want unrestricted use of the space *outside* the free expression areas.  (Doc. 1, at 13)  Therefore, for purposes of this motion, the analysis is limited by plaintiffs' requested relief.

Bye in his concurring opinion thought the areas were traditional public forums. *Bowman v. White*, 444 F.3d 967, 979 & 983 (8th Cir. 2006). The whole panel, however, found the same restrictions at issue here to be constitutional under either forum designation. *Id.* In this circumstance and under either forum designation, ASU's Policy passes constitutional muster.

### 2. ASU's Freedom of Expression Policy complies with the requirements of the First Amendment, both facially and as applied to plaintiffs.

The Policy is constitutional because it is content neutral, its requirements are necessary to serve significant government interests, and it is narrowly drawn to achieve those interests.

"In an unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest." *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006).

There is no question the Policy is content and viewpoint neutral:

> [S]uch opportunities must be provided on an equal basis and adhere to the basic principle that the university will remain neutral as to the content of any public demonstration.
>
> . . .
>
> Should any individual or group desire the use of other areas of campus [outside the free expression areas] and other times for speeches and demonstrations, a request must be made to the Vice Chancellor for Student Affairs, his/her designee, or the Director of Student Development and Leadership at least 72 hours in advance of the event. Such plans will be considered in accordance with the principle of content neutrality.
>
> . . .
>
> The university maintains a position of neutrality as to the content of any written material distributed on the campus under this policy.

-13-

(Doc. 1-3, at 2-3) (emphasis added).  As the U.S. Supreme Court put it, the Policy "is not a 'regulation of speech.'  Rather, it is a regulation of the places where some speech may occur." *Hill v. Colorado*, 530 U.S. 703, 719 (2000).  Moreover, plaintiffs do not allege any facts to support a plausible claim that the Policy was applied in any way other than neutrally.  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.  *Ball v. City of Lincoln, Neb.*, 870 F.3d 722, 736 (8th Cir. 2017) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)).  Plaintiffs readily acknowledge that they were asked to move their table not because of the content of what they were saying, but rather because they did not make a request to reserve space or get prior approval to set up where they were. (Doc. 1, at 12-13)

The real issue raised by the Complaint is whether the relevant requirements of the Policy are narrowly drawn to achieve a significant government interest.  As noted above, plaintiffs challenge the following aspects of the Policy for campus locations outside the identified free expression areas: (a) the Policy requires prior approval (Doc. 1, at 16-17 ¶¶145-148); (b) the request must be made at least 72 hours before the event (Doc. 1, at 17 ¶154); and (c) the Policy gives discretion to university administrators in evaluating and approving a request (Doc. 1, at 18 ¶¶158-163).  Each of these aspects was considered previously by the Eighth Circuit, and approved as constitutional.  *Bowman v. White*, 444 F.3d 967, 980-82 (8th Cir. 2006).

The *Bowman* court recognized three significant government interests applicable to a public university in Arkansas: (1) protecting the educational experience of students in furtherance of the University's educational mission; (2) ensuring public safety; and (3) fostering a diversity of uses for University resources.  *Id.* at 980.  These same interests apply equally to ASU and are stated in ASU's Policy.  (Doc. 1-3, at 2)

A regulation is narrowly tailored when it furthers a significant government interest that would be achieved less effectively without the regulation. *Bowman*, 444 F.3d at 980. The statute does not, however, need to be the least restrictive means of regulation possible. *Id.* Thus, the Court should analyze whether each of the time, place, and manner restrictions are sufficiently narrowly tailored to meet one or more of ASU's significant government interests. And as evidenced below, ASU's time, place, and manner restrictions are narrowly tailored to serve each of its significant government interests.

### a.  Prior approval, and non-content based discretion.

The *Bowman* court held that a non-content-based discretionary permit requirement for use of University property for free expression purposes was narrowly tailored to serve several significant government interests, even though the court considered the requirement a "prior restraint" on speech. *Id.* at 980-81. A permit requirement may be imposed if it does not delegate overly broad licensing discretion to a government official, is content-neutral, is narrowly tailored to the University's significant governmental interests, and leaves ample alternative channels for communication. *Id.* at 980.

