

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB **0 4** 2019

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**TURNING POINT USA AT ARKANSAS
STATE UNIVERSITY**, *et al.*,

        Plaintiffs,

   v.

**RON RHODES**, *et al.*,

        Defendants.

Case No. 3:17-cv-00327-JLH

**MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF
PLAINTIFFS BY PEACE AND LOVE; THE FOUNDATION FOR INDIVIDUAL
RIGHTS IN EDUCATION; THE AMERICAN CIVIL LIBERTIES UNION; AND THE
AMERICAN CIVIL LIBERTIES UNION OF ARKANSAS**

Peace and Love, the Foundation for Individual Rights in Education, the American Civil

Liberties Union, and the American Civil Liberties Union of Arkansas (collectively, "Amici"), by

and through counsel, move this Court to grant them leave to file an amici curiae brief in support

of Plaintiffs Turning Point USA at Arkansas State University's and Ashlyn Hoggard's

(collectively, "Plaintiffs'") Motion for Summary Judgment.

    1.    In support of their Motion, Amici file simultaneously herewith a Brief in Support

of this Motion and a copy of their proposed amici curiae brief attached hereto as Exhibit A.

    2.    Plaintiffs consent to the filing of the proposed amici curiae brief.

WHEREFORE, Amici move this Court for an Order permitting them to file the attached

amici curiae brief in support of Plaintiffs' Motion for Summary Judgment.

Dated: February 4, 2019

Respectfully submitted,

*Holly Dickson*

Holly Dickson, Bar No. 98137
THE ARKANSAS CIVIL LIBERTIES
UNION FOUNDATION, INC.
904 West Second Street, Suite 1
Little Rock, Arkansas 72201
(501) 374-2842
holly@acluarkansas.org

*Counsel for Amici Peace and Love, the*
*Foundation for Individual Rights in*
*Education, the American Civil Liberties*
*Union, and the American Civil Liberties*
*Union of Arkansas*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2019, a true and correct copy of the foregoing

was filed in paper with the Court and that I am causing to be served by electronic mail a true and

correct copy of the foregoing to each party's counsel of record.

*Holly Dickson*

Holly Dickson

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
ARKANSAS JONESBORO DIVISION**

**TURNING POINT USA AT ARKANSAS
STATE UNIVERSITY,** *et al.,*

          Plaintiffs,

    v.

**RON RHODES,** *et al.,*

          Defendants.

Case No. 3:17-cv-00327-JLH

**BRIEF OF AMICI CURIAE
PEACE AND LOVE, THE
FOUNDATION FOR INDIVIDUAL
RIGHTS IN EDUCATION, THE
AMERICAN CIVIL LIBERTIES
UNION, AND THE AMERICAN CIVIL
LIBERTIES UNION OF ARKANSAS IN
SUPPORT OF PLAINTIFFS**



**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, counsel for amici curiae Peace and Love, the Foundation for Individual Rights in Education, the American Civil Liberties Union, and the American Civil Liberties Union of Arkansas certifies that amici are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in amici curiae.

## INTERESTS OF AMICI[1]

Amicus Peace and Love is a registered student organization at Arkansas State University. Peace and Love is dedicated to acting out of love and aiming for peace in order to have young people come together, put their differences aside, and become the generation that unites people from all walks of life and from all different upbringings. Peace and Love aims to spread peace and love by reaching people through random acts of kindness on ASU's campus. Freedom of expression on campus is therefore integral to Peace and Love's mission. Due to the Freedom of Expression Policy at issue in this case, Peace and Love has had trouble getting tables in time to promote events and has been prevented from speaking in the areas of campus where they could best spread the word about past and future events.

Amicus the Foundation for Individual Rights in Education ("FIRE") is a nonpartisan, nonprofit organization dedicated to promoting and protecting civil liberties at our nation's institutions of higher education. Since 1999, FIRE has worked to protect student First Amendment rights at campuses nationwide. FIRE believes that to best prepare students for success in our democracy, the law must remain unequivocally on the side of robust free speech rights on campus. FIRE coordinates and engages in targeted litigation to ensure that student First Amendment rights are vindicated when violated at public institutions.

Amicus the American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with over 2 million members, dedicated to defending the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. For nearly a century, the ACLU has been at the forefront of efforts nationwide to protect the full array of civil

---

[1] Counsel for *amici curiae* certify that no counsel for a party authored this brief in whole or in part, and that no person other than amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

rights and civil liberties, including the freedom of speech. The American Civil Liberties Union of Arkansas (ACLU of Arkansas) is a state affiliate of the national ACLU. The ACLU and ACLU of Arkansas have appeared before this Court and others in free speech cases, both as direct counsel and as amicus curiae.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................... i

INTERESTS OF AMICI................................................................................................ ii

SUMMARY OF THE ARGUMENT ............................................................................ 1

FACTUAL BACKGROUND........................................................................................ 4

ARGUMENT ............................................................................................................... 7

I.    Defendants' Policy Unconstitutionally Restricts Speech in Traditional Public Forums and Constitutes an Unconstitutional Prior Restraint. ................................................................. 7

    A.    Freedom of expression is central to the role of a university. ................................. 7

    B.    The generally accessible areas of campus are traditional public forums............... 8

    C.    The ASU Policy creates a prior restraint on protected speech and is not a constitutional permitting scheme. .......................................................... 10

        1.    Permit requirements without objective criteria to cabin administrative decision-making will not survive constitutional scrutiny. ........................ 11

        2.    Blanket prior notice or permit policies covering all expressive activity anywhere on campus are not narrowly tailored. ....................................... 15

            a.    The ASU Policy is not narrowly tailored because it requires individuals and small groups to seek approval before speaking... 15

            b.    The ASU Policy is not narrowly tailored because it requires speakers to seek approval prior to engaging in any expression anywhere on campus................................................................... 16

            c.    The ASU Policy is not narrowly tailored because it prevents speech in response to breaking news. ........................................... 19

        3.    Blanket prior notice or permit policies covering all expressive activity anywhere on campus do not provide adequate alternative channels of communication............................................................................................. 20

    D.    Bowman does not change this analysis................................................................. 21

II.    Conclusion ........................................................................................................... 24

## SUMMARY OF THE ARGUMENT

Arkansas State University ("ASU")'s "Freedom of Expression Policy" (hereinafter, "Policy" or "ASU Policy") restricts the exercise of freedom of expression by any person on its campus. Under the Policy, some forms of expression, like distributing leaflets or tabling, can occur only in specific "Free Expression Areas" of campus. Even there, individuals must schedule their speech with the university before engaging in it. To speak anywhere else on campus, speakers must seek university approval at least three days in advance. And the policy fails to impose any deadline by which ASU must respond to such requests, or to clearly define or limit the standards by which ASU can grant or deny them.

This significantly burdens all speech on all parts of ASU's grounds. Such a policy is intolerable on a public campus, where free expression has long been recognized as essential to a democratic society. Universities have a responsibility to provide students with "wide exposure to that robust exchange of ideas," *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967), and public campuses have been central loci for both student and public protest for decades.

Given this history, public spaces on campus—like sidewalks, parks, quads, and plazas—are traditional public forums for free expression, or, at minimum under Eighth Circuit law, designated unlimited public forums. *Bowman v. White*, 444 F.3d 967, 983 (8th Cir. 2006). ASU attempts to avoid the constitutional standards applicable to a public forum by labeling its campus "non-public" by fiat of policy. But, as this Court has recognized, it is the nature the campus spaces and their historical uses—not ASU's fiat—that must control. Mot. to Dismiss Opinion and Order at 4 [ECF No. 20] (hereinafter, "Opinion and Order").

In such public forums, a government actor cannot issue a blanket prohibition against certain forms of speech, like tabling and leafletting. Nor can a government actor require all

1

speakers to seek prior permission from administrators to speak in these forums unless it provides objective, content-neutral criteria that are narrowly tailored to serve a significant government interest and leave open ample alternative means of communication. By instead requiring all speakers to seek approval before speaking anywhere on campus, the Policy imposes a prior restraint on speech that fails First Amendment scrutiny on several grounds.

First, the Policy lacks finite standards to cabin the discretion of administrators tasked with determining when and under what circumstances permission to use campus grounds will be granted. Permit or licensing schemes without narrow, objective, and definite standards are facially unconstitutional because they fail to give individuals notice of what is prohibited, cannot clearly guide the government decision-maker, and inevitably invite viewpoint discrimination. *See Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

Second, the First Amendment requires that reasonable time, place, or manner restrictions on speech in public forums be narrowly tailored to significant government interests. *Bowman*, 444 F.3d at 980. ASU's permit requirements inside and outside the Free Expression Areas cannot meet this standard because they apply to individuals, small groups, and large groups and significantly burden all speech everywhere on campus, without any differentiation or attempt at tailoring. In addition, the Policy fails to provide any opportunities for spontaneous speech in response to breaking news events.

Finally, a reasonable time, place, or manner restriction must leave open ample alternative channels of communication. *Id*. Because the Policy applies to all areas of campus, it does no such thing. In particular, students wishing to demonstrate in response to unfolding events must leave their own campus to do so.

Contrary to Defendants' argument, the Policy is not constitutional under the Eighth Circuit's decision in *Bowman*. In that case, the court of appeals upheld the application of a policy—which had clearly-defined standards to guide administrators' approval or denial of permits—to a non-student itinerant preacher's large events on campus. The facts are a far cry from Plaintiffs' challenge to a facially infirm permit policy applied to halt one student and one guest from soliciting signatures from individual passersby. The First Amendment does not allow such a broad and all-encompassing exercise of governmental control.

## FACTUAL BACKGROUND

ASU's Freedom of Expression Policy applies to "faculty, staff, students, student

organizations, and visitors," Arkansas State University, Freedom of Expression (Mar. 13, 2017),

Compl. Ex. 3 [ECF No. 1-3] (hereinafter, "ASU Policy"), and, as this Court has already found,

"governs first amendment expression on all of campus." Opinion and Order at 1.

The ASU Policy designates a handful of lawns, a plaza, and an amphitheater as "Free

Expression Areas," which it describes as "generally available" for all "speeches and

demonstrations" on Monday to Friday from 8:00am to 9:00pm. ASU Policy at 1. Use of a Free

Expression Area "for speaking, demonstrating and other forms of expression will be scheduled

through the Director of Student Development and Leadership." *Id.* Therefore, to speak in a

designated Area during the designated times, people "must request permission to use it in

advance" from the school administration. Opinion and Order at 1. However, the ASU Policy

includes no explanation or standards by which such requests are approved, rejected, or

scheduled. ASU Policy at 1–2.

Individuals or groups wishing to use another area of campus—or to engage in expressive

activity that may obstruct traffic or use amplified sound in a Free Speech Area, or to use such an

Area at all before 8 AM or after 9 PM on weekdays or on weekend—must seek approval at least

72 hours in advance through specified administrative offices. Though the ASU Policy states that

"[s]uch plans will be considered in accordance with the principle of content neutrality," it does

not offer the standards by which such requests will be evaluated. *Id.* at 1.

The ASU Policy includes a set of "provisions" or "stipulations" that "will be used to

evaluate any plan requiring approval," but the list is not exhaustive. The first two require

approval 72 hours in advance for events that may obstruct traffic or use sound amplification; the

next four require that there be no "obstruction of entrances or exits to buildings," "interference

4

with educational activities," "impediment to . . . traffic or other disruptions of university

activities," or "interference with scheduled university ceremonies, events or activities;" and the

final two require those who engage in a "Freedom of Expression event [to] remove all resulting

structures, signs and litter" and comply with applicable state, federal, and university laws and

policies. In addition to those requirements, the ASU Policy also states, without elaboration, that

speech may be limited "in order to serve the interests of health and safety, prevent disruption of

the process, and protect against invading the rights of others." *Id.* at 2.

Finally, certain expressive activities are never allowed outside of the Areas. Use of a

table or stand is expressly limited to Free Expression Areas with the permission of the Director

of Student Development and Leadership. *Id.* The ASU Policy is silent as to whether there are

different selection criteria or scheduling processes for this use as compared with speaking,

demonstrating, or "other" forms of expression. Distributing written material on a person-to-

person basis may also only occur in an Area, or within another set of specified locations,

including several other plazas and greens, but still excluding many central, public areas of

campus. *Id.*

All told, the ASU Policy requires anyone engaging in virtually any form of speech or

expressive activity on the vast majority of the university's campus to obtain a permit 72 hours

ahead of time, or to request permission an unspecified amount of time in advance to express

themselves in the small percentage of campus comprising the Free Speech Areas. Compl. ¶ 79

[ECF No. 1]. The ASU Policy does not define how those requests will be approved, rejected, or

scheduled, nor does it require the university to "respond to requests to use free speech areas or

other areas within a certain time frame or even at all." Opinion and Order at 2.

The ASU Policy restricts the speech of student groups like Amicus Peace and Love. The group's mission is to "act[ ] out of love and aim[ ] for peace" in order to have young people "come together, put our differences aside, and become the generation that unites people from all walks of life and from all different upbringings." *About Us*, PEACE & LOVE, https://wearepeaceandlove.org/about/ (last visited Feb. 1, 2019). On ASU's campus, student members aim to spread peace and love by reaching people through random acts of kindness on campus. *Registered Student Organizations*, ARKANSAS STATE UNIV., https://www.astate.edu/rso/ (last visited Feb. 1, 2019). This requires the ability to engage in expression around campus, but the group's efforts have been inhibited by the ASU Policy. The student group has had trouble getting tables in time to promote events and has been prevented from speaking in areas where they could best spread the word about past and future events, including an annual fashion show event to promote and raise money for the Salvation Army.

## ARGUMENT

I.  **Defendants' Policy Unconstitutionally Restricts Speech in Traditional Public Forums and Constitutes an Unconstitutional Prior Restraint.**

A.  **Freedom of expression is central to the role of a university.**

The educational mission of colleges and universities depends on the freedom of speech on campus, and courts have recognized the special role that college campuses play in the health of our democratic society. "The essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. State of N.H.*, 354 U.S. 234, 250 (1957). "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603 (internal quotation and alterations omitted). Indeed, college campuses often function as laboratories for ideas that later have impact on greater society, and "[t]he quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 836 (1995) (internal citations omitted).

Thus, on college and university campuses, "the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition" and the "danger . . . to speech from the chilling of individual thought and expression" is "especially real in the University setting." *Id.* at 835. Therefore, on college campuses, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian*, 385 U.S. at 603; *see also McCauley v. Univ. of the V.I.*, 618 F.3d 232, 243 (3d Cir. 2010) ("Our public universities require great latitude in expression and inquiry to flourish...").

7

Student speech, including campus protest, has been the lifeblood of college campuses for decades. "[I]n times of great national discussion, such as during the height of the Vietnam War or the debate over the war in Iraq, college campuses serve as a stage for societal debate." *Bowman*, 444 F.3d at 979. From the 1960s through the 1980s, college students staged historic protests to support civil rights and oppose apartheid in South Africa. Today, in addition to other free speech activity, student protesters seek to advocate for Palestinian rights and to call on colleges to remove the names of slave-owners and segregationists from campus buildings.

Non-student speech on campus is also powerful. "Often those speaking on college campuses are not enrolled students, but rather people . . . who travel from campus to campus to spread their message. Thus, public university campuses historically contain places where space is specifically designated by society and universities themselves for speech." *Id.* at 979. Indeed, "there is no forum more appropriately considered a 'marketplace of ideas' and historically used by all members of the public to present both socially acceptable and unacceptable speech than a street, sidewalk, or park found on a public university campus." *Id.* at 988 (Bye, J., concurring).

**B.     The generally accessible areas of campus are traditional public forums.**

"[F]rom ancient times," the use of public spaces for "assembly, communicating thoughts between citizens, and discussing public questions" has "been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The precise limitations on the state depend on the nature of the forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). Traditional public forums—places that have historically been devoted to or

8

used for public discourse, including streets, sidewalks, and parks—are at the most speech-protective "end of the spectrum." *Perry*, 460 U.S. at 45 (citing *Hague*, 307 U.S. at 515).

These spaces are critical to the development of public discourse and the functioning of democracy—and this is no less true on university campuses. "[T]he precedents of [the Supreme] Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972); *see also Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973); *Minn. State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 293 (1984) (Marshall, J., concurring).

Given the historical importance of campus protest and the role free expression plays in education, it is not surprising that courts considering campus areas that resemble public streets, sidewalks, and parks generally hold that they are traditional public forums, or at minimum designated public forums. *See Widmar v. Vincen*t, 454 U.S. 263, 267 n.5 (1981) ("the campus of a public university, at least for its students, possesses many of the characteristics of a public forum"); *Justice for All v. Faulkner*, 410 F.3d 760, 768–69 (5th Cir. 2005) (open outdoor areas of University of Texas at Austin found to be designated public fora); *Shaw v. Burke*, No. 17-cv-2386, 2018 U.S. Dist. LEXIS 7584, at *22 (C.D. Cal. Jan. 17, 2018) ("open, outdoor areas of universities . . . are public fora[,]" regardless of a college's regulations to the contrary); *Univ. of Cincinnati Chapter of Young Americans for Liberty v. Williams*, No. 12-cv-155, 2012 U.S. Dist. LEXIS 80967, at *29–30 (S.D. Ohio June 12, 2012) (open, outdoor areas of campus were designated public fora); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 861–62 (N.D. Tex. 2004) ("[T]o the extent [Texas Tech University] has park areas, sidewalks, streets, or other similar common areas, these areas are public forums, at least for the University's students, irrespective

9

of whether the University has so designated them or not. These areas comprise the irreducible public forums on the campus.").

Although the ASU Policy asserts that "the campus of Arkansas State University is not a public forum open for assembly and expression of free speech," ASU Policy at 1, that statement cannot unilaterally alter the realities of the campus "spaces and their historical uses," *see* Opinion and Order at 4. Indeed, under Eighth Circuit law, areas of campus that have the physical characteristics of public streets, sidewalks, and parks, and have traditionally been used for expressive conduct constitute traditional public forums, *Bowman*, 444 F.3d at 984 (Bye, J., concurring), or, at a minimum, designated unlimited public forums, *id*. at 979.[2] On ASU's campus, such areas include sidewalks, numerous plazas, and large grassy spaces, none of which are included in Defendants' list of "Freedom Expression Areas."

C.      **The ASU Policy creates a prior restraint on protected speech and is not a constitutional permitting scheme.**

A requirement that a person obtain a permit before speaking is a prior restraint on speech. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Prior restraints—that is, administrative procedures requiring a speaker to obtain a license or permit or to register before speaking—are highly disfavored and difficult to justify under well-established law. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.") (internal quotation marks and citations omitted). As the Supreme Court has observed:

> It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse

---

[2] Regulation of speech in traditional public forums and designated unlimited public forums is subject to the same constitutional limitations, discussed further in Section C. *See Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).

a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165–66 (2002). The ASU Policy's requirements that speakers seek permission to express themselves in the Free Expression Areas and that they obtain a permit 72 hours in advance of any expressive activity elsewhere on campus constitute prior restraints.

Even if a prior restraint on speech is content-neutral, it will pass constitutional muster only if it "does not delegate overly broad licensing discretion to a government official, … is narrowly tailored to the University's significant governmental interests, and leaves ample alternative channels for communication." *Bowman*, 444 F.3d at 980.

Like campus free speech zone policies struck down by other federal courts, the ASU Policy fails each prong of this test. Policies so severely restricting expression—requiring *any* speaker to obtain governmental permission before engaging in *any* speech *anywhere* on a public campus—do not pass constitutional muster. They delegate far too much discretion to administrative decision-makers; they are not narrowly tailored to any significant administrative interest; and they do not allow ample alternative channels of communication.

       1.    Permit requirements without objective criteria to cabin administrative decision-making will not survive constitutional scrutiny.

Permit requirements granting unbridled discretion to administrators violate the First Amendment. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150 (1969). A "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Id.* at 150–51. "A restriction on speech is constitutional only if certain principles are adhered to. Among these principles is a requirement that the restriction be specific enough that it does not delegate unbridled discretion to the government officials entrusted to enforce the regulation." *Lewis v.*

11

*Wilson*, 253 F.3d 1077, 1079 (8th Cir. 2001); *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1065

(9th Cir. 2011) ("[N]o court has held that a standardless policy passes muster.").

Permit requirements without clearly defined and limited standards make it all too easy for

the government decision maker to engage in viewpoint discrimination. *See Lakewood*, 486 U.S.

at 757 ("Standards provide the guideposts that check the licensor and allow courts quickly and

easily to determine whether the licensor is discriminating against disfavored speech.").

Indeed, as the Eighth Circuit has held, the risk of viewpoint discrimination "'is at its

zenith when the determination of who may speak and who may not is left to the unbridled

discretion of a government official.'" *Roach v. Stouffer*, 560 F.3d 860, 869 (8th Cir. 2009)

(quoting *Lakewood*, 486 U.S. at 763).[3] In *Steele v. City of Bemidji*, the Eighth Circuit struck

down a permitting scheme for precisely this reason: it vested government actors "with too much

discretion to discriminate against disfavored speech or unpopular speakers." 257 F.3d 902 (8th

Cir. 2001).

Similarly, the Seventh Circuit explained in *Southworth v. Board of Regents of the*

*University of Wisconsin System*:

> From the earliest unbridled discretion cases to *Thomas*, the Supreme Court has
> made clear that when a decisionmaker has unbridled discretion there are two
> risks: First, the risk of self-censorship, where the plaintiff may edit his own
> viewpoint or the content of his speech to avoid governmental censorship; and

---

[3] Whether Defendants applied the policy in a viewpoint- and content-neutral manner is irrelevant
to Plaintiffs' facial challenge because "[f]acial attacks on the discretion granted a decisionmaker
are not dependent on the facts surrounding any particular permit decision." *Forsyth*, 505 U.S. at
133 n.10; *see also Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) ("Proof of an abuse of power in
the particular case has never been deemed a requisite for attack on the constitutionality of a
statute purporting to license the dissemination of ideas"). What matters is not whether
Defendants have applied their policies in an unconstitutional manner, but "'whether there is
anything preventing [them] from doing so.'" *Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp.
2d 575, 584 (S.D. Tex. 2003) (quoting *Forsyth*, 505 U.S. at 133 n.10); *see also Roach*, 560 F.3d
at 869.

> second, the risk that the decisionmaker will use its unduly broad discretion to favor or disfavor speech based on its viewpoint or content, and that without standards to guide the official's decision an as-applied challenge will be ineffective to ferret out viewpoint discrimination. Both of these risks threaten viewpoint neutrality.

307 F.3d 566, 578–79 (7th Cir. 2002).

The *Southworth* court found an obvious link between unbridled discretion and the risk of viewpoint discrimination: "Given that the risks which the Supreme Court sought to protect against in adopting the unbridled discretion standard are risks to the constitutional mandate of viewpoint neutrality, we conclude that the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement." *Id.* at 579–80. *Cf. Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018) ("It is 'self-evident' that an indeterminate prohibition carries with it '[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation.'" (quoting *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 576 (1987)).

Courts have consistently held that college and university policies must have objective, content-neutral standards for limitations on speech. *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000) (remanding case to determine whether referendum process for allocating student activity fees was viewpoint-neutral); *see also Rosenberger*, 515 U.S. at 829 (striking down university policies). In *Shaw*, the court considered a permit policy for the use of the college's free speech zone that—just like the ASU Policy—required any student or campus visitor to get prior permission from an administrative office, but on its face failed to clearly set out the criteria and standards by which such permission was granted or withheld. 2018 U.S. Dist. LEXIS 7584, at *28–29. The court held that "to the extent Pierce's policy does not provide 'narrow[,][sic]

objective, and definite standards to guide the licensing authority,' it is invalid on its face. *Id.* at
\*29 (quoting *Forsyth*, 505 U.S. at 131).

Likewise, in *Pro-Life Cougars v. Univ. of Houston*, the court struck down a university
policy providing the University of Houston's Dean of Students with unfettered discretion when
approving the location of "potentially disruptive" student events involving expressive activity.
259 F. Supp. 2d 575, 577–78 (S.D. Tex. 2003). The court found the policy unconstitutional
because it was "devoid of any objective guidelines or articulated standards," leaving the dean
"free to determine whether the proposed student expressive activity is or is not 'potentially
disruptive.'" *Id.* at 583.

The ASU Policy is an unconstitutional prior restraint that lends itself to viewpoint
discrimination, like the policies at issue in *Shaw* and *Pro-Life Cougars*.  Notably, the policy only
requires that "plans be *considered* in accordance with the principle of content neutrality." ASU
Policy at 1 (emphasis added). There is no *requirement* on the face of the policy that decisions be
made in a viewpoint- or content-neutral manner. Moreover, even though the policy contains
eight stipulations governing the conduct of individuals engaging in expressive activity on
campus, ASU Policy at 2, there is no language on the face of the policy requiring that *only* those
eight stipulations be considered. Rather, the Policy suggests that approval may also be granted or
denied "in order to serve the interests of health and safety, prevent the disruption of the process,
and protect against invading the rights of others," *id.* These statements are ambiguous in that—as
in *Pro-Life Cougars*—it is not clear how an administrator will determine what "serve[s] the
interests of health and safety," much less what "process" may not be disrupted, or how the
potential for expression to disrupt is evaluated. *Id.* at 2. This lack of definite guidance leaves
administrators free to deny permission based on their perception of the proposed expression or to

impose additional restrictions or requirements on a group or individual seeking to engage in expressive activity on ASU's campus. The First Amendment does not permit such a result.

> 2.      Blanket prior notice or permit policies covering all expressive activity anywhere on campus are not narrowly tailored.

The ASU Policy asserts that it is intended to protect health and safety, prevent disruption of the operation of the university, and protect against invading the rights of others. While these may be significant government interests, ASU's prior notice and permit requirements in and outside the Free Expression Areas are not narrowly tailored to any of them for several reasons.

> a.      The ASU Policy is not narrowly tailored because it requires individuals and small groups to seek approval before speaking.

First, courts have roundly rejected the blanket application of permit requirements to individuals or small groups in a public forum on the basis that such wide-reaching speech restrictions are not sufficiently tailored to significant government interests. "Almost every . . . circuit . . . ha[s] refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." *Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009). This is because "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005); *see also Boardley v. Dep't of the Interior*, 615 F.3d 508, 524 (D.C. Cir. 2010) (invalidating permit requirement for any expression in national park as overbroad and not narrowly tailored because it applied it individuals and small groups); *Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005) ("unflinching application" of a permit requirement "to groups as small as two or three renders it constitutionally infirm.").

The Eighth Circuit has specifically "entertain[ed] doubt" about whether applying a city permit requirement to a group of ten people "is sufficiently tied to the City's interest in

15

protecting the safety and convenience of citizens who use the public sidewalks and streets."
*Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996). As the Ninth Circuit observed of a
permit ordinance covering the speech of even a single speaker: "Rather than being narrowly
tailored to protect speech, as it should have been, it was tailored so as to preclude speech."
*Grossman v. City of Portland*, 33 F.3d 1200, 1207 (9th Cir. 1994).

> b.   The ASU Policy is not narrowly tailored because it requires
> speakers to seek approval prior to engaging in any expression
> anywhere on campus.

Against this backdrop, it is not surprising that courts have repeatedly held that public
colleges or universities cannot impose blanket waiting or permission requirements on students
who wish to exercise their First Amendment rights on campus. In *Williams*, a federal district
court enjoined a policy requiring students to give the University of Cincinnati at least five days'
notice before they engaged in expressive activity outside of a designated free speech area. 2012
U.S. Dist. LEXIS 80967, at *4. The court noted that the "breadth and unprecedented nature" of
the regulation was "indicative of the University's failure to narrowly tailor the regulation to serve
a compelling interest." *Id*. at *21 (quoting *Watchtower*, 536 U.S. at 166). The "mere fact that the
notice requirement applie[d] to *all* student speech raise[d] constitutional concerns." *Id*. (emphasis
in original).

Similarly, in *Roberts*, the court held that Texas Tech University's requirement that
students get a permit at least two days before engaging in any expressive activity outside
designated free speech areas "sweeps too broadly in imposing a burden on a substantial amount
of expression that does not interfere with any significant interests of the University." 346 F.
Supp. 2d at 870

Most recently, in a strikingly similar case to the one at hand, a federal district held that a
student successfully alleged a violation of his First Amendment rights where his college

maintained a policy restricting speech on campus to a free speech area *and* required advance

permission for its use. *Shaw*, 2018 U.S. Dist. LEXIS 7584, at \*31. Like the ASU Policy, the

policy in *Shaw* was silent on whether there was any waiting period between seeking permission

and use of the free speech area. *Id*. at \*5–6. Noting that "[c]ourts strike permitting requirements

where they indiscriminately apply regardless of the number of speakers[,]" the court explained

that "[t]hese types of regulations are impermissible because they are not legitimately tied to the

government's interests." *Id*. at \*29–30. "Where a large group of protestors may disrupt class, or

impede foot traffic, the likelihood that a single protestor would do the same is low." *Id*. at \*30.

   In ruling that the campus speech policies at issue were not narrowly tailored to a

significant government interest, the *Williams*, *Roberts*, and *Shaw* courts noted that the colleges

could have easily drafted rules targeted at specific situations that pose a real threat to campus

safety or operations, such as regulations regarding large crowds, sound amplification near class

buildings, or blocking building access. *Shaw*, 2018 U.S. Dist. LEXIS 7584, at \*26; *Williams*,

2012 U.S. Dist. LEXIS 80967, at \*20–22; *Roberts*, 346 F. Supp. 2d at 870 n.20. The *Williams*

court noted that "[a]t least one other Ohio public university has been able to satisfy similar

interests with nothing more than an anti-disruption policy." 2012 U.S. Dist. LEXIS 80967, at \*21

n.3.

   While the ASU Policy includes a number of "stipulations" that resemble the type of anti-

disruption regulations referenced by the *Williams*, *Roberts*, and *Shaw* courts, it imposes these

rules *in addition to* its blanket permit requirements in and outside the Free Expression Areas, and

also allows administrators to grant or deny permission "to serve the interest of health and safety,

prevent disruption of the process, and protect against invading the rights of others," without any

further explanation of what such interests mean or what guidelines will be used to determine what serves and what obstructs them.

In contrast to ASU, many colleges and universities nationwide have developed narrowly tailored policies that allow for robust expressive activity while enabling administrators to operate campuses of all shapes and sizes. FIRE conducts an annual review of speech codes at over 450 of the country's top colleges and universities and documents numerous examples of campus free speech policies that are appropriately permissive of peaceful student engagement and demonstration.[4] For example, at the University of Toledo—a school of similar size and setting to ASU[5]—"any person or group may use, without prior notification, any publicly accessible outdoor area of any university campus except parking lots, garages and driveways." *See Univ. of Toledo, Policy 3364-5-14: Expression on Campus*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., https://www.thefire.org/fire_speech-codes/toledo-campus-expression (last visited Feb. 1, 2019). Such expression is further limited only in that it must comply with federal, state, and local law, and "[t]he use of walkways or other common areas may not block the free passage of others nor impede the regular operation of the university." *Id.* Numerous other colleges and universities— including schools in the Eighth Circuit—that designate areas for free speech, as ASU has, fashion them as optional spaces that can be reserved for a speaker's priority use without limiting their ability to speak in other public areas of campus without prior permission.[6] In this context,

---

[4] *See Spotlight Database*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., https://www.thefire.org/spotlight (last visited Feb. 1, 2019).

[5] *See College Rankings, Univ. of Toledo*, U.S. NEWS, *available at* https://www.usnews.com/best-colleges/university-of-toledo-3131 (last visited Feb. 1, 2019).

[6] In FIRE's Spotlight Database, examples of schools in the Eighth Circuit with demonstration policies using this model, or which simply permit expressive activity in the public outdoor areas of campus on grounds similar to University of Toledo—can be found at the University of Missouri, Missouri State University, Southeast Missouri State University, Iowa State University,

Defendants' argument that ASU's security and safety needs require far more restriction of speech than similar schools falls flat.

                c.      The ASU Policy is not narrowly tailored because it prevents speech in response to breaking news.

Finally, ASU's Free Speech Policy suffers from another fatal flaw. ASU's blanket permission requirement for all speech on campus is not narrowly tailored because it prevents spontaneous speech. Courts consistently overturn prior restraints that burden a substantial amount of spontaneous speech—impeding speakers' ability to respond timely to unfolding events—both on campus and off. *See Watchtower*, 536 U.S. at 167–68 (striking down village ordinance preventing all door-to-door canvassing without a permit where it "effectively banned" a "significant amount of spontaneous speech"); *Shuttlesworth*, 394 U.S. at 163 (Harlan, J., concurring) ("Timing is of the essence in politics. . . . When an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all."); *Williams*, 2012 U.S. Dist. LEXIS 80967, at \*21 (campus speech policy failed narrow tailoring test where, *inter alia*, it "essentially ban[ned] spontaneous speech"); *Shaw*, 2018 U.S. Dist. LEXIS 7584, at \*30–31 (student plaintiff alleged First Amendment violation where campus permit requirement prevented spontaneous speech).[7]

---

Carlton College, Winona State University, and the University of North Dakota. *See Spotlight Database*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., https://www.thefire.org/spotlight (last visited Feb. 1, 2019).

[7] Although the Eighth Circuit upheld a three-day permit requirement in *Bowman*, that holding should not govern in this case for the reasons outlined in section D. In addition, it is worth noting that, while approving a three-day requirement imposed on one individual, the court recognized that "a five-day advance notice requirement for a permit was not narrowly tailored." *Bowman*, 444 F.3d at 982 (citing *Brownell*, 88 F.3d at1523–24 (8th Cir.1996)). From the face of the ASU Policy, it is not clear whether the notice required is always three days or, in some instances, longer; at some points, the Policy states that a request must be *made* 72 hours in advance, while in others it states that a request must be *approved* in that timeframe.

3.      Blanket prior notice or permit policies covering all expressive activity anywhere on campus do not provide adequate alternative channels of communication.

To survive First Amendment scrutiny, a speech restriction must also leave open ample alternative channels of communication. *Bowman*, 444 F.3d at 980. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places ... a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984). Moreover, the alternative forum may not compromise the "quantity or content" of the expression. *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989).

ASU's Policy provides no channels at all for spontaneous expression, and requires 72 hours notice for any expression on the vast majority of campus outside ASU's small Free Expression Areas. This system certainly impacts the quantity of speech and could easily impact the content if, for example, speakers are prevented from timely responding to still-unfolding events.

Defendants argued at the motion to dismiss stage that "nothing in the Policy restricts individuals from publicizing their views through other means[,]" citing as examples op-eds or articles in the student newspaper, interviews on student-run television, and demonstrating on adjacent off-campus property. Defs' Reply in Supp. of Mot. to Dismiss at 3 [ECF No. 19]. Each of these examples significantly impacts and restricts the timing, audience, form, and nature of expression. The *Shaw* court rejected a similar argument where defendants proposed student bulletin boards as an ample alternative channel of communication, holding that "[p]lacing a pamphlet on a billboard is a different medium of expression, and does not sufficiently permit students alternative channels of expression." *Shaw*, 2018 U.S. Dist. LEXIS 7584, at *27. The Court here should similarly reject Defendants' meager attempt to characterize different mediums

20

and off-campus locations for expression as sufficient alternatives to simply allowing speakers to engage in peaceful, non-disruptive expression in the public areas of campus.

### D.     Bowman does not change this analysis.

Defendants will undoubtedly rely on *Bowman*, 444 F.3d 967, to argue that a 72-hour advance notice approval requirement for speech anywhere on campus is constitutional. But that would misconstrue *Bowman*. In *Bowman*, the Eighth Circuit properly held that a university could require a permit for designated unlimited public forums only if "it does not delegate overly broad licensing discretion to a government official, is content-neutral, is narrowly tailored to the University's significant governmental interests, and leaves ample alternative channels for communication." *Bowman*, 444 F.3d at 980. And the court concluded that the specific policy at issue, as applied to the plaintiff, an itinerant street preacher, satisfied that standard.

The policy and challenge at issue in *Bowman* are distinguishable from the case at hand in several important ways. First, the policy in *Bowman* "grant[ed] the University the right to deny or revoke a permit . . . only for limited reasons." *Id.* at 981. In contrast, while the ASU Policy identifies several stipulations according to which requests may be evaluated, it also grants administrators broad discretion to additionally limit speech in order to serve "the interests of health and safety, prevent disruption of the process, and protect against invading the rights of others." These stated interests—and the second one in particular—are vague, and the Policy fails to set forth narrow, limited, and objective standards to define them or for evaluating whether particular expression will serve or impede them.

Second, the *Bowman* court upheld the permit requirement's application to the plaintiff because it was narrowly tailored to the university's interest in "accommodate[ing] the crowds that Bowman attracts." *Bowman*, 444 F.3d at 981. The court noted the plaintiff's history of submitting permit applications for an estimated attendance of fifty to one hundred people and

21

that "actual attendance at his events has run as high as two hundred people." *Id.* Indeed, the *Bowman* court relied on cases approving permit requirements for large groups in reaching its conclusion that the permit requirement before it was narrowly tailored. *See id.* (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) (upholding a park permit requirement for groups of fifty or more); *Grossman*, 33 F.3d at 1206 (suggesting permit requirements "*may* be justified in the case of large groups") (emphasis in original)).

While that determination may have been erroneous because it allowed the university to consider a crowd's reaction to speech in order to limit the speaker's expression, *see, e.g., Forsyth*, 505 U.S. at 134 ("Listeners' reaction to speech is not a content-neutral basis for regulation"), that government interest is not present in this case. The case at bar involves both a facial and as-applied challenge to a permit requirement that on its face applies to *any* individual and was applied to silence *one* student and *one* non-student engaged in peaceful, non-disruptive expressive activity in a public campus space. They had not drawn a crowd—nor were they interfering with any of the government interests the *Bowman* court identified as stemming from large crowds: "ensuring public safety, minimizing the disruption of the educational setting, and coordinating the use of limited space by multiple entities." *Bowman*, 444 F.3d at 981.

Finally, *Bowman* addressed the rights of a non-student, as opposed to a student and student club. Defendants argued at the motion to dismiss stage, and will likely argue again, that the student versus non-student distinction has no bearing on the First Amendment analysis. Defs' Reply in Supp. of Mot. to Dismiss at 2 [ECF No. 19]. That is wrong. Indeed, the Supreme Court "has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum. ... [and has] not held ... that a campus must make all of its facilities equally available to students and nonstudents alike[.]" *Widmar*, 454 U.S. at 268 n.5.

22

*Bowman* addressed a university's interest in preserving the educational setting and its resources by limiting their use by an outside preacher for large events. It is a different case where a university limits the speech of a student peacefully seeking to engage with fellow students on her own campus.

The *Bowman* court implicitly acknowledged this point, observing that "a university's mission is education and the search for knowledge" and that an institution is justified in reserving its limited resources "for University community members." 444 F.3d at 978, 982 (quoting *ACLU Student Chapter - Univ. of Md., College Park v. Mote*, 321 F. Supp. 2d 670, 681 (D. Md. 2004)). As explained above, the Supreme Court has long held that freedom of speech is integral to the educational mission of a public university. It is therefore perfectly consistent with *Bowman* to hold that a university's interest in preserving its educational environment is not at all furthered by requiring its students to ask permission before engaging in any speech on their own campus.

Moreover, it is worth noting that, while *Bowman* upheld a three day permit requirement as imposed on a "non-University Entity," it struck down a five-day cap imposed on the same speaker, noting that it was not narrowly tailored if it could inhibit his speech even when no one else wanted to use the same area of campus. *Id.* at 981–82. ASU's decision to issue the non-student a criminal trespass warning appears to be similarly suspect here.

Thus, far from being a lawful regulation of time, place, and manner, Defendants' policy constitutes an unconstitutional prior restraint. Defendants' policy severely restricts the areas in which students, faculty, staff, and visitors can speak, leaflet, gather signatures, and table requires all students, faculty, staff, and visitors on a public campus to obtain permission before engaging in speech anywhere on campus.

## II.        Conclusion

To ensure that students are able to express themselves on campus, Plaintiffs' motion for summary judgment should be granted.

Dated: February 4, 2019                    Respectfully submitted,

_____
Holly Dickson, Bar No. 98137
THE ARKANSAS CIVIL LIBERTIES UNION
FOUNDATION, INC.
904 West Second Street, Suite 1
Little Rock, Arkansas 72201
(501) 374-2842
holly@acluarkansas.org

Vera Eidelman
Emerson Sykes
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org
esykes@aclu.org

Marieke Tuthill Beck-Coon
Brynne S. Madway
THE FOUNDATION FOR INDIVIDUAL RIGHTS
IN EDUCATION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473; Fax (215) 717-3440
marieke@thefire.org
brynne.madway@thefire.org

*Counsel for Amici Peace and Love, the Foundation*
*for Individual Rights in Education, the American*
*Civil Liberties Union, and the American Civil*
*Liberties Union of Arkansas*