**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**TURNING POINT USA AT ARKANSAS
STATE UNIVERSITY**, *et al.***,**

            Plaintiffs,

      v.

**RON RHODES,** *et al.*,

            Defendants.

Case No. 3:17-cv-00327-JLH

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS .......................................................................... 4

ARGUMENT ................................................................................................ 4

I.   Defendants' Speech Zone Policy violates Plaintiffs' First
     Amendment free speech rights. ........................................................ 4

   A.   The First Amendment applies to college campuses. ................... 5

   B.   Defendants' Speech Zone Policy is overbroad as it
   restricts a substantial amount of protected speech. .......................... 6

   C.   Defendants' Speech Zone Policy is an unconstitutional
   prior restraint. ................................................................................ 11

        1.   Defendants' Speech Zone Policy grants Defendants'
             unbridled discretion to grant or deny permission to
             speak anywhere on campus. ......................................... 12

           a.   The Speech Zone Policy is not content or viewpoint
                neutral. ................................................................... 19

           b.   Defendants' Speech Zone Policy is not narrowly
                tailored. .................................................................. 22

           c.   Defendants' Speech Zone Policy does not provide
                ample alternative means of communication. ..................... 29

II.   Defendants' Speech Zone Policy violates Plaintiffs'
      Fourteenth Amendment Right to Due Process. ........................... 31

CONCLUSION ........................................................................................ 35

CERTIFICATE OF SERVICE ................................................................. 37

TABLE OF AUTHORITIES

<u>CASES</u>

*American-Arab Anti-Discrimination Committee v. City of Dearborn,*
    418 F.3d 600 (6th Cir. 2005)...................................................... 24

*Apex Oil Co. v. Jones Stephens Corp.,*
    881 F.3d 658, 660 (8th Cir. 2018)................................................4

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ...................................................................11

*Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987)............................................................. 9, 10

*Board of Regents of University of Wisconsin System v. Southworth,*
    529 U.S. 217 (2000) ................................................................ 19

*Bell v. City of Winter Park,*
    745 F.3d 1318 (11th Cir. 2014).............................................. 30

*Bowman v. White,*
    444 F.3d 722 (8th Cir. 2006).......................................... 11, 27

*Burbridge v. Sampson,*
    74 F. Supp. 2d 940 (C.D. Cal. 1999) ......................................25

*Burk v. Augusta-Richmond County,*
    365 F.3d 1247 (11th Cir. 2004)............................................. 23

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)................................................................. 32

*City of Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988)......................................................... 12, 20

*Connally v. General Construction Co.,*
    269 U.S. 385 (1926)......................................................... 34, 35

*Cornelius v. NAACP Legal Defense & Education Fund,*
    473 U.S. 788 (1985)............................................................... 10

*DeJohn v. Temple University,*
    537 F.3d 301 (3d Cir. 2008) ................................................................. 29

*Dodds v. Richardson,*
    614 F.3d 1185 (10th Cir. 2010) ........................................................... 12

*Douglas v. Brownell,*
    88 F.3d 1511 (8th Cir. 1996) ............................................................... 23

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................... 6, 18, 19, 20

*Freedman v. Maryland,*
    380 U.S. 51 (1965) ............................................................................... 21

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ............................................................................. 22

*Grace Christian Life v. Woodson,*
    2016 WL 3194365 (E.D.N.C. June 4, 2016) ........................................ 15

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................. 32

*Gregoire v. Centennial School District,*
    907 F.2d 1366 (3d Cir. 1990) ............................................................. 28

*Grossman v. City of Portland,*
    33 F.3d 1200 (9th Cir. 1994) ............................................................. 24

*Hays County Guardian v. Supple,*
    969 F.2d 111 (5th Cir. 1992) ............................................................. 25

*Healy v. James,*
    408 U.S. 169 (1972) ............................................................................... 5

*Holloman v. Harland,*
    370 F.3d 1252 (11th Cir. 2004) ...................................................... 28, 29

*International Society for Krishna Consciousness, Inc. v. Lee,*
    505 U.S. 672 (1992) ............................................................................. 10

*Josephine Havlak Photographer, Inc. v. Village of Twin Oaks,*
　　864 F.3d 905 (8th Cir. 2017)............................................................... 11, 12

*Keyishian v. Board of Regents of University of New York,*
　　385 U.S. 589 (1967)..................................................................................1

*Khademi v. South Orange County Community College District,*
　　194 F. Supp. 2d 1011 (C.D. Cal. 2002) ....................................................25

*Knowles v. City of Waco,*
　　462 F.3d 430 (5th Cir. 2006)............................................................ 23, 24

*Krantz v. City of Fort Smith,*
　　160 F.3d 1214 (8th Cir. 1998)................................................................ 22

*Lady J. Lingerie, Inc. v. City of Jacksonville,*
　　176 F.3d 1358 (11th Cir. 1999)........................................................ 18, 20

*Lee v. International Society for Krishna Consciousness, Inc.,*
　　505 U.S. 830 (1992).............................................................................. 10

*Lewis v. Wilson,*
　　253 F.3d 1077 (8th Cir. 2001)................................................................ 19

*Long Beach Area Peace Network v. City of Long Beach,*
　　574 F.3d 1011 (9th Cir. 2009)................................................................ 30

*McCauley v. University of Virgin Islands,*
　　618 F.3d 232 (3d Cir. 2010) ....................................................................7

*McCullen v. Coakley,*
　　134 S. Ct. 2518 (2014)........................................................................... 22

*Morse v. Frederick,*
　　551 U.S. 393 (2007)............................................................................... 28

*OSU Student Alliance v. Ray,*
　　699 F.3d 1053 (9th Cir. 2012)................................................................ 19

*Pro-Life Cougars v. University of Houston,*
　　259 F. Supp. 2d 575 (S.D. Tex. 2003)............................................... 19, 20

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015)............................................................ 20

*Roach v. Stouffer*,
    560 F.3d 860 (8th Cir. 2009).................................................. 12

*Roberts v. Haragan*,
    346 F. Supp. 2d 853 (N.D. Tex. 2004) .............................. 25, 26

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ............................................................... 25

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969)........................................................... 18, 24

*Smith v. Tarrant County College District*,
    670 F. Supp. 2d 534 (N.D. Tex. 2009) .............................. 14, 19

*Stephenson v. Davenport Community School District*,
    110 F.3d 1303 (8th Cir. 1997)............................................ 31, 32

*Thomas v. Chicago Park District*,
    534 U.S. 316 (2002).......................................................... 21, 22

*Thomas v. Collins*,
    323 U.S. 516 (1945) ...............................................................24

*United States. v. Kistner*,
    68 F.3d 218 (8th Cir. 1995).................................................... 11

*University of Cincinnati Chapter of Young Americans for Liberty v. Williams*,
    2012 WL 2160969 (S.D. Ohio June 12, 2012)........................ 6, 24, 25, 26

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)................................................................ 32

*Walker v. Wegner*,
    624 F.2d 60 (8th Cir. 1980)................................................... 21

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).................................................... 11, 29, 30

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton,*
    536 U.S. 150 (2002) ...................................................................................29

*Widmar v. Vincent,*
    454 U.S. 263 (1981).......................................................................... 11, 28

Rules

Fed. R. Civ. P. 56(a) .................................................................................4

## INTRODUCTION

On October 11, 2017, Ashlyn Hoggard, a political science major at Arkansas State University, and two companions began talking with students passing by their table on a large, open walkway outside the Reng Student Union on the Arkansas State University campus.



Ashlyn and her two friends were not causing a disturbance, blocking traffic or entrances to buildings, harassing passersby, or otherwise disrupting the operation of the University. No one filed any complaint about their presence or activities. Yet, within a half-hour, two campus police officers and two University administrators descended upon Ashlyn and her friends. The University officials told the group that they were in violation of University policy because they were outside of the University's speech zones and they had not obtained the University's prior permission to speak on campus as required by University policy. The University administrators warned Ashlyn and

another student that failure to abide by University policy was a violation of the Student Code of Conduct and they would be subject to punishment if they did not follow the administrators' orders. Further, the police officers issued a citation to Emily Parry, a non-student representative for Turning Point USA, and threatened her with arrest for criminal trespass if she failed to leave the campus.

The University administrators banished the small group from the Student Union area for violating the Speech Zone Policy and refused to allow them to speak anywhere on the Jonesboro campus that day. They were told if they wanted to speak at another time on campus they were required to do so in one of the small speech zones, comprising a mere 1% of campus, but only if they obtained the University's permission 24 hours in advance.

Prior to this confrontation, Ashlyn was unaware of the University's speech zone policy. When she reviewed the University's so-called "Freedom of Expression" policy (the "Speech Zone Policy"), Ashlyn was shocked to learn that the policy requires students to obtain permission from the University *before* speaking *anywhere* on campus. Specifically, the University's Speech Zone Policy imposes the following restrictions: (i) all "speaking, demonstrating, or other forms of expression" must take place in one of seven, small speech zones; (ii) prior permission must be obtained from the University before anyone is allowed to speak in any of the speech zones; (iii) use of the speech zones is limited to 8:00 a.m. to 9:00 p.m. Monday through Friday; and (iv) if a student desires to speak anywhere else in the outdoor areas of campus other than the

speech zones, the student must obtain prior permission from the Vice President of Student Affairs or the Director of Student Development *at least 72 hours* in advance. Furthermore, the Speech Zone Policy fails to establish any objective, content-neutral criteria to limit the discretion of the University officials. Instead, the policy grants officials unbridled discretion to deny requests at their whim. And the officials used this discretion to enforce the policy against Plaintiffs.

While claiming to hold First Amendment freedoms in high regard, Arkansas State uses its Speech Zone Policy to forbid all spontaneous speech, require prior permission before engaging in speech anywhere on campus, and to confine speech and expression to several small speech zones. Instead of fostering the free exchange of ideas through speech, the University stifles and restricts speech subjecting it to the whims of Arkansas State officials.

For decades, American college campuses have served as bulwarks for free speech and protection of the First Amendment. Free speech is so vital to higher education that it has been called the very "lifeblood of academic freedom." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008). But at Arkansas State, freedom of speech and expression are reduced to mere slogans.

The University's Speech Zone Policy, premised on the unsubstantiated fears of listeners' reactions to speech, is overbroad in its scope and vague in its language. Thus, the Policy violates both the First and the Fourteenth Amendments. Plaintiffs respectfully request that this Court grant them summary judgment.

<u>**STATEMENT OF FACTS**</u>

The facts are as stated in Plaintiffs' Statement of Material Facts Not in Dispute, which Plaintiffs incorporate as if fully set forth here.

<u>**ARGUMENT**</u>

"Summary judgment is warranted where there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law." *Apex Oil Co. v. Jones Stephens Corp.*, 881 F.3d 658, 660 (8th Cir. 2018). Summary judgment is appropriate here because there are no genuine issues as to any material fact and Plaintiffs are entitled to judgment as a matter of law. Fed R. Civ. P. 56(a).

**I.   Defendants' Speech Zone Policy violates Plaintiffs' First Amendment free speech rights.**

Defendants' Speech Zone Policy violates the First Amendment both facially and as-applied to Plaintiffs because it is (i) overbroad, and (ii) it imposes an unconstitutional prior restraint that grants Defendants unbridled discretion to restrict speech based on content and viewpoint. Defendants enforce a Speech Zone Policy that prevents students at Arkansas State from engaging in constitutionally protected speech anywhere in the outdoor areas of campus without receiving prior permission from the University. If they do not get permission in advance and if they do not confine their speech to small zones on campus, students face censorship from administrators and campus police and face discipline, including suspension or expulsion, under the Student Code of

Conduct. At Arkansas State, fear of offending listeners trumps the free speech rights of students and shackles the free exchange of ideas.

### A. The First Amendment applies to college campuses.

For decades, courts have affirmed that the First Amendment protects students on campus to the same degree it protects citizens off campus. "With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981). To be sure, "state colleges . . . are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972).

In fact, federal courts routinely strike down policies like Defendants' that require permission before speaking anywhere on campus because these policies violate the First Amendment. For example, the University of Houston required students to obtain a permit before they could speak on campus and allowed administrators to determine if they were "potentially disruptive." *Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 577-78 (S.D. Tex. 2003). Pursuant to that policy, University of Houston administrators deemed a pro-life display "potentially disruptive" and relegated it to a remote area of campus. *Id.* at 578–79. The court held that the policy unconstitutionally granted unfettered discretion because it was devoid of objective guidelines or articulated standards that administrators should consider when determining whether something was "potentially disruptive" and because it did not require administrators to explain the rationale for their decisions. *Id.* at 583–84.

Similarly, the University of Cincinnati enforced a policy requiring students to obtain a permit to use a Free Speech Area constituting less than 0.1% of the campus grounds for any "demonstrations, picketing, and rallies." *Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*, No. 1:12-cv-155, 2012 WL 2160969, at *1 (S.D. Ohio June 12, 2012). Because the "University did not provide any written criteria for determining whether an expressive activity constitutes a demonstration, picket, or rally," the court struck down the policy as overbroad, not narrowly tailored to serve a compelling interest, and unconstitutionally vague. *Id*. at *6-8.

Similar to the policies struck down at University of Houston and University of Cincinnati, the Speech Zone Policy at Arkansas State restricts expressive activities to approximately 1% of campus, requires prior permission before engaging in speech anywhere on campus, and provides no objective definitions or criteria for what constitutes "speaking," "speech," "peaceful and orderly protests," "march," "other forms of expression," or "demonstrations." Thus, as discussed in more detail below, Defendants' Policy is unconstitutionally overbroad and imposes an unconstitutional prior restraint on protected speech.

**B.    Defendants' Speech Zone Policy is overbroad as it restricts a substantial amount of protected speech.**

A law is unconstitutionally overbroad if it "penaliz[es] a substantial amount of speech that is constitutionally protected." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Josephine Havlak*

*Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017) (quotation omitted). *See also McCauley v. Univ. of V.I.*, 618 F.3d 232, 247 (3d Cir. 2010); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165 (2002) ("The mere fact that [these policies] cover[] so much speech raises constitutional concerns."). Defendants' Speech Zone Policy is overbroad because it penalizes a substantial amount of constitutionally protected speech.

Arkansas State's campus is approximately 1,376 acres composed of various publicly-accessible buildings and outdoor areas, including public streets, sidewalks, open-air quadrangles, and parks with large cultivated grass areas, trees, benches, and sidewalks. Plaintiffs' Undisputed Statement of Facts ("SOF") ¶ 29. The outdoor areas of the University's campus are open to the public and there are no gates or barriers to pedestrian entry. SOF ¶ 28.

Defendants' Speech Zone Policy applies to every form of students' expressive activity and encompasses the entire campus. SOF ¶ 38. Under the Policy, students are prohibited from "speaking, demonstrating and other forms of expression" anywhere in the open, outdoor areas of Arkansas State's 1,376 acre campus without obtaining Defendants' prior permission. SOF ¶ 42. The policy establishes just seven small speech zones that are designated for students' expressive activities, four of which are in remote locations and far away from student foot-traffic. SOF ¶ 40.

The speech zones comprise a small fraction of the entire campus. SOF ¶ 41. The speech zones are only open from 8:00 a.m. to 9:00 p.m. Monday through Friday. SOF ¶ 43. If students want to use the speech zones, they must first

obtain the permission of Defendant Spack. SOF ¶ 42. But the policy does not limit Defendant Spack's discretion in determining whether to grant permission. SOF ¶ 36; Ex. 9. And the policy provides no timeline as to when a decision to grant or deny a permit request must be made. SOF ¶ 36; Ex. 9.

If students wish to engage in any expressive activities outside the speech zones, including just one student wishing to talk with other students, they must obtain permission at least 72 hours in advance from Defendants Stripling or Spack. SOF ¶ 53. As with the permit for use of the speech zones, the policy does not limit University officials' discretion in determining whether to grant permission and provides no guidance on when these permits must be granted. SOF ¶ 36; Ex. 9.

The Policy's prior permission requirement eradicates any possibility for spontaneous speech and eliminates the possibility of students addressing important issues when they may be of greatest interest to the University community.

Additionally, the policy prohibits students from distributing written materials anywhere on campus except in the speech zones and eight other small areas designated in the policy. SOF ¶ 54. Students are prohibited from using a stand, table, or booth except in the speech zones, and they must obtain prior permission from Defendant Spack (or her designee, Ms. Rouse) before setting one up. SOF ¶ 44. The policy does not authorize students to speak to other students while distributing literature in the literature distribution zones. SOF ¶ 55.

8

The overbreadth of the Policy is aptly demonstrated through Defendants' enforcement of the Policy against Plaintiffs. Ms. Hoggard and Ms. Parry set up their table on the edge of a large walkway outside of the Reng Student Union to talk with students about Turning Point USA, encourage them to become members, and talk about their constitutional rights. SOF ¶ 89. They were not engaging in any of the conduct prohibited by the Speech Zone Policy such as blocking entrances or exits to buildings, or blocking free flow of traffic on the sidewalks. SOF ¶ 90. They simply stood where students freely walk and congregate, and conversed with willing passersby. SOF ¶ 90.

But they quickly learned that free speech was not allowed on the University's campus, as Defendants enforced the Speech Zone Policy and ordered them to leave the area or face punishment. SOF ¶ 92. Because they were outside of a speech zone and did not receive prior permission to speak, Defendants prohibited them from speaking anywhere else on campus that day. SOF ¶ 105. Defendants informed them that if they wanted to speak on campus in the future, they were required to receive permission 24 hours in advance and must speak in one of the speech zones. SOF ¶ 74. Since then, Ms. Hoggard has refrained from speaking with other students and promoting her Turning Point group outside of the speech zones because of the fear of arrest and punishment. SOF ¶ 116.

The Speech Zone Policy imposes restrictions that have been unconstitutional, even in nonpublic fora, for at least thirty years. In the 1980s, Los Angeles International Airport banned expressive activities in its

terminals. *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 570–71 (1987). Defendants use the same broad brush, banning speech on the entire campus unless they grant permission to speak. SOF ¶ 38. No one can speak, even in the speech zones, without permission. SOF ¶ 38. Like LAX's, Defendants' policy "reaches the universe of expressive activity, and, by prohibiting *all* protected expression, purports to create a virtual 'First Amendment Free Zone'" on campus. *Jews for Jesus*, 482 U.S. at 574; SOF ¶ 38. Such bans are unconstitutional in any forum: "We think it obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech." *Jews for Jesus*, 482 U.S. at 575.[1]

A policy unreasonable in airports cannot be reasonable for students in the "marketplace of ideas," *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 789 (1985) (noting "reasonableness must be assessed in the light of the purpose of the forum"), especially when Defendants have discretion to grant or deny permits. SOF ¶ 87.

As Ms. Hoggard quickly learned, speech is not free at Arkansas State. Students cannot speak anywhere on campus without obtaining Defendants' prior permission. For areas outside the speech zones, that permission must be obtained at least 72 hours in advance, even if the activity involves just a couple

---

[1]   *Accord Lee v. Int'l Soc'y for Krishna Consciousness, Inc.*, 505 U.S. 830, 831 (1992) (striking leafleting ban in nonpublic fora inside airport while allowing it on sidewalks outside) as First Amendment violation); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 685–92 (1992) (O'Connor, J., concurring) (finding the ban unreasonable).

of students wishing to speak with their fellow students about important, contemporaneous events. Accordingly, the policy is overbroad.

### C. Defendants' Speech Zone Policy is an unconstitutional prior restraint.

In addition to its massive overbreadth, Defendants' Policy imposes a prototypical unconstitutional prior restraint on protected speech. As "students enjoy First Amendment rights of speech and association on the [college] campus, . . . the denial . . . of use of campus facilities for meetings and other appropriate purposes must be subjected to the level of scrutiny appropriate to any form of prior restraint." *Widmar*, 454 U.S. at 267 n.5 (quotation omitted). The Eighth Circuit describes a prior restraint as "any permit requirement [that] gives 'public officials the power to deny use of a forum in advance of actual expression.'" *United States v. Kistner*, 68 F.3d 218, 221 n.7 (8th Cir. 1995) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 783 n.5 (1989)).

As prior restraints censor speech before it occurs, there is a "heavy presumption" against their constitutionality. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Bowman v. White*, 444 F.3d 967, 980 (8th Cir. 2006). They "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

A prior restraint on expression is presumptively unconstitutional, regardless of the forum, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content- and viewpoint-neutral, reasonable time, place and manner restrictions, (3) is narrowly

tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication. *Josephine Havlak*, 864 F.3d at 913 (citation omitted). The Policy need fail only one of these to be prongs to be unconstitutional; it fails them all.

### 1. Defendants' Speech Zone Policy grants Defendants' unbridled discretion to grant or deny permission to speak anywhere on campus.

The Supreme Court "consistently condemn[s]" speech regulations that "vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969). Policies that do so are treated as viewpoint-based. *Roach v. Stouffer*, 560 F.3d 860, 870 (8th Cir. 2009) ("[U]nbridled discretion to determine who may speak based on the viewpoint of the speaker . . . allows for viewpoint discrimination and is therefore unconstitutional."). Given vague or non-existent criteria, officials "may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988).

Defendants' Speech Zone Policy grants officials five layers of unbridled discretion. First, it gives them discretion over whether students can speak anywhere on campus, inside or outside the speech zones. SOF ¶ 87. To use any outdoor area other than the speech zones (i.e., 99% of the campus), the policy says "[s]hould any individual or group desire the use of other areas for speeches and demonstrations, a request must be made to the Vice Chancellor for Student

Affairs, his/her designee, or the Director of Student Development and Leadership at least 72 hours in advance of the event." SOF ¶ 53.

Similarly, the Policy provides that use of the speech zones "for *speaking*, demonstrating and *other forms of expression* will be scheduled through the Director of Student Development and Leadership[.]" SOF ¶ 42 (emphasis added). By its terms, the Policy grants Defendants permit authority over "speaking" and "other forms of expression" without any limitations. SOF ¶ 42. Even casual conversation falls under the purview of the Policy as it contains no exemption for even the most benign speaking inside or outside of the speech zones. SOF ¶ 47. Furthermore, no provision in the Policy requires that permission to use any area of the campus—inside or outside the speech zones— must be granted. SOF ¶ 48.

In their depositions, Defendants acknowledge that the policy leaves many questions unanswered. And that they alone possess the authority to determine the enforcement of the policy. "Where does the speech zone begin and end?" "How do I know whether my political discussion that some may find offensive requires me to get a permit for a speech zone?" SOF ¶ 76. "If I wear a political hat or T-shirt or walk around holding a political sign, am I engaging in an 'other form of expression' which must be confined to a speech zone?" SOF ¶ 76. For Defendants, the answer to each of these questions is: "Just ask us and we will tell you." SOF ¶ 76. This is the very definition of unbridled discretion.

In a strikingly similar case, a Texas community college required students to obtain a permit before they could speak on campus and relegated such speech

to a "free-speech zone," but it failed to provide any objective criteria for administrators to use in evaluating a permit application. This policy violated the First Amendment because it gave officials unfettered discretion to impose a prior restraint on speech. *Smith v. Tarrant Cty. Coll. Dist.*, 670 F. Supp. 2d 534, 538 (N.D. Tex. 2009).

Second, Defendants have discretion over whether students *must* use the speech zones rather than any other outdoor area of campus. For example, the policy states that the speech zones are designated for "peaceful and orderly protests and demonstrations." SOF ¶ 45. But the Policy fails to define either "peaceful and orderly protests" or "demonstrations" and provides no factors to consider in determining whether speakers are engaging in one of these activities. SOF ¶ 45. Likewise, protests and demonstrations are not defined by a certain number of speakers or by size of a group under the policy. SOF ¶ 46. Instead, each determination regarding a protest or demonstration lies within the sole discretion of Defendants. SOF ¶ 48.

Third, Defendants have discretion over whether students can use the speech zones when they are closed (i.e., weekends, before 8:00 a.m., and after 9:00 p.m.). The policy says if students wish to use the zones during "other times for speeches and demonstrations" they must request permission 72 hours in advance. SOF ¶ 53. It is completely silent on what permits to grant, or the factors to consider. SOF ¶ 36; Ex. 9.

Fourth, Defendants have unbridled discretion over who can set up a "stand, table or booth" in the speech zones. The policy says that those can be used "only

14

with permission from the Director of Student Development and Leadership." SOF ¶ 44. Again, the policy is silent on what permits to grant or the factors to consider. SOF ¶ 36; Ex. 9. Defendants' broad discretion was evident in the current matter. Plaintiffs' attempt to set up their own table on the plaza in front of the Student Union was met with immediate refusal and without any attempt to allow Plaintiffs to move to another location. SOF ¶ 20. While their table did not block any entrance or walkway and did not cause any sort of disruption, Plaintiffs were removed from the area by administrators and campus police. SOF ¶ 22.

University administrator Ms. Elizabeth Rouse and campus police officer Lt Terry Phipps publicly confronted Ms. Hoggard and Ms. Parry for the offense of setting up a table without permission in front of the Student Union. SOF ¶ 21. When they were reluctant to depart and stop talking to students, Ms. Rouse told them that they were not allowed to be there and that they could not speak in the free speech zones without receiving permission 24 hours in advance. SOF ¶ 104.

To drive home the seriousness of the situation, Lt Phipps issued a "PNG" or "persona non grata" citation to Ms. Parry (a non-student) within a couple of minutes of his arrival at the scene. SOF ¶ 105. Although Lt. Phipps acknowledged that he did not know what policy Ms. Parry was believed to have violated, he issued her a PNG and made it clear to her that she was not welcome. SOF ¶ 107. If she did not understand the gravity of the situation, it became more apparent when a second officer, Andrew Thrasher, appeared at

15

the scene to take down her personal information and serve her with the actual PNG citation for violating the "free speech area policy." SOF ¶ 108. The citation threatened Ms. Parry with arrest for criminal trespass if she came on campus grounds again and did not comply with the PNG. SOF ¶ 109.

Although an Arkansas State student, Ms. Hoggard did not escape unscathed. Lt Phipps requested her ID and that of Joel Haynes, a student who was also at the table promoting Turning Point USA at Arkansas State. SOF ¶ 91. Lt Phipps listed them as suspects in his police report recounting the violations of the Speech Zone Policy and warned them that their failure to comply with the policy would result in punishment under the Student Code of Conduct. SOF ¶ 111. The campus police officers then continued to video tape the encounter and remained at the scene to ensure that everyone at the table had departed the area. SOF ¶ 113. Backed by law enforcement, the University exercised its unbridled discretion against students and non-students alike.

Fifth, the policy allows Defendants to change the material terms of the policy by designating additional areas as speech zones or modifying existing zones. Nothing in the policy says when or how these zones can be modified, or sets forth the criteria they must use to modify them. SOF ¶ 36; Ex. 9. Incredibly, Defendants have exercised this discretion to create an *unwritten* speech zone policy, known only by them, where preferred groups receive permission to speak while other students and non-students are excluded. SOF ¶ 84.

Although not specified anywhere in the Speech Zone Policy, Defendants have unilaterally determined that the large walkway in front of the Reng Student

Union may only be used by registered student organizations. And a student organization cannot use the area unless it obtains prior permission from Ms. Rouse. This ad hoc policy is not reduced to writing. Thus, students have no way of knowing about this policy beforehand, and have no way to determine whether a request is being denied for improper reasons. Instead, Defendants have used their complete discretion to unilaterally close off one of the most heavily-trafficked, and most desired areas on campus, to the majority of the student population.

Not surprisingly, Plaintiffs, along with most of the students at Arkansas State, were unaware of this unwritten policy when they arrived on campus to promote their student group. SOF ¶ 18. But because Plaintiffs had not yet obtained registered student organization status, they were forced to take down their table and leave the area under threat of punishment by University police and administrators. SOF ¶ 16. While just one example of Defendants' discretion in creating additional speech zones and restrictions on speech, Plaintiffs' case demonstrates how expansive the Policy is and how much discretion it permits.

Defendants may argue that the policy does not grant unbridled discretion because the policy lists eight criteria for Defendants to apply when considering requests to speak. SOF ¶ 36; Ex. 9. However, these criteria do not limit Defendants' discretion. The policy makes it clear that the criteria are simply the minimum requirements that every request must meet before permission *may* be granted. SOF ¶ 36; Ex. 9.

None of listed criteria limits the discretion of school officials as

demonstrated by their treatment of Plaintiffs.  The Policy does not say that speakers who satisfy the criteria must be approved, that these are the only reasons a request can be denied, or that officials cannot deny requests for other, unwritten reasons. SOF ¶ 36; Ex. 9. Instead, the Policy authorizes Defendants to deny requests that meet all of criteria. And, in fact, that is exactly what Defendants did when Plaintiffs attempted to speak. SOF ¶¶ 85-86.

Plaintiffs were not violating any one of the eight criteria specified in the Policy. SOF ¶ 85. Yet, Defendants refused to allow them to speak and forced them to leave the area.  SOF ¶ 86. Defendants' Policy explicitly permits such an arbitrary denial "in order to serve the interests of health and safety, prevent the disruption of the process, and protect against invading the rights of others." SOF¶ 36; Ex. 9. Defendants' Policy provides no explanation or definition to guide administrators in judging which actions rise to a level requiring silencing of speech.  Defendants and Defendants only determine which denials "serve the interests of health and safety, prevent disruption of the process, and protect against invading the rights of others." SOF ¶ 36; Ex. 9.

At each of the five layers, Defendants' policy lacks the required "narrow, objective, and definite standards." *Forsyth Cty.*, 505 U.S. at 131 (quoting *Shuttlesworth*, 394 U.S. at 151). Instead, the policy is far from "*precise* and *objective*," giving officials far more than "merely ministerial" discretion. *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999). It grants unbridled discretion, making it viewpoint-based and unconstitutional

18

in any forum.[2]

### a. The Speech Zone Policy is not content or viewpoint neutral.

Policies cannot be deemed viewpoint neutral without including affirmative "protection . . . for viewpoint neutrality." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). "Where a regulation requires that a speaker receive permission to engage in speech, the official charged with granting the permission must be provided specific standards on which to base his or her decisions. "Without such standards, every application of the regulation 'creates an impermissible risk of suppression of ideas.'" *Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001) (quoting *Forsyth Cty.*, 505 U.S. at 129).

Defendants' Speech Zone Policy lacks any such protections. Nothing prevents officials from:

- allowing certain students to speak outside the zones while denying other viewpoints access to those same venues, SOF ¶ 36; Ex. 9;
- allowing certain students to speak in the speech zones while denying other viewpoints access to the speech zones, SOF ¶ 36; Ex. 9;
- selectively allowing students to speak when the speech zones are closed, SOF ¶ 36; Ex. 9;
- selectively allowing certain students to set up a stand, table or booth, in the speech zones while denying other viewpoints the right to do the

---

[2]   Numerous courts have struck down college speech zones for granting unbridled discretion. *See, e.g., OSU Student All. v. Ray*, 699 F.3d 1053, 1063-66 (9th Cir. 2012) (striking student newspaper bin restriction that "created no standards to cabin discretion" and "set no fixed standard[s]" for applying the policy because it conferred unbridled discretion as "a standardless policy"); *Pro-Life Cougars*, 259 F. Supp. 2d at 577–79, 583–84 (striking policy letting officials move "potentially disruptive" events as it lacked "any objective guidelines or articulated standards"); *Smith*, 670 F. Supp. 2d at 536, 538 (striking policy requiring students get a permit twenty-four hours before speaking in a speech zone for granting "unfettered discretion in imposing prior restraints on speech in public forums").

same, SOF ¶ 36; Ex. 9;

- denying requests that meet all eight considerations due to other factors, SOF ¶ 36; Ex. 9, including "the whim of the administrator," *Forsyth Cty.*, 505 U.S. at 133; or
- modifying the zones to benefit favored speakers. SOF ¶ 36; Ex. 9.

While Defendants may (wrongly) argue that no one abused this discretion, "the success of a facial challenge on the grounds that [a policy] delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content- [or viewpoint-] based manner, but whether there is anything in the [policy] preventing him from doing so." *Forsyth Cty.*, 505 U.S. at 133 n.10; *accord Lakewood*, 486 U.S. at 770 n.11 ("Facial attacks . . . are not dependent on the facts surrounding any particular permit denial."). Because the Policy grants unbridled discretion, Defendants may not simply espouse a permissible rationale for its application in a particular case in order to survive a constitutional challenge. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (finding content discrimination despite "an innocuous justification").

Moreover, even though the policy does not explicitly authorize the denial or revocation of a permit on the basis of viewpoint, it does nothing to limit discretion or to provide the required "*precise* and *objective*" criteria. *Lady J. Lingerie*, 176 F.3d at 1362; SOF ¶ 36; Ex. 9. The University of Houston similarly said it "considers only content-neutral factors when applying [the challenged policy]," but the court rejected this as it "presumes that [officials] will act in good faith and adhere to standards absent from the [policy]'s face," which "'is the very presumption that the doctrine forbidding unbridled discretion disallows.'" *Pro-Life Cougars*, 259 F. Supp. 2d at 584 (quotation

omitted). Defendants' policy is indistinguishable from Houston's in its unbridled discretion and deserves a similar fate.

In his 30(b)(6) deposition, Defendant Dr. Rick Stripling, Vice Chancellor of the University and the official responsible for implementing the Speech Zone Policy, explicitly acknowledged that he considers the content of the speech in determining how to apply the Policy. SOF ¶ 75.  When questioned about the process by which he evaluates requests to speak on campus, Defendant Stripling repeatedly referenced content as a basis for determining where and when the Policy would apply. SOF ¶ 76. In fact, when posed a hypothetical about whether the Policy would apply to a situation identical to Plaintiffs', Vice Chancellor Stripling asked "And what are they talking about?" Ex. 8 at 62:17. Dr. Stripling also testified that speech deemed offensive to some would be quarantined to the speech zones, while less controversial subjects such as biology could be discussed freely regardless of the location on campus. SOF ¶ 72; Ex. 8. As demonstrated by Dr. Stripling's testimony, there is no question that the Speech Zone Policy, both facially and applied, is not content or viewpoint neutral. SOF ¶ 72; Ex. 8.

As a content-based prior restraint, Defendants' Speech Zone Policy also fails to satisfy any of the procedural requirements imposed by *Freedman v. Maryland*, 380 U.S. 51 (1965); *Walker v. Wegner*, 624 F.2d 60 (8th Cir. 1980). Such restraints "can be imposed only for a specified brief period" of time, "expeditious judicial review . . . must be available," and "the censor must bear the burden of going to court to suppress the speech and must bear the burden

of proof." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 321 (2002).

The Speech Zone Policy applies at all times on the entire campus, even to student conversations. SOF ¶ 47. It imposes no time limits for granting permits and gives Defendants Dr. Stripling and Dr. Spack the final word, without requiring an explanation for a denial. SOF ¶ 60-61. Defendants' Policy provides speakers with no judicial or administrative review of any kind. SOF ¶ 52. The Speech Zone Policy contains none of the procedural safeguards required by *Freedman*. Thus, it is an unconstitutional, content-based, prior restraint.

### b.  Defendants' Speech Zone Policy is not narrowly tailored.

In addition to being content- and viewpoint-based, Defendants' Speech Zone Policy is not narrowly tailored to serve a significant governmental interest and it does not leave open ample alternative means of communication. *Krantz v. City of Fort Smith*, 160 F.3d 1214 (8th Cir. 1998). That is, it must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted).

"Although a governmental restriction does not have to be the least restrictive or least intrusive means of regulation, it may not, under well-established constitutional standards, curtail substantially more speech than is necessary to accomplish its purpose . . . ." *Krantz*, 160 F.3d at 1222. Too often "silencing the speech is . . . the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (citation omitted). Defendants' Speech

Zone Policy flunks this test.

Defendants' Policy purports to "allow equal opportunity for all persons to be able to speak," "ensure[] order and protect[] University property," and to "allow[] a place for the campus community to express ideas and opinions." SOF ¶ 36; Ex. 9. In reality, the Policy prevented Plaintiffs from having any place to express ideas and opinions and did nothing to provide an equal opportunity for other persons to be able to speak.

Courts have found five aspects of Defendants' Speech Zone Policy to fail the narrow tailoring requirement, often dismissing Defendants' interests. First, as Ms. Hoggard knows, this policy prevents as few as two students and their invited guest from talking with other students about their student group outside the speech zones. SOF ¶ 86. To speak anywhere on campus outside the speech zones (i.e., 99% of campus), Ms. Hoggard must seek a permit three days in advance, regardless of how many people accompany her. SOF ¶ 53.

In *Douglas v. Brownell*, the Eighth Circuit expressed "doubt whether applying the permit requirement to [groups of ten or more persons] is sufficiently tied to the City's interest in protecting the safety and convenience of citizens who use the public sidewalks and streets." 88 F.3d 1511, 1524 (8th Cir. 1996). Similarly, the Eleventh Circuit has recognized that many courts invalidated "permitting requirements because their application to small groups rendered them insufficiently tailored." *Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1255 n.13 (11th Cir. 2004); *see, e.g., Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("[O]rdinances requiring a permit for

demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring.").

Second, this policy "effectively ban[s]" "a significant amount of spontaneous speech," violating the First Amendment. *Watchtower*, 536 U.S. at 167–68. This is often "the most effective kind of expression," but permit procedures prevent "immediate speech" from responding to "immediate issues." *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994). Often, timing is of the essence. *Shuttlesworth*, 394 U.S. at 163 (Harlan, J., concurring) ("[W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all.").

But at Arkansas State, there is no place for spontaneous speech.[3] Students must get a permit to speak anywhere, anytime on campus—whether outside the zones (*i.e.*, 99% of campus), SOF ¶ 38; Ex. 4 ¶ 83, or inside them. SOF ¶ 41. They cannot address time-sensitive matters spontaneously. *Williams*, 2012 WL 2160969, at *6 (noting "expansive permitting schemes place an objective burden" on free speech and "essentially ban spontaneous speech").

---

[3] *Watchtower*, 536 U.S. at 165–66 ("It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *Thomas v. Collins*, 323 U.S. 516, 539 (1945) ("As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly.").

Third, Defendants limit almost all student speech to seven small zones (*i.e.*, small fraction of campus). SOF ¶ 40. Courts considering whether Defendants' asserted interests justify such limits have found similar policies are not narrowly tailored. In one such case, Texas Tech University employed a policy requiring students to obtain a permit at least two business days before engaging in protected speech on the campus outside of the designated free-speech zones. *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004). The Texas Tech policy was unconstitutionally overbroad and was not narrowly tailored as it burdened "more speech than [was] necessary to further the government's legitimate interests." *Id.* at 869 (quoting *Hays Cty. Guardian v. Supple*, 969 F. 2d 111, 118 (5th Cir. 1992). *See also Khademi v. S. Orange Cty. Cmty. Coll. Dist.*, 194 F. Supp. 2d 1011, 1034-35 (C.D. Cal. 2002) (striking leafleting ban inside and outside college buildings as "not narrowly tailored" to preventing litter and protecting students from solicitors); *Burbridge v. Sampson*, 74 F. Supp. 2d 940, 950-51 (C.D. Cal. 1999) (restricting certain student events to three "preferred areas" does not advance "a single interest, much less a significant one"); *Williams*, 2012 WL 2160969, at *7 (same for limiting student speech to one area).

Fourth, Defendants require students to seek a permit three days before using any area outside the speech zones, going beyond the policy struck down at Texas Tech. *Roberts*, 346 F. Supp. 2d at 869 (requiring "student[s] to acquire a permit at least two business days before" speaking "outside of the designated free-speech zones but in areas of the campus that are public forums

nonetheless"). Like Defendants' justification, Texas Tech said this was needed to "preserv[e] an environment suitable for classroom instruction and library study," coordinate events, 'and address "noise and safety" concerns. *Id.* at 869. But it was not narrowly tailored "because it sweeps too broadly in imposing a burden on a substantial amount of expression that does not interfere with any significant interests of the University." *Id.* at 870; *Williams*, 2012 WL 2160969, at *6–7 (finding three-day notice period not narrowly tailored to having a "peaceful and safe" campus). It "is simply unfathomable that a [Arkansas State] student needs to give the [College] advance notice of an intent to [leaflet]. *There is no danger to public order arising out [of] students walking around campus [leafleting].*" *Williams*, 2012 WL 2160969, at *7 n.5.

Fifth, the Speech Zone Policy prohibits students from leafletting everywhere except for certain outdoor locations on campus and the Policy prohibits students from speaking while doing so. SOF ¶ 54. The Policy designates nine locations on campus for the distribution of written material, but it makes no exception in these areas for "speaking, demonstrating and [engaging in] other forms of expression" without prior permission. SOF ¶55. Defendants do not even attempt to justify why the policy would allow a single student to distribute literature in a certain area but would prohibit that same student from simply speaking with other students in that same area without prior permission. SOF ¶ 55. This type of arbitrary distinction does not further any significant interest of Arkansas State. And is certainly not narrowly tailored to achieve any such interest.

Defendants' enforcement of the Policy against Plaintiffs in this case demonstrate that the policy is not narrowly tailored. Ms. Hoggard and her two companions were simply speaking with students on a large, open walkway. Plaintiffs' actions presented no threat to public order or to any University property. SOF ¶ 90. Neither were they obstructing any walkways or entrances. SOF ¶ 90. In fact, Ms. Hoggard and her companions chose their specific location near the Student Union *because* it was out of the way. Ex. 18. Nevertheless, Defendants quickly shut down Plaintiffs' protected speech activities and insisted that Ms. Hoggard and her companions leave. SOF ¶ 113.

Defendants will likely again attempt to defend their policy by relying upon *Bowman*, but *Bowman* is not controlling for two reasons. First, the permit requirement in *Bowman* did not apply to students. It only applied to persons unaffiliated with the university. *Bowman*, 444 F.3d at 981. Second, the *Bowman* decision is based on the Court's finding that the "University has a significant public safety interest in requiring a permit because of the time and resources necessary to accommodate the crowds that Bowman attracts." *Id.* The Court based its finding on the following facts: (i) the majority of plaintiff's permit requests listed estimated attendance between 50 and 100 people; (ii) the actual attendance was as high as 200 people; and (iii) plaintiff has "demonstrated the capacity to attract a crowd and disrupt the unique educational environment." *Id.* The *Bowman* Court held that "[u]nder these circumstances, the permit requirement is justified." *Id.*

None of those factors are present here. Instead, Defendants' Speech Zone

Policy applies to students as well as non-students. The policy does not just apply to large groups. SOF ¶ 36; Ex. 9. Rather, it requires all students to obtain a permit 72 hours in advance to speak anywhere on campus, other than the speech zones, even for a single student. SOF ¶ 36; Ex. 9. Defendants enforced the Speech Zone Policy against Plaintiffs even though they were not: (i) attracting a crowd, (ii) blocking any entrance or exit to any buildings, (iii) impeding access to the buildings or parking lots, or (iv) blocking the free flow of traffic on the sidewalks. SOF ¶ 90. Accordingly, Defendants' Speech Zone Policy is not narrowly tailored because it requires even a couple of students to obtain a permit to speak 72 hours in advance in virtually all public places on campus. SOF ¶ 53.

Defendants' asserted interests do not satisfy strict scrutiny. First, Defendants cite their educational mission, SOF ¶ 36; Ex. 9; Defs.' Mot. to Dismiss Brief at 14 (Dkt. No. 12), as if this mission did not include fostering a robust marketplace of ideas where students engage one another on important topics. Even so, a college's "institutional mission . . . does not exempt its actions from constitutional scrutiny." *Widmar*, 454 U.S. at 268. "[T]he broad argument . . . that . . . public [high] school officials [may] censor any student speech that interferes with a school's 'educational mission' . . . strikes at the very heart of the First Amendment." *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J. concurring); *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) (finding "educational mission" is "so vague" as to give "virtually unlimited discretion"). Even at high school, "[w]here students' expressive

activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably *might* have such an effect." *Holloman v. Harden*, 370 F.3d 1252 (11th Cir. 2004). Defendants' policy addresses this same contingency, and they have "*less leeway* in regulating student speech." *DeJohn*, 537 F.3d at 316.

Next, Defendants insist they must "ensure public safety." SOF ¶ 36; Ex. 9. Requiring a permit for all student speech, including a single student, anywhere on campus is not narrowly tailored to protect public safety, particularly in the absence of any credible threat or evidence. *See e.g. Watchtower*, 536 U.S. at 165–69.

Last, Defendants assert their interest in fostering a diversity of uses for University resources. SOF ¶ 36; Ex. 9. But Defendants have not put forth any argument demonstrating how requiring two students and a guest to obtain a permit to speak with other students on campus is narrowly tailored to achieve that interest. Moreover, diversity is *lessened* by restricting student speech, not enhanced.

In short, Defendants' Speech Zone Policy is a restriction on First Amendment rights of breathtaking scope and cannot be justified by a compelling government interest. It is not narrowly tailored; it is an unconstitutional prior restraint.

### c. **Defendants' Speech Zone Policy does not provide ample alternative means of communication.**

To qualify as a permitted prior restraint, Defendants' Speech Zone Policy must also "leave open ample alternative channels of communication." *Ward*, 491 U.S. at 802; *Bell v. City of Winter Park*, 745 F.3d 1318, 1322 (11th Cir. 2014) (same). Relevant factors include whether the speaker can "reach the intended audience," the location is "part of the expressive message," there is "opportunity for spontaneity" in the alternative location, and the alternatives are more costly or less convenient. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009). Defendants' policy fails to satisfy this standard.

Defendants' Speech Zone Policy requires students to obtain a permit before speaking *anywhere* on campus. SOF ¶ 36; Ex. 9. Thus, the policy does not leave open *any* alternative channel of communication for students to speak with other students on campus. Plaintiffs have no acceptable means of "reaching their intended audience" unless they receive prior permission from the Defendants. This prior permission requirement destroys the "opportunity for spontaneity" on the campus, as students are not free to engage other students in regard to real-time national or campus issues.

Furthermore, the policy's confinement of speaking, demonstrations, and other expressive activity to one of the small speech zones severely limits the extent to which the location can be "part of the expressive message," because this prohibits students from engaging with other students *en route* to their classes or destinations. SOF ¶ 36; Ex. 9. While the monetary "cost" may be

negligible, the inconvenience of having to request a place and then remain confined to that place in order to engage other students is especially high.

Defendants assert that students can still communicate to other students through social media or by submitting articles to the student newspaper. However, these options suffer significant deficiencies. Social media is much more impersonal than live conversation and does not allow Plaintiffs to reach all of the intended audience, particularly those who eschew social media. Social media also offers nothing for speakers who want the location to be part of the expressive message. Sending out a message over social media also provides no significant opportunity for spontaneity, at least in regard to dialogue between the speaker and the listener. These facts demonstrate that an acceptable alternative does not exist at Arkansas State.

Defendants' Speech Zone Policy is an unconstitutional prior restraint because it grants unbridled discretion to Defendants, is not content- or viewpoint-neutral, is not narrowly tailored, and does not leave open ample alternative means of communications.

## II. Defendants' Speech Zone Policy violates Plaintiffs' Fourteenth Amendment Right to Due Process.

Defendants' Speech Zone Policy violates the Fourteenth Amendment's Due Process Clause. A regulation is void-for-vagueness under the Due Process Clause if it "forbids or requires the doing of an act in terms so vague that [students] of common intelligence must necessarily guess at its meaning and differ as to its application." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). The void-for-vagueness doctrine also "prevents

arbitrary and discriminatory enforcement." *Id.* In analyzing a policy under this doctrine, the court must first "determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Id.* As indicated by Defendants' enforcement of the Speech Zone Policy against Plaintiffs, the policy clearly reaches a substantial amount of constitutionally protected conduct.

A policy is vague if it fails to "give [students] of ordinary intelligence a reasonable opportunity to know what is prohibited," lacks "explicit standards for those who apply [it]," or chills constitutional freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *accord City of Chi. v. Morales*, 527 U.S. 41, 56 (1999). Here, "a more stringent vagueness test should apply" as these policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord Stephenson*, 110 F.3d at 1308-09.

Defendants' Speech Zone Policy is written so vaguely that students cannot know how to structure their requests, leaving Defendants to grant permits in a discriminatory way. The terms "speaking, demonstrating, and other forms of expression" are entirely vague and ambiguous. SOF ¶ 42. They provide no clarity or guidelines in the policy and offer no distinction between the giving of a speech or a demonstration and "casual, everyday conversation." SOF ¶ 47.

Likewise, Defendants reserve the authority to restrict speech "in order to serve the interests of health and safety, prevent the disruption of the process, and protect against invading the rights of others." SOF ¶ 36; Ex. 9. This

boundless clause creates significant ambiguity offering no explanation as to how "the process" may be disrupted or to which "process" the Policy even refers. SOF ¶ 36; Ex. 9. Neither does it identify which "rights of others," might be invaded or how those rights would be weighed against the First Amendment rights of speakers.

Defendants' enforcement of the Policy against Plaintiffs demonstrates these significant ambiguities. While Ms. Hoggard and her guest were "engaging students in conversation," Defendants stated that "they were in violation of the Speech Zone Policy because they were talking with students outside of the speech zones." SOF ¶ 95. The Policy does not provide any criteria or definition that allows students to distinguish between expression that Defendants would consider a casual conversation with other students (which is allegedly allowed under the Policy without prior permission) and expression that would be considered "speaking" and thus would require the students to obtain Defendants' prior permission. SOF ¶ 47.

In fact, the Policy requires prior permission before engaging in "other forms of expression." SOF ¶ 76. This vague, undefined phrase could be interpreted to cover a vast swath of expression: the wearing of a "MAGA" ("Make America Great Again") hat; wearing tape over one's mouth to bring attention to persons or groups who feel unheard or silenced; or singing the lyrics to "War" by Edwin Starr in the presence of students or faculty. All of the above examples are arguably covered by the Speech Zone Policy and could thereby be prohibited without prior permission from Defendants.

In his deposition, Defendant Stripling conceded that nearly anything could be considered an "other form of expression" under the Policy, including the wearing of a MAGA hat, the wearing of a T-shirt reading "Abortion Kills Babies," and holding up an anti-war sign. SOF ¶ 76. Any of these could potentially trigger the Speech Zone Policy and require a reservation. SOF ¶ 76. Yet, given the vague language and lack of definitions in the Policy, the only way that students are able to know for certain whether their desired expression is covered by the Policy is to ask Defendants *before* engaging any "other form of expression." This is constitutionally unacceptable.

The Speech Zone Policy is also vague in its geographical scope. SOF ¶ 79. Five lawns, one amphitheater, and one plaza are designated as Free Speech Zones, yet none of these areas are described with specificity or by any sort of dimensions. SOF ¶ 79. Even a student attempting to comply with one of the Speech Zones cannot ascertain when she has wandered from the permitted area into a non-Speech area. SOF ¶ 83. These zones are in no way marked or cordoned off so that a student would necessarily know that she is speaking within or outside of a permissible zone on campus. SOF ¶ 79. In fact, when asked to outline the borders of the speech zones, Defendants specified different sizes and different locations for the zones. SOF ¶ 80. Astonishingly, Defendant Spack acknowledged that the only way to determine the exact dimensions would be to hire a surveyor. SOF ¶ 82.

The Speech Zone Policy relies upon vague terms and fails to provide any definitions to guide students and administrators when interpreting the Policy.

Thus, "[students] of common intelligence must necessarily guess at [the policy's] meaning"; officials will "necessarily . . . differ as to [their] application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The Defendants' Speech Zone Policy is demonstrably vague.

### CONCLUSION

Defendants' Speech Zone Policy imposes an unconstitutional prior restraint on speech. It is exceptionally overbroad and vague, provides almost limitless discretion to administrators, and authorizes content- and viewpoint- based discrimination against student speech based on the views and reactions of listeners, chilling student speech. Defendants enforced this unconstitutional policy against Plaintiffs to stop them from engaging in constitutionally protected speech. Accordingly, Plaintiffs respectfully request that the Court grant this Motion for Summary Judgment against the Defendants and their unconstitutional Speech Zone Policy.

Respectfully submitted this 4th day of February 2019,

*/s/ Tyson C. Langhofer*
Tyson C. Langhofer*
Arizona Bar No. 032589
**Alliance Defending Freedom**
15100 N. 90th ST.
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
tlanghofer@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE,
Suite D-1100

35

Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Fax: (770) 339–6744
dcortman@ADFlegal.org


Ethan C. Nobles
Arkansas Bar No. 95048
**Nobles Law Firm**
149 S. Market
Benton, AR 72015
Telephone: (501) 794-9742
Fax: (501) 641-7057
ethan @NoblesLawFirm.com


\* Admitted *pro hac vice.*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2019, I electronically filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

Delena C. Hurst
Associate General Counsel
Arkansas State University System
501 Woodland Dr., #600
Little Rock, AR 72201
Telephone: (501) 660-1009
dhurst@asusystem.edu

Rodney P. Moore
Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Telephone: (501) 371-0808
rpmoore@wlj.com

Jeffrey W. Puryear
Ryan M. Wilson
Womack Phelps Puryear Mayfield & McNeil, P.A.
P.O. Box 3077
Jonesboro, AR 72403
Telephone: (870) 932-0900
jpuryear@wpmfirm.com
rwilson@wpmfirm.com

*Attorneys for Defendants*

*/s/ Tyson C. Langhofer*
Tyson C. Langhofer
*Attorney for Plaintiffs*