University of Arkansas' policy did not delegate overly broad discretion to its officials, nor did it allow the denial or revocation of a permit on the basis of content. *Id.* The policy allowed the University the right to deny or revoke a permit for use of campus space only for limited reasons, such as interference with the educational activities of the institution. *Id.* at 981. Further, the *Bowman* court ruled that the permit requirement was justified to coordinate multiple uses of limited space, assure preservation of the campus, prevent uses that are dangerous to students and other people, and to assure financial accountability for damage caused by events. *Id.* In summary, the court found that "although the Policy admittedly does burden Bowman's speech by requiring him

to plan sufficiently in advance to obtain a permit, it is not overly burdensome so as to make the permit requirement unconstitutional." *Id.*

ASU's Policy is the same, if not less restrictive.  (Doc. 1-3, at 3-4)  *See supra* Section I. The Policy does not delegate overly broad discretion to its officials, nor does it allow the denial or revocation of a permit on the basis of content.  (Doc. 1-3, at 2-4)  The Policy limits an official's ability and authority to place limitations on the time, place, and manner of covered speech to the following reasons: to serve the interests of health and safety; to prevent disruption of the process; and to protect against invading the rights of others.  (Doc. 1-3, at 3)  The Policy then lists eight (8) separate considerations to guide an official's decision-making process, including obstruction of entrances and exits, interference with education activities, impediments to normal pedestrian traffic, sound amplification, and compliance with state and federal laws.  (Doc. 1-3, at 3-4)  This rubric gives clear guidance to ASU officials.

As noted, plaintiffs never attempted to secure approval to set up their table and thus never gave any ASU administrator the opportunity to exercise discretion.  Even if they were not obstructing pedestrian traffic or blocking the doors to the Student Union, that allegation has no bearing on this analysis because plaintiffs are attacking the Policy itself, not the actual exercise of discretion under the Policy.  Regardless, the Eighth Circuit in *Bowman* has specifically held that a university can require permission before allowing use of university facilities on campus.

Further, the same significant governmental interests for the University of Arkansas are applicable to ASU.  ASU's Policy specifically lists the reasons for its regulations: equal opportunity for all persons can be assured; order within the university community can be preserved; university property can be protected; and a secure environment for individuals to exercise freedom of expression can be provided.  (Doc. 1-2, at 2)  As *Bowman* confirms, the

requirement of obtaining prior approval for use of campus property is narrowly tailored to serve these interests and it leaves open ample alternative channels for communication.  *Bowman v. White*, 444 F.3d 967, 980-81 (8th Cir. 2006).  Such a requirement furthers these interests, which would be achieved less effectively without the regulation.  *Id.*  Thus, the requirement of prior approval is constitutional and does not burden substantially more speech than necessary to further these interests.

### b.    Seventy-two hour notice requirement.

Again, *Bowman* specifically held that a three-day notice requirement was sufficiently narrowly tailored and thus constitutionally permissible.  *Id.* at 982.  The plaintiff in *Bowman* argued that the advance notice requirement "effectively bar[red] him from engaging in constitutionally protected spontaneous speech."  *Id.*  The University asserted that the notice requirement was necessary to plan for exigencies such as crowd control and insurance requirements.  *Id.*  In approving the advance notice requirement, the court recognized that a university is less able than a city or other entity with police powers to deal with a significant disruption on short notice.  *Id.*

Plaintiffs here make the same arguments that were rejected in *Bowman*.  They claim to want to engage in spontaneous speech.  (Doc. 1, at 13)  However, ASU's concerns are the same as expressed in *Bowman*: to determine what, if any security, crowd control, or additional insurance will be required for any event.  Consistent with *Bowman*, a requirement of 72-hours notice is narrowly tailored to serve ASU's significant government interests.

Binding case law is clear that nothing in ASU's Policy violates the First Amendment or constitutes an unconstitutional restriction on free speech.

**B.**     **ASU's Freedom of Expression Policy complies with the due process requirements of the Fourteenth Amendment.**

ASU's Policy does not violate the Fourteenth Amendment either.  The Policy provides specific and clear guidance to administrators and students alike.  A common sense reading of the Policy is all that is required to gain an understanding of its terms.

Plaintiffs allege that the Policy violates the due process requirements of the Fourteenth Amendment in two respects: (1) allegedly no criteria to guide administrators in deciding whether to grant, deny, or otherwise place conditions on covered speech; and (2) the terms "speaking, demonstrating, and other forms of expression" are vague and undefined.  (Doc. 1, at 20).  However, plaintiffs are simply wrong.  The Policy contains a specific rubric and lengthy set of factors to guide ASU administrators in considering requests.  (Doc. 1-3, at 3-4)  Additionally, plaintiffs cherry-pick the phrase "speaking, demonstrating, and other forms of expression" out of the Policy section titled "Speeches and Demonstrations."  (Doc. 1-3, at 2)  When read in context within that section, the phrase is not vague or ambiguous; rather, it clearly addresses speeches and demonstrations, not one-on-one or casual conversations.

**1.**     **ASU's Policy provides specific guidance to administrators.**

The Policy gives clear and objective guidance to ASU administrators when considering a request for use of space outside the free expression areas.  (Doc. 1-3, at 3-4)  A regulation need only "contain adequate standards to guide the official's decision . . . ." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).  Even when enforcement of the regulation requires the exercise of some degree of judgment, confined by the language of the regulation, that degree of judgment is permissible. *Grayned v. City of Rockford*, 408 U.S. 104 (1972).

Further, in the higher education context, the Eighth Circuit has recognized that "a school has inherent authority to maintain order and to discipline students." *Esteban v. Cent. Missouri*

*State College*, 415 F.2d 1077, 1088 (8th Cir. 1969) (citations omitted).  Further, "a school has latitude and discretion in its formulation of rules and regulations and of general standards of conduct." *Id.* (citations omitted).

> College attendance, whether it be a right or a privilege, very definitely entails responsibility.  This is fundamental.  It rests upon the fact that the student is approaching maturity.  His elementary and secondary education is behind him.  He already knows, or should know, the basics of decent conduct, of nonviolence, and of respect for the rights of others. . . .
>
> . . . The mass denial of rights of others is irresponsible and childish.  So is the defiance of proper college administrative authority ("I have the right to be here"; "I refuse to identify myself"; gutter abuse of an official . . .)  One might expect this from the spoiled child of tender years.  One rightly does not expect it from the college student who has had two decades of life and who, in theory, is close to being "grown up."

*Id.*

The *Esteban* court ultimately held *inter alia*, that a college has the inherent power to promulgate rules and regulations; has the inherent power to properly discipline students; has the power to appropriately protect itself and its property; may expect its students to adhere to generally accepted standards of conduct; and "that, as to these, flexibility and elbow room are to be preferred over specificity." *Id.* at 1089.  "[S]chool regulations are not to be measured by the standards which prevail for the criminal law and criminal procedure; . . . the courts should interfere only where there is a clear case of constitutional infringement." *Id*. at 1089-90.

ASU's Policy contains a specific rubric with eight different factors.  (Doc. 1-3, at 3-4) Plaintiffs allege that the Policy contains "no criteria" to guide administrators, but that is simply wrong.  The mere fact that ASU's Policy allows administrators some degree of discretion, confined by the terms of the Policy, does not render the Policy constitutionally infirm.  The Policy

appropriately confines the exercise of any judgment or discretion to the factors listed.

Accordingly, the Policy does not give administrators "unbridled" or "unlimited" discretion.

### 2.     The Policy is not vague or ambiguous.

A common sense reading of the Policy, in context, is all that is needed to understand it.

"The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth

amendments."  *Stephenson v. Davenport Community School Dist.*, 110 F.3d 1303, 1308 (8th Cir.

1997) (citation omitted).  A regulation can be void-for-vagueness in two ways.  First, "a regulation

is void-for-vagueness if it 'forbids or requires the doing of an act in terms so vague that [persons]

of common intelligence must necessary guess at its meaning and differ as to its application . . . .'"

*Id.*  Second, the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement

that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution

on an ad hoc and subjective basis."  *Id.*

The terms "speaking, demonstrating, and other forms of expression" are not vague or

ambiguous.  In determining whether a regulation is unconstitutionally vague, "courts have

traditionally relied on the common usage of statutory language, judicial explanations of its

meaning, and previous applications of the statute to the same or similar conduct."  *Id.* at 1309.  In

the context of the Policy, the term "speaking" is clearly a variation of the word "Speeches" as it is

used in the title to that part of the Policy and two sentences earlier in the section.  (Doc. 1-3, at 2)

Common usage and understanding tells a reader that the making or giving of a speech does not

encompass casual, everyday conversation.  Further, citing Webster's Dictionary, the U.S. Supreme

Court specifically rejected plaintiffs' theory that the term "demonstrating" could be interpreted to

encompass innocuous, casual speech.  *Hill v. Colorado*, 530 U.S. 703, 721-22 (2000).  "The

regulation of such expressive activities, by definition, does not cover social, random, or other

everyday communications. See Webster's Third New International Dictionary 600, 1710 (1993) (defining "demonstrate" as "to make a public display of sentiment for or against a person or cause")." *Id.*

Plaintiffs attached posters to their table to promote TPUSA's mission "to educate students about the importance of fiscal responsibility, free markets, and limited government." (Doc. 1, at 3 ¶18, and at 12 ¶¶104-105) Clearly, plaintiffs were not engaging in random or social conversation. They were making a public display of sentiment for their cause and attempting to solicit support for their organization from passing students. This qualifies as "demonstrating" under *Hill v. Colorado*, 530 U.S. 703 (2000). It is objectively unreasonable and otherwise not plausible to consider the Policy unconstitutionally vague is this circumstance.

In light of the context of the Policy, a common sense reading, and binding case law, the Policy is not void-for-vagueness.

### 3.      ASU's policy is not overbroad.

The Supreme Court has noted that the overbreadth doctrine is "strong medicine" that should be employed only "with hesitation, and then 'only as a last resort.'" *Upper Midwest Booksellers v. City of Minneapolis*, 780 F.2d 1389, 1391 (8th Cir. 1985) (citing *New York v. Ferber*, 458 U.S. 747, 769, 102 S. Ct. 3348, 3361, 73 L. Ed. 2d 1113 (1982)). When conduct and speech are involved, the overbreadth must be "real" and "substantial" in relation to an ordinance's "plainly legitimate sweep" before the ordinance should be invalidated on its face. *Id.* A regulation relates to both conduct and speech when it regulates the manner in which certain speech may be disseminated. *Id.*

Plaintiffs claim that the Policy is overbroad because it "encompass[es] a substantial amount of constitutionally protected speech." (Doc. 1, at 17) However, the mere fact that a policy places

time, place, and manner restrictions on constitutionally protected speech does not render the policy overbroad. These restrictions are expressly allowed under certain circumstances. *Bowman v. White*, 444 F.3d 967, 980-82 (8th Cir. 2006). And as discussed above, the Policy cannot reasonably be read to regulate, restrict, or prohibit casual or everyday conversations. By its express terms, the Policy applies to speeches, demonstrations, distribution of written material, and marches. (Doc. 1-2, at 2-3; Doc. 1-3, at 2-3) The Policy is not unconstitutionally overbroad, and it does not violate the Fourteenth Amendment.

As shown, clearly established law supports the constitutionality of ASU's Policy. At the time of the underlying events, it was clearly established that a public university in Arkansas could require prior approval, 72-hours notice, and the exercise of content-neutral discretion when faced with a request for use of campus property. For this reason, all defendants are entitled to qualified immunity.

**VI.     <u>Plaintiffs have not and cannot state a plausible claim for relief.</u>**

The Court should dismiss this case pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure, because the Policy complies with all aspects of the U.S. Constitution. The Complaint fails to plead plausible claims of violation of the First Amendment or the Due Process Clause of the Fourteenth Amendment, which requires dismissal of all plaintiffs' claims, including their claims for prospective injunctive relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts

> that are "merely consistent with" a defendant's liability, it "stops
> short of the line between possibility and plausibility of 'entitlement
> to relief.'"

*Id.* 556 U.S. at 678.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'"  *Id.*  In other words, while "the pleading

standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more

than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Id.*

The majority of plaintiffs' Complaint is a formulaic recitation of the elements of causes of

action for violations of the First and Fourteenth Amendment.  The remainder of the Complaint

either contests the constitutionality of restrictions that the Eighth Circuit has expressly allowed, or

makes bald conclusions that directly contradict the Policy's express provisions.  As an example of

the latter deficiency, the Complaint incorrectly and repeatedly claims that the Policy limits all

speech to the free expression areas.  (Doc. 1, at 2 ¶3, at 9 ¶78, at 10 ¶85, at 16 ¶144, at 17 ¶154)

This allegation is incorrect, as the Complaint states that "if students want to engage in expressive

activity outside of the speech zones they must obtain permission from the vice chancellor for

student affairs at least 72 hours in advance of the event."  (Doc. 1, at 8 ¶74)

Thus, plaintiffs know that the Policy provides a specific protocol for reserving space

outside the free expression areas, and their repeated statements to the contrary should be

disregarded.  When a district court is faced with a Rule 12(b)(6) motion to dismiss for failure to

plead a plausible claim, the court may properly look to the exhibits to determine the viability of

the complaint's allegations.  *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010).  The

court may also reject a plaintiff's characterization of an exhibit in determining whether she has

stated a plausible claim.  *Id.*  In *Brown*, the court stated, "While we recognize that we must accept

as true a plaintiff's factual allegations for the purpose of analyzing a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff is the master of his own complaint, and we are not required, even at this preliminary stage, to draw unreasonable inferences from documents the plaintiff makes part of the complaint." *Id.*

The same conclusion applies to plaintiffs' contradictory statements about the claimed lack of factors to guide an administrator's discretion (Doc. 1, at 2 ¶4, at 9 ¶82, at 10 ¶84, at 10 ¶88, at 11 ¶¶91-92, at 18-19 ¶¶158-165, at 20 ¶173), and plaintiffs' claim that the Policy is not content-neutral on its face (Doc. 1, at 2 ¶4, at 18 ¶¶158 & 162, at 19 ¶165). Those conclusory statements directly contradict the provisions of the Policy. Thus, the Court should disregard and reject those parts of the Complaint, pursuant to *Brown v. Medtronic, Inc.*, 628 F.3d 451 (8th Cir. 2010).

When the Court chips away those parts of the Complaint that are not entitled to the assumption of truth, all that remains are positions that have been squarely rejected by the Eighth Circuit. *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006). A public university in Arkansas may properly require permission and 72-hours notice of a person's desire to use campus property for a demonstration or other form of public expression. *Id.* at 980-82. The provisions of the Policy are clear when read in context, and they do not grant ASU administrators "unbridled" or "unlimited" discretion when evaluating requests for use of campus property. The Policy contains a specific and detailed rubric to guide administrators' decisions. (Doc. 1-3, at 3-4) For these reasons, the Complaint fails to plead facts sufficient to state a plausible claim for relief of any kind, whether prospective injunctive relief or money damages. Accordingly, the Complaint should be dismissed with prejudice.

Separate and apart from the above deficiencies, none of the individual defendants had any personal involvement in the events underlying plaintiffs' claims, and accordingly, the claims

against them should be dismissed.  To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).  *Respondeat superior* has no application in § 1983 actions.  *Id.*  "[A] plaintiff must plead that each Government official defendant, through the official's own actions, has violated the Constitution."  *Id.*  General supervisory authority over operations is insufficient to establish personal involvement.  *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007).

Plaintiffs fail to plead that any defendant was personally involved in the alleged events. Plaintiffs admittedly did not submit a request to Ms. Spack or any other defendant, and so no defendant has ever affirmatively acted to deny plaintiffs any right.  While plaintiffs do make conclusory allegations about the general roles of defendants, general supervisory authority is not sufficient to plead personal involvement.

**VII.   Conclusion.**

ASU's Freedom of Expression Policy fully complies with the First and Fourteenth Amendments to the U.S. Constitution.  It strikes the correct balance between furthering the rights of free speech and preserving ASU's mission of education.  Additionally, plaintiffs' claims are barred by sovereign immunity and qualified immunity, and plaintiffs lack constitutional standing. Accordingly, the Complaint should be dismissed.

Respectfully submitted,

Delena C. Hurst (2007089)
dhurst@asusystem.edu
Associate General Counsel
Arkansas State University System
501 Woodlane Dr., #600
Little Rock, AR 72201
Ph: (501) 660-1009

-and-

Rodney P. Moore (96134)
rpmoore@wlj.com
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Ph: (501) 371-0808

-and-

Jeffrey W. Puryear (93109)
jpuryear@wpmfirm.com
Ryan M. Wilson (2008206)
rwilson@wpmfirm.com
WOMACK PHELPS
PURYEAR MAYFIELD & McNEIL, P.A.
P.O. Box 3077
Jonesboro, AR 72403
Ph: (870) 932-0900


By:___/s/ Ryan M. Wilson_____
        *Attorneys for defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of February, 2018, I electronically filed the foregoing with the clerk of the Court by using the CM/ECF system, which will send electronic notice to the following counsel of record:


Ethan C. Nobles
NOBLES LAW FIRM
149 S. Market
Benton, AR 72015
ethan@NoblesLawFirm.com

Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
tlanghofer@adflegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
dcortman@adflegal.org
*Attorneys for plaintiffs*

                                            __/s/ Ryan M. Wilson_____
                                            Ryan M. Wilson