**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**TURNING POINT USA AT ARKANSAS
STATE UNIVERSITY**, *et al.***,**

                Plaintiffs,

    v.

**RON RHODES,** *et al.*,

                Defendants.

Case No. 3:17-cv-00327 JLH

**RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

<u>T<small>ABLE OF</small> C<small>ONTENTS</small></u>

TABLE OF AUTHORITIES ...............................................................v

INTRODUCTION ............................................................................1

ARGUMENT ...................................................................................3

I.   Defendants mischaracterize the terms of the Speech Zone Policy. .........3

    A.   The Policy designates the entire outdoor area of the ASU
         campus as an unlimited designated public forum. ........................4

    B.   The Policy specifically designates Heritage Plaza as a free
         expression area and does not limit its use to RSO's. .....................5

    C.   The Speech Zone Policy grants Defendants unbridled
         discretion to deny requests to speak and thus is not content
         neutral. ..........................................................................8

         1.   The Policy does not contain any objective criteria. ...............8

         2.   Defendants consider the content of speech when
             evaluating requests to speak. ..................................................9

    D.   The Speech Zone Policy applies to all expressive activity
         and does not exempt casual, everyday conversations.................. 10

II.   Defendants are not entitled to summary judgment because the
    Speech Zone Policy violates Plaintiffs' First Amendment free
    speech rights both facially and as-applied. ........................................... 12

    A.   The Speech Zone Policy is unconstitutional both facially
         and as-applied because it is overbroad and it imposes an
         unconstitutional prior restraint on Plaintiffs' ability to
         speak on campus. ........................................................... 12

         1.   An as-applied challenge is not limited to actual
             enforcement, but includes the entire Policy that is
             applicable to Plaintiffs and the ongoing chilling effect
             on Plaintiffs' speech. ........................................................ 13

2.    The Speech Zone Policy is overbroad because it penalizes a substantial amount of protected speech. ........ 16

3.    The Speech Zone Policy is an unconstitutional prior restraint because it grants Defendants unbridled discretion, is not content and viewpoint neutral, it is not narrowly tailored, and does not leave open ample alternative means of communication ................................. 17

    a.    The Policy grants Defendants unbridled discretion. .................................................. 18

    b.    The Policy allows Defendants to discriminate on the basis of the content and viewpoint of speech. ....................................................... 20

    c.    Defendants' Speech Zone Policy is not narrowly tailored to achieve a significant governmental interest. ................................................... 23

4.    The Policy does not leave open ample alternative means of communication. .................................................... 31

III.    Defendants are not entitled to summary judgment because the Speech Zone Policy violates Plaintiffs' Fourteenth Amendment Due Process rights. ................................................... 32

IV.    Defendants violated clearly established law and are not entitled to qualified immunity. .......................................... 35

  A.    It is clearly established that prior restraints that grant unbridled discretion discriminate based on viewpoint and are unconstitutional .................................................... 36

  B.    Defendants admit they consider the content of students' speech when enforcing the Policy. ................................. 38

  C.    Each Defendant is directly responsible for the existence or enforcement of the Speech Zone Policy ......................... 39

V.    Plaintiffs have standing because the Speech Zone Policy is a prior restraint on their speech, and Defendants' unbridled discretion chills Plaintiffs' speech. ........................................................... 40

CONCLUSION................................................................................. 42

CERTIFICATE OF SERVICE........................................................... 44

## TABLE OF AUTHORITIES

### CASES

*Ball v. City of Lincoln,*
  870 F.3d 722 (8th Cir. 2017).............................................................. 27, 28

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ...................................................................................... 18

*Baribeau v. City of Minneapolis,*
  596 F.3d 465 (8th Cir. 2010)............................................................................ 36

*Board of Regents of University of Wisconsin System v. Southworth,*
  529 U.S. 217 (2000).......................................................................................... 21

*Bell v. City of Winter Park,*
  745 F.3d 1318 (11th Cir. 2014) ............................................................ 31

*Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.,*
  482 U.S. 569 (1987) ................................................................ 16-17

*Bowman v. White,*
  444 F.3d 967 (8th Cir. 2006)..........................................................*passim*

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) ........................................................................ 23, 24

*Burnham v. Ianni,*
  119 F.3d 668 (8th Cir. 1997)........................................................ 35, 36, 37

*Camfield Tires, Inc. v. Michelin Tire Corp.,*
  719 F.2d 1361 (8th Cir. 1983)................................................................ 4

*Citizens United v. Federal Election Commission,*
  558 U.S. 310 (2010) ................................................................ 13, 28-29

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ................................................................................ 32

*City of Fort Smith v. Krantz,*
  160 F.3d 1214 (8th Cir. 1998)............................................................ 25

*City of Lakewood v. Plain Dealer Publishing Co.,*
  486 U.S. 750 (1988) ..........................................................................*passim*

*Cohen v. California,*
  403 U.S. 15 (1971) ................................................................................ 29

*Connally v. General Construction Co.,*
    269 U.S. 385 (1926)................................................................ 34

*Douglas v. Brownell,*
    88 F.3d 1511 (8th Cir. 1996).................................................. 25

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992)........................................... 16, 37, 38, 39, 41

*Frisby v. Schultz,*
    487 U.S. 474 (1988)................................................................ 24

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)................................................................ 32

*Hays County Guardian v. Supple,*
    969 F.2d 111 (5th Cir. 1992).................................................. 37

*Healy v. James,*
    408 U.S. 169 (1972)................................................................ 38

*Josephine Havlak Photographer, Inc. v. Village of Twin Oaks,*
    864 F.3d 905 (8th Cir. 2017).............................................. 16, 18

*Justice for All v. Faulkner,*
    410 F.3d 760 (5th Cir. 2005).................................................. 37

*Lewis v. Wilson,*
    253 F.3d 1077 (8th Cir. 2001) ............................................... 21

*Matal v. Tam,*
    137 S. Ct. 1744 (2017)............................................................ 29

*McCullen v. Coakley,*
    573 U.S. 464 (2014)................................................................ 25

*McGlone v. Bell,*
    681 F.3d 718 (6th Cir. 2012).................................................. 37

*Minnesota Voters Alliance v. Mansky,*
    138 S. Ct. 1876 (2018)............................................................ 23

*Nebraska Press Association v. Stuart,*
    427 U.S. 539 (1976)................................................................ 18

*Pro-Life Cougars v. University of Houston,*
    259 F. Supp. 2d 575 (S.D. Tex. 2003)............................... 22, 37

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015)................................................................ 24

*Roach v. Stouffer,*
    560 F.3d 860 (8th Cir. 2009).................................................... 18

*Roberts v. Haragan,*
    346 F. Supp. 2d 853 (N.D. Tex. 2004) ............................... 25, 37

*Rock for Life-UMBC v. Hrabowski,*
    411 F. App'x 541 (4th Cir. 2010) ........................................... 30

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ................................................................. 38

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ..................................................... 18, 37, 38

*Smith v. Tarrant County College District,*
    670 F. Supp. 2d 534 (N.D. Tex. 2009)............................... 20, 37

*Stephenson v. Davenport Community School District,*
    110 F.3d 1303 (8th Cir. 1997)................................................. 32

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)................................................................. 13

*Texas v. Johnson,*
    491 U.S. 397 (1989) ................................................................. 29

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) ................................................................. 37

*United States v. Kistner,*
    68 F.3d 218 (8th Cir. 1995)..................................................... 17

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ................................................................. 29

*University & Community College System of Nevada v. Nevadans
    for Sound Government,*
    100 P.3d 179 (Nev. 2004)........................................................ 37

*University of Cincinnati Chapter of Young Americans for Liberty v.
    Williams,* No. 1:12–cv–155, 2012 WL 2160969 (S.D. Ohio
    June 12, 2012) ......................................................... 25-26, 37

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ................................................................................ 32

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ......................................................................... 17, 31

*Watchtower Bible & Tract Society of New York*,
    536 U.S. 150 (2002) ................................................................................ 31

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ................................................................................ 39

## INTRODUCTION

Arkansas State University maintains and enforces a Freedom of Expression policy (the "Speech Zone Policy") which requires everyone, including students, to obtain a prior permit before engaging in expressive activity *anytime* and *anywhere* in the outdoor areas of campus. The Speech Zone Policy designates seven small outdoor areas as so-called Free Expression Areas. These areas comprise less than 1% of campus, and four of the seven are in locations with virtually no foot traffic. Although designated as Free Expression Areas, students are not free to use these areas for expressive activity. Rather, students are required to obtain prior permission from Defendants Stripling or Spack before using the Free Expression Areas.

Even worse, students are prohibited from speaking in any other outdoor area of campus, unless they obtain permission from Defendant Stripling at least *3 days* in advance. Thus, the Speech Zone Policy prohibits students from engaging in spontaneous speech in all outdoor areas of campus. Further, the Speech Zone Policy grants Defendants unbridled discretion to deny a student's request to speak for any or no reason at all.

Defendants enforced this policy to stop Ms. Hoggard from speaking with students on the edge of a large walkway in Heritage Plaza outside the Reng Student Union to promote her Turning Point USA student group. Although Ms. Hoggard was not blocking doors or walkways or creating a disturbance, Defendants enforced the Speech Zone Policy against her and ordered her to leave the area because she was outside the speech zones and had not obtained a permit to speak on campus as required by the policy.

Plaintiffs filed this action alleging that Defendants violated their First

Amendment rights of speech and Fourteenth Amendment rights of due process, both facially and as-applied, by enforcing the Policy which requires them to obtain a permit before speaking anywhere on the ASU campus. Defendants filed this motion arguing that they are entitled to summary judgment on all of Plaintiffs' claims. However, Defendants' entire motion is based on four incorrect assertions regarding the terms of the Speech Zone Policy. Defendants' assertions are refuted by the plain language of the Policy and Defendants' own testimony.

First, Defendants assert that the outdoor areas of campus have not been designated as public forums for expressive activities. However, the Policy authorizes anyone to use any outdoor area of campus, provided that they obtain prior permission from Defendant Stripling. Further, Defendants admit that the Policy does not exclude any outdoor area of campus from free expression.

Second, Defendants assert that Heritage Plaza is reserved exclusively for use by Registered Student Organizations ("RSOs"). However, the Policy specifically designates Heritage Plaza as a Free Expression Area which can be used by any student or member of the public.

Third, Defendants assert that the Policy requires requests to speak be evaluated on a content neutral basis. However, Defendant Stripling testified that he considers the content of the speech in determining whether to grant a permit to speak.

Finally, Defendants assert that the Policy does not apply to casual, everyday conversation. However, the Policy specifically provides that it applies

to "speaking, demonstrating, and other forms of expression." The Policy does not exempt casual, everyday conversations. And the testimony of Defendants Spack and Stripling confirm that the terms of the Policy are broad enough to regulate such conversations.

The uncontroverted evidence, including the terms of the Policy, Defendants' enforcement of the Policy against Plaintiffs, and Defendants' testimony regarding their interpretation of the Policy, demonstrate that the Policy imposes an unconstitutional prior restraint on all expressive activity in all outdoor areas of campus which are designated public forums. Defendants enforced that Policy against Plaintiffs to stop them from speaking with other students simply because they did not obtain prior permission. Accordingly, Defendants are not entitled to summary judgment because the Policy, both facially and as-applied, violates Plaintiffs' free speech rights under the First Amendment and their due process rights under the Fourteenth Amendment.

<u>**ARGUMENT**</u>

## I.  Defendants mischaracterize the terms of the Speech Zone Policy.

In their Motion for Summary Judgment, Defendants mischaracterize the provisions of the Speech Zone Policy. Specifically, Defendants allege that (1) the outdoor areas of campus have not been designated as public forums for free expression; (2) the Policy specifically reserves Heritage Plaza for exclusive use by RSOs; (3) the Policy requires requests to speak to be evaluated on a content neutral basis; and (4) the Policy does not apply to "casual, everyday conversations." These allegations are simply not true as evidenced by the express terms of the Policy and Defendants' own testimony.

On a summary judgment motion, courts may disregard self-serving allegations that lack foundation in evidence or contradict prior deposition testimony. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983) ("The very purpose of summary judgment under Rule 56 is to prevent 'the assertion of unfounded claims or the interposition of specious denials or sham defenses....'").

### A. The Policy designates the entire outdoor area of the ASU campus as an unlimited designated public forum.

Defendants incorrectly assert that the outdoor areas of campus, other than the Free Expression Areas, have not been opened for use for expressive activities. Contrary to Defendants' assertion, the Policy designates the entire ASU campus as an unlimited designated public forum for members of the general public and members of the university community. The Policy states that its "provisions and regulations shall apply to faculty, staff, students, student organizations, and visitors." Doc. 1-3 at 2. The Policy does not distinguish between members of the general public and students or other members of the university community. The Policy imposes the same restrictions and limitations on the speech of students that it imposes on non-students.

Although the Policy designates several areas as Free Expression Areas for speeches and demonstrations, the Policy also specifically opens up the rest of the campus for expressive activities: "Should any individual or group desire the use of other areas of the campus and other times for speeches and demonstrations, a request must be made to the Vice Chancellor for Student Affairs, his/her designee, or the Director of Student Development and Leadership at least 72 hours in advance of the event." Doc. 1-3 at 2. Thus, by its own terms, the Policy designates the outdoor areas of campus as an

4

unlimited designated forum. In fact, Defendants specifically acknowledge that the Policy "does not exclude any specific areas of campus from freedom of expression." Defs.' MSJ Brief, Doc. 36 at 19.

In *Bowman v. White*, the Eighth Circuit held that the areas at issue in that case were an unlimited designated forum because the university's policy opened the areas for expressive activities. 444 F.3d 967, 978-79 (8th Cir. 2006). The Court found that the Policy (i) authorized speech by University and Non-University Entities, (ii) applies to facilities or outdoor space, (iii) applies to the specific areas at issue, and (iv) did not limit the use to a specific group of speakers or for discussion on a very narrow topic. *Id.* "As such, the Policy indicates that the University itself designated the areas in question as locations for free expression." *Id.* at 979.

For purposes of determining the type of forum at issue, all of the same factors apply to the Policy in the present action. The Policy authorizes speech by members of the general public and members of the university community. The Policy applies to all outdoor spaces, including the area where Defendants stopped Plaintiffs from speaking. Finally, the Policy does not limit use of the campus to specific speakers or discussions on a narrow topic. Rather, the campus is open to all speakers and all topics, provided that such speakers receive Defendants' prior permission before speaking. Accordingly, ASU's entire campus is an unlimited designated public forum.

**B.     The Policy specifically designates Heritage Plaza as a free expression area and does not limit its use to RSOs.**

In an attempt to avoid Plaintiffs' challenge to the Speech Zone Policy, Defendants incorrectly allege Plaintiffs were not stopped from speaking for a violation of the Speech Zone Policy. Rather, Defendants baldly assert that Plaintiffs instead violated an unwritten policy governing RSOs which provides

that Heritage Plaza is specifically reserved solely for use by RSOs and University departments. However, this is directly contrary to the express terms of the Policy. Further, it is contradicted by undisputed evidence, including Defendants' own statements on the day of the event at issue.

The Policy provides that there are "several areas designated as *Free Expression Area* [sic] for speeches and demonstrations at Arkansas State University." One of the areas specifically identified by the Policy as a Free Expression Area is "Heritage Plaza east of Reng Student Union at Caraway Road." Free Expression Areas may be used by students and nonstudents alike. Doc. 1-3 at 1-2. The Policy does not exclude any portion of Heritage Plaza from use as a Free Expression Area. *Id*. In fact, the Speech Zone Policy provides no specific dimensions or defined boundaries for any of the Free Expression Areas. Doc. 1-3; Doc. 35-3 at 65:9-19; Doc. 35-2 at 114:16-18. Defendants' allegation is directly contradicted by the express terms of the University's Policy.

Defendants' allegation is also directly contradicted by their own statements on the day they stopped Plaintiffs from speaking on campus. On October 11, 2017, Ms. Hoggard and Ms. Parry set up a small table on Heritage Plaza east of the Reng Student Union, the exact area described by the Policy as a Free Expression Area. Doc. 35-1 at 200:2-7; Doc. 35-9; Doc. 35-10. Shortly thereafter, Elizabeth Rouse appeared and told Plaintiffs that they had to stop speaking with students because they did not have prior permission to speak in the area and they were not in a speech zone. Doc. 35-1 at 92:9-22, 200:2-7. At no time did Ms. Rouse, Lt. Phipps, or any other University administrator tell Plaintiffs or Ms. Parry that they were not allowed in Heritage Plaza because they were not a registered student organization. Doc. 35-10.

During this encounter, Ms. Parry noticed an off-campus speaker speaking nearby in Heritage Plaza. Doc. 35-10 at 2:06-2:16. Ms. Parry asked why the

nearby gentleman was allowed to speak but they were being forced to leave. Ms. Rouse stated that he had obtained prior permission and could remain there even though he was in Heritage Plaza. Doc. 35-10 at 2:06-2:16.

Neither Lt. Phipps, Ms. Rouse, nor any other University official offered to allow Ms. Hoggard and Ms. Parry to move away from Heritage Plaza and relocate to another speech zone or other location. Doc. 35-4 at 113:2-4; Doc. 40-19 at ¶ 17; Doc. 40-20 at ¶¶ 10-11; Doc. 35-9; Doc. 35-10. Ms. Rouse admitted to this fact in her deposition testimony. Doc. 35-4 at 113:2-4.

Moreover, the Persona Non Grata ("PNG") issued by Lt. Phipps specifically states that that Ms. Parry "was in violation of the following: Violation of Free Speech Area Policy." Doc. 40-17. The PNG does not say that Ms. Parry violated an RSO policy as Defendants now allege. Defs.' MSJ Brief, Doc. 36 at 38.

Finally, the alleged policy granting RSOs exclusive use of Heritage Plaza does not exist in the Speech Zone Policy or in any other written document. Doc 1-3; Doc. 35-4 at 126:6-128:19. Notably, the written application to become an RSO does not state that Heritage Plaza or the area outside of the Student Union is reserved solely for use by RSOs. Doc. 1-5; Doc. 35-7. Nevertheless, Defendants rely on this same application in support of their claim. Defs.' MSJ Brief, Doc. 36 at 15.

The application contains an entire section covering "information table reservations," but makes no mention of Heritage Plaza or reserving tables *outside* the Student Union. Doc. 1-5 at 2; Doc. 35-7 at 2. The only other section of the application addressing "reservations" generally makes the following references to the Reng Student Union: assessment of fees to "reserve rooms *in* the Reng Student Union" (emphasis added); the hanging of signs or decorations "on any surfaces *in* the Reng Student Union" (emphasis added); the prohibition on serving outside food or beverages "*inside* the Reng Student Union"

(emphasis added); and the requirement to purchase food and drinks "through Sodexo for any event *in* the facility[]" (emphasis added). Doc. 1-5 at 2; Doc. 35-7 at 2. In her deposition, Ms. Rouse admitted that no such language requiring reservations for space on Heritage Plaza or outside the Student Union exists in the application or anywhere else. Doc. 35-4 at 126:6-128:19.

The express terms of the Policy and Defendants' own statements on the day of the incident conclusively establish that Heritage Plaza is designated as a Free Expression Area for use by anyone not just RSOs. Other than Defendants' self-serving statements long after the incident, there is simply no evidence to support Defendants' allegation that Heritage Plaza is reserved exclusively for RSOs.

### C. The Speech Zone Policy grants Defendants unbridled discretion to deny requests to speak and thus is not content neutral.

Defendants incorrectly allege that the Policy requires that requests to speak be evaluated on a content neutral basis. However, this allegation is wrong for two reasons. First, the Policy does not provide any criteria to guide administrators in evaluating a request. Second, Defendant Stripling testified that he considered the content of speech when evaluating a request to speak.

### 1. The Policy does not contain any objective criteria.

The language of the Speech Zone Policy provides no objective criteria for evaluating whether a request to speak must be granted. Doc. 1-3. Speakers' requests are evaluated based solely in the discretion of an administrator.

Defendants argue that the Policy mentions eight factors under a section titled "Provisions" and claim that these provide a rubric to follow. Defs.' MSJ Brief, Doc. 36 at 33. Doc. 1-3 at 3-4. Defendants are mistaken. The list consists only of eight proscriptions that apply to every expressive event and which speakers may not ignore. Doc. 1-3 at 3-4. For example, number seven on the list

requires event organizers to "remove all resulting structures, signs and litter from the area at the end of the event." Doc. 1-3 at 4. Viewing this as a factor to weigh *in advance* to determine whether to permit an event is nonsensical. It proscribes conduct that happens at the end of an event, not before.

Moreover, nothing in the Policy "confines" administrators to considering only these terms, contrary to Defendants' bald assertion. Defs.' MSJ Brief, Doc. 36 at 33; Doc. 1-3. Even if a request meets all of these "factors," no provision in the Policy requires that permission be granted. Doc. 1-3. Defendant Spack conceded this crucial fact in her deposition. Doc. 35-3 at 36:8-10, 13-17, 20-21.

In the absence of objective, definable criteria, the decision of whether to allow a speaker to speak is bound only by the whim of an administrator. Defendant Stripling said it plainly when he testified: "And again back what we said earlier, policies, as you said they are written with broad interpretations. And so there's a point in time where it is left to an individual, whether it be me or somebody who works for me or university president. [...] If there comes a question in the end." Doc. 35-2 at 95:17-96:6. This admission becomes particularly problematic given Stripling's testimony that he would determine application of the Speech Zone Policy based on a number of factors including the topic of conversation. Doc. 35-2 at 62-63, 89, 98-99:22-100:18,100:19-23, 103:19-104:5.

According to plain terms of the Policy and Defendants' own testimony, the undisputed evidence demonstrates that the Policy does not contain any objective criteria to bridle Defendants' discretion.

### 2. Defendants consider the content of speech when evaluating requests to speak.

The Policy requires students to obtain permission from Defendant Stripling before speaking anywhere on campus, other than the Free Expression Areas. Doc. 1-3. While the Policy purports to mandate that administrators consider

requests "in accordance with the principle of content neutrality[,]" the Policy provides no way to prevent content-based discrimination. Doc. 1-3. In fact, Defendant Stripling specifically testified that he considers the content of the speech when evaluating requests to speak.

When asked whether the Speech Zone Policy requires a student to request permission to give a speech, Stripling responded "[w]ell if they're just gonna talk about their biology class and they're going to talk under the tree under the scenario you gave me and it's six members of the class, they do not necessarily have to[.]" Doc. 35-2 at 103:19-104:4.

Stripling was asked whether students sitting in front of the Student Union talking to passersby would violate the Speech Zone Policy and he replied, "[a]nd what are they talking about?" Doc. 35-2 at 62:17.

Defendant Stripling also testified that if students were talking about a topic that caused others to complain or that could be offensive, they would "need to be in the speech zone area." Doc. 35-2 at 62:18-63:11.

In a final example, Defendant Stripling was asked about whether a group of six students sitting under a tree discussing politics implicated the Speech Zone Policy when they asked questions of passersby. He stated that it depends on the questions. Doc. 35-2 at 99:22-100:23.

Defendants' own testimony clearly demonstrates that the Policy is not content neutral on its face or as-applied.

### D. The Speech Zone Policy applies to all expressive activity and does not exempt casual, everyday conversations.

The Speech Zone Policy applies to all expressive activity on ASU's campus, including casual, everyday conversations, wearing expressive garb, or handing out leaflets or pamphlets. Doc. 1-3; Doc. 35-2 at 62:11-63:24, 98:8-110:23-111:14. The Speech Zone Policy applies to "speaking, demonstrating, and other

forms of expression." Doc. 1-3. The Policy provides no exemption from the permission requirement for students engaging in casual conversation inside or outside of the speech zones. Doc. 1-3. While Defendants argue that such a proviso must be self-evident when reading the Policy, Defendants themselves fail to explain the parameters of this alleged exception. Defs.' MSJ Brief, Doc. 36 at 7, 34-35. Further, the Policy does not define "casual, everyday conversation" or otherwise distinguish it in any way from the types of speech covered in the Policy. Doc. 1-3. Thus, no objective means exists for a student or administrator to determine whether the expressive activity would qualify as such. Doc. 1-3.

Defendants blithely assert that the Policy has never been applied to "casual, everyday conversations," but even this defense assumes agreement on some objective definition of that term. Defs.' MSJ Brief, Doc. 36 at 35. Moreover, when asked to clarify the Speech Zone Policy's application to various types of speech, including descriptions of what many would consider "casual, everyday conversations," Defendant Stripling gave evasive and dissembling responses. Doc. 35-2 at 62:11-63:24, 98:8-110:23. His responses varied depending on the topic of conversation, whether the speakers were students or not, and, if the speakers were students, whether they belonged to an RSO. Doc. 35-2 at 62:11-63:24, 98:8-110:23. Ultimately, he agreed that the University decides what is and what is not covered by the Policy. Doc. 35-2 at 95:17-96:6.

When asked to define "other forms of expression," Defendant Stripling conceded the boundless scope of this term admitting "I guess anything could be considered a form of expression[.]" Doc. 35-2 at 111:3. Defendant Stripling acknowledged that examples of "other forms of expression" would include the wearing of a MAGA hat, the wearing of a T-shirt reading "Abortion Kills Babies," and simply holding up an anti-war sign. Doc. 35-2 at 109:21-111:14.

Accordingly, Defendants' assertion that the Policy does not regulate casual, everyday conversations is contrary to the terms of the Policy and Defendant Stripling's testimony.

## II. Defendants are not entitled to summary judgment because the Speech Zone Policy violates Plaintiffs' First Amendment free speech rights both facially and as-applied.

As detailed in Plaintiffs' Brief in Support of Motion for Summary Judgment (Doc. No. 41), Defendants' Speech Zone Policy violates the First Amendment both facially and as-applied to Plaintiffs because it is (i) overbroad, and (ii) it imposes an unconstitutional prior restraint that grants Defendants unbridled discretion to restrict speech based on content and viewpoint. Pls' MSJ Brief, Doc. 41 at 4-31. Plaintiffs incorporate those arguments as if set forth herein.

### A. The Speech Zone Policy is unconstitutional both facially and as-applied because it is overbroad and it imposes an unconstitutional prior restraint on Plaintiffs' ability to speak on campus.

As discussed in more detail in Section I above, the University's Speech Zone Policy is a prior restraint because it requires everyone, student or non-student, to obtain prior permission before engaging in any expressive activity anywhere on campus. That permission must be obtained *72 hours* in advance to use any area of campus other than the Free Expression Areas which comprise less than 1% of campus. This all-encompassing restriction on speech on a college campus is overbroad because it penalizes a substantial amount of speech that is constitutionally protected. Furthermore, the Speech Zone Policy fails to establish any objective, content-neutral criteria to limit the discretion of the University officials. Instead, the policy grants officials unbridled discretion to deny requests at their whim. Defendant Stripling admitted that he wields this unbridled discretion to analyze the content of the proposed

speech in determining whether to admit or decline a student's request to speak. Doc. 35-2 at 62:11-63:24, 95:17-96:6, 98:8-110:23. And Defendants used this discretion to enforce the Policy against Plaintiffs to stop them from speaking. Accordingly, Defendants are not entitled to summary judgment because the uncontroverted facts demonstrate that the Policy is unconstitutional both facially and as-applied.

> **1. An as-applied challenge is not limited to actual enforcement, but includes the entire Policy that is applicable to Plaintiffs and the ongoing chilling effect on Plaintiffs' speech.**

Defendants improperly attempt to cabin Plaintiffs' as-applied challenge to only the incident where they were removed from the Heritage Plaza area by police, and only to Defendants' purported unwritten policy limiting expression on the plaza to RSOs. Defs.' MSJ Brief, Doc. 36 at 12-18. But, "the distinction between facial and as-applied challenges is not so well defined" and primarily "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Indeed, as-applied challenges to First Amendment restrictions are not so limited. In the First Amendment context, an as-applied challenge encompasses all the potential applications of a regulation that limits and chills the students' speech whether or not the policy has been specifically enforced. *See e.g. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (a plaintiff need not wait to be prosecuted under a policy restricting speech but may challenge it so long as he demonstrates "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."(citation omitted)).

Here, it is undisputed that the Speech Zone Policy applies to Plaintiffs, a student and an RSO, and that it prohibits them from engaging in "speaking,"

"speech," "peaceful and orderly protests," "march[es]," "demonstrations, and "other forms of expression," or distribution of literature[1], anywhere on campus without prior permission. That permission must be obtained at some unspecified time in advance to use the small Free Expression Areas, [2] and 72 hours before to speak anywhere else on campus that Defendants, at their discretion, permit. Doc. 1-3 at 2.

Plaintiffs desire to engage in spontaneous expression in public outdoor areas of campus both in and outside the speech zones, but are prohibited from doing so. Doc. 40-19 at 3:11-4:25. Although Defendants' specific enforcement of their unwritten policy regarding Heritage Plaza demonstrates the unbridled discretion they retain, and that there is a credible threat of enforcement regarding Defendants' Speech Zone Policy, the as-applied challenge in this case extends to the entire policy that serves as a prior restraint on the students' expression in publicly accessible outdoor areas—not just the unwritten policy favoring RSO expression in Heritage Plaza. Plaintiffs' Complaint challenges the application of the entire Policy which imposes a prior restraint on Plaintiffs' expression in all public outdoor areas of campus.

Regarding Plaintiffs' facial challenge, *City of Lakewood v. Plain Dealer Publishing Company*, 486 U.S. 750 (1988), outlines "the heart of [the Court's] test to distinguish laws that are vulnerable to facial challenge from those that are not." *Id.* at 759. Specifically, the Court "identified two major First

---

[1] The Policy requires prior permission before distributing literature everywhere on campus except for several small designated areas. Doc. 1-3 at 3.

[2] Although the Policy does not specify the amount of advance notice required to use the Free Expression Areas, Elizabeth Rouse instructed Plaintiffs that they must request permission 24 hours prior to the proposed use of such areas. Parry Video, Doc. 35-10 at 02:16-02:25.

Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *Id.* In such cases, "courts must entertain an immediate facial attack on the law." *Id.*

Like in *City of Lakewood*, both concerns are present in this case. First, Ms. Hoggard has refrained from speaking in the outdoor areas of campus due to the Policy and Defendants' enforcement of the Policy against her. Doc. 40-19 at 3:11-4:25. Second, the Policy makes it difficult to detect whether Defendants deny permits based on content because the Policy does not have any standards by which to measure Defendants' actions. *See* Section I.C.1. *supra*.

In addition, the *City of Lakewood* Court identified "two features which, at least in combination, justify the allowance of a facial challenge." *City of Lakewood, 486 U.S. at 159.* First, any policy that requires a permit renewal allows the licensor to "measure [the] probable content or viewpoint by speech already uttered" and thus discriminate based on viewpoint without "necessarily view[ing or evaluating] the text of the words about to be spoken." *Id.* The second feature is present when a "licensing system . . . is directed narrowly and specifically at expression or conduct commonly associated with expression." *Id.* at 760. Here, the Speech Zone Policy requires a permit every time a student engages in expressive activity, and the policy is directed specifically at expression. Thus, a facial challenge is appropriate. *Id.*

At bottom, however, whether the policy is facially unconstitutional or unconstitutional as applied to the students in this case, rises and falls on the same analysis: can Defendants prohibit students from engaging in any expressive activity in the public outdoor areas of campus without a permit, and even then, can Defendants restrict expression to specific zones without an

additional permit that is granted only at Defendants' discretion?

Because the Speech Zone Policy is a prior restraint that is overbroad, and is content and viewpoint discriminatory, Defendants may not constitutionally prohibit students from engaging in expressive activity on campus without a permit.

### 2. The Speech Zone Policy is overbroad because it penalizes a substantial amount of protected speech.

A law is unconstitutionally overbroad if it "penaliz[es] a substantial amount of speech that is constitutionally protected." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017) (quotation omitted). Defendants' Speech Zone Policy is overbroad because it penalizes a substantial amount of constitutionally protected speech.

Defendants' Speech Zone Policy applies to every form of students' expressive activity and encompasses the entire campus. Doc. 1-3; Doc. 40-5 at ¶ 67. Under the Policy, students are prohibited from "speaking, demonstrating and other forms of expression" anywhere in the open, outdoor areas of Arkansas State's 1,376 acre campus without obtaining Defendants' prior permission. Doc. 1-3; Doc. 40-5 at ¶¶ 89-99; Doc. 35-9 at 0:01-1:05; Doc. 35-10 at 0:34-2:20. The Policy does not define "other forms of expression," nor does it exempt any types of expressive activities from the prior permission requirement. Thus, by its own terms, the Policy requires a prior permit before engaging in all "forms of expression" on campus.

In *Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, the Supreme Court struck down as overbroad a policy regulating speech at

LAX airport because it regulated "even talking and reading, or the wearing of campaign buttons or symbolic clothing." 482 U.S. 569, 575 (1987). Defendants' Policy is similarly overbroad. As Stripling acknowledged, the Policy applies to the wearing of symbolic clothing. Thus, just like the policy in *Jews for Jesus*, the policy is overbroad.

Even if the Policy did not regulate casual, everyday conversations, the Policy would still be overbroad. Defendants admit that the Policy regulates "speeches, demonstrations, distribution of written material, and marches." Defs.' MSJ Brief, Doc. 36 at 37. The Policy does not differentiate between speeches, demonstrations, or marches that involve 10 people or those that involve 100 people. Instead, the Policy requires prior permission for these expressive activities regardless of the number of people involved. Further, even a single person distributing written material outside the small speech zones requires prior permission from Defendants. In fact, in the present case Defendants enforced the Policy against two individuals, Ms. Hoggard and Ms. Parry, who were simply talking with students about TPUSA. Defendants do not cite to a single case upholding a policy that encompasses so much protected speech. Accordingly, the Policy clearly punishes a substantial amount of protected speech and is overbroad.

> **3.  The Speech Zone Policy is an unconstitutional prior restraint because it grants Defendants unbridled discretion, is not content and viewpoint neutral, it is not narrowly tailored, and does not leave open ample alternative means of communication.**

A prior restraint is "any permit requirement [that] gives 'public officials the power to deny use of a forum in advance of actual expression.'" *United States v. Kistner*, 68 F.3d 218, 221 n.7 (8th Cir. 1995) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 783 n.5 (1989)). As prior restraints censor speech before it occurs, there is a "heavy presumption" against their constitutionality.

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Bowman*, 444 F.3d at 980. They "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

A prior restraint on expression is presumptively unconstitutional, regardless of the forum, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content- and viewpoint-neutral, reasonable time, place and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication. *Josephine Havlak*, 864 F.3d at 913 (citation omitted). The Policy need fail only one of these to be prongs to be unconstitutional; it fails them all.

### a. The Policy grants Defendants unbridled discretion.

The Supreme Court "consistently condemn[s]" speech regulations that "vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969) (citation omitted). Policies that do so are treated as viewpoint-based. *Roach v. Stouffer*, 560 F.3d 860, 870 (8th Cir. 2009) ("[U]nbridled discretion to determine who may speak based on the viewpoint of the speaker . . . allows for viewpoint discrimination and is therefore unconstitutional."). Given vague or non-existent criteria, officials "may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood*, 486 U.S. at 763–64.

Defendants' Speech Zone Policy grants officials at least six layers of unbridled discretion: (1) Defendants have discretion over whether students can speak anywhere on campus, inside or outside the speech zones; (2) Defendants have discretion over whether a student must use the speech zone or will be allowed to use other areas of campus; (3) Defendants have discretion over

whether students can use the speech zones outside of the normal hours designated by the Policy (i.e., weekends, before 8:00 a.m., and after 9:00 p.m.); (4) Defendants have discretion over whether students can set up a stand, table, or booth inside of the speech zones; (5) Defendants have discretion to establish new speech zones or modify the scope of the existing speech zones; and (6) Defendants have discretion to determine whether a student's speech is covered by the Policy (i.e., whether they have to obtain a permit or not). The Policy does not provide any criteria to limit Defendants' discretion as to any of these decisions.

Given the broad discretion granted on the face of the Policy, Defendants do not point to any terms of the Policy that limit discretion. Rather, Defendants argue that "ASU's historical practice demonstrates that requests are not denied." Defs.' MSJ Brief, Doc. 36 at 29. However, this allegation is rebutted by Defendants' enforcement of the Policy against Plaintiffs and Defendants' own testimony as to their enforcement of the Policy.

Defendants allege that if there is a potential issue, they will work with speakers to reach a mutually agreeable solution. Defendants' allegation is belied by their actions in this case. Plaintiffs' attempt to set up their own table on the plaza in front of the Student Union was met with immediate refusal and without offering to allow Plaintiffs to move to another location. Although their table did not block any entrance or walkway and did not cause any sort of disruption, Plaintiffs were removed from the area by administrators and campus police. Defendants did not attempt to work with Plaintiffs to reach a mutually agreeable solution.

In their depositions, Defendants acknowledge that the Policy leaves many questions unanswered. And that they alone possess the authority to determine the enforcement of the Policy. Where does the speech zone begin and end? How

do I know whether my political discussion that some may find offensive requires me to get a permit for a speech zone? Doc. 35-2 at 109:21-111:14. If I wear a political hat or T-shirt or walk around holding a political sign, am I engaging in an 'other form of expression' which must be confined to a speech zone? Doc. 35-2 at 110:23-24, 111:3. For Defendants, the answer to each of these questions is: Just ask us and we will tell you. Doc. 35-2 at 109:21-111:14. This is the very definition of unbridled discretion. *See Smith v. Tarrant Cty. Coll. Dist.*, 670 F. Supp. 2d 534, 538 (N.D. Tex. 2009) (striking a college policy requiring a permit to speak on campus because it failed to provide any objective criteria for administrators to use when evaluating a permit application).

In sum, Plaintiffs' allegations of bridled discretion are belied by their application of the Policy to Plaintiffs. Plaintiffs were not violating any one of the non-exclusive criteria that Defendants claim bridled their discretion. Yet, Defendants refused to allow them to speak and forced them to leave the area. Defendants' Policy explicitly permits such an arbitrary denial. Thus, the Policy granted Defendants unbridled discretion.

> **b.    The Policy allows Defendants to discriminate on the basis of the content and viewpoint of speech.**

Defendants argue that the Policy is content-neutral because the Policy baldy states that permits "will be considered in accordance with the principle of content neutrality." Defs.' MSJ Brief, Doc. 36 at 24. This argument fails for several reasons. First, Defendants admit they consider content when making permit decisions. Defendant Stripling explicitly acknowledged that he considers the content of the speech in determining how to apply the Policy. Doc. 35-2 at 62:18-63:11, 99:22-100:23, 103:19-104:5, 109:21-111:14.   When questioned about the process by which he evaluates requests to speak on campus, Defendant Stripling repeatedly referenced content as a basis for

determining where and when the Policy would apply. Doc. 35-2 at 62:18-63:11, 99:22-100:23, 103:19-104:5, 109:21-111:14. In fact, when posed a hypothetical about whether the Policy would apply to a situation identical to Plaintiffs', Defendant Stripling asked "And what are they talking about?" Doc. 35-2 at 62:17. Defendant Stripling also testified that speech deemed offensive to some would be quarantined to the speech zones, while less controversial subjects such as biology could be discussed freely regardless of the location on campus. Doc. 35-2 at 97:14-20, 103:19-104:4. Accordingly, there is no question that the Speech Zone Policy, both facially and applied, is not content or viewpoint neutral.

Second, the bare statement that content will not be considered does not save a policy that grants unbridled discretion. Policies cannot be deemed viewpoint neutral without including affirmative "protection . . . for viewpoint neutrality." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). "Where a regulation requires that a speaker receive permission to engage in speech, the official charged with granting the permission must be provided specific standards on which to base his or her decisions. Without such standards, every application of the regulation 'creates an impermissible risk of suppression of ideas.'" *Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001) (quoting *Forsyth Cty.*, 505 U.S. at 129).

Defendants' Speech Zone Policy lacks any such protections. The Policy does not prevent Defendants from (i) allowing certain students to speak outside the zones while denying other viewpoints access to those same venues, (ii) allowing certain students to speak in the speech zones while denying other viewpoints access to the speech zones, (iii) selectively allowing students to speak when the speech zones are closed, (iv) selectively allowing certain students to set up a stand, table or booth, in the speech zones while denying other viewpoints the

21

right to do the same, or (v) denying requests that meet all eight considerations due to other factors.

In defending a challenge to its speech permit policy, the University of Houston argued that it "considers only content-neutral factors when applying [the challenged policy]," but the court rejected this as it "presumes that [officials] will act in good faith and adhere to standards absent from the [policy]'s face," which "'is the very presumption that the doctrine forbidding unbridled discretion disallows.'" *Pro-Life Cougars v. Univ. of Hous., 259 F. Supp. 2d 575, 584 (S.D. Tex. 2003)* (*quoting City of Lakewood*, 486 U.S. at 770). Defendants' policy is indistinguishable from Houston's in its unbridled discretion and deserves a similar fate.

Third, Defendants allege that they have never denied permits to speak on campus in the past, Defs.' MSJ Brief, Doc. 36 at 30, but this ignores that 1) they require a permit to engage in expression in the first place, and 2) the Supreme Court has made clear that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood*, 486 U.S. at 757.

Defendants allege that they will only make decisions based on the "interest of health and safety" to "prevent disruption" and "protect against invading the rights of others." Defs.' MSJ Brief, Doc. 36 at 30. Of course, it is undisputed that none of these factors were at issue when Defendants stopped Plaintiffs from speaking in this case. But even more fundamentally, these are the same "high-sounding ideal[s]" that the Court rejected as "illusory constraints" in *City of Lakewood*. There, the Court noted that:

> [t]he city asks us to presume that the [decision maker] will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and

conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows. The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice.[3] This Court will not write nonbinding limits into a silent state statute.

486 U.S. at 769–70 (citations omitted). Even in nonpublic forums, such as polling locations, the constitution requires clear guidance for even well-intentioned decision makers. As the Supreme Court held last year, "[w]e do not doubt that the vast majority of election judges strive to enforce the statute in an evenhanded manner, nor that some degree of discretion in this setting is necessary. But that discretion must be guided by objective, workable standards." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018).

Defendants' Policy discriminates based on the content and viewpoint of speech and thus it is an unconstitutional prior restraint.

### c. Defendants' Speech Zone Policy is not narrowly tailored to achieve a significant governmental interest.

Defendants assert that the Policy furthers the following governmental interests: (i) allows organized and equal access to the space; (ii) provides accountability in protecting University property; and (iii) ensures the safety and security of the speaker and other persons while on campus. Defs.' MSJ at 26. Defendants fail to meet their burden for two reasons. First, Defendants bear the burden to prove their alleged interests. *See Brown v. Entm't Merchants Assin*, 564 U.S. 786, 799-800 (2011) ("Because the Act imposes a

---

[3] Defendants assert that they have a well-established practice which does not consider content. However, this allegation is directly refuted by Defendant Stripling's testimony. Stripling Dep., Doc. 35-2 at 62:18-63:11, 99:22-100:23, 103:19-104:5, 109:21-111:14.

restriction on the content of protected speech, it is invalid unless [the Government] can demonstrate that it passes strict scrutiny . . . . The State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution. That is a demanding standard. . . . [A]mbiguous proof will not suffice.") (citations omitted) (finding the state failed to meet its burden of proof even when some expert research was cited); *see also Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015) ("[I]t is the [Defendants'] burden to demonstrate" its alleged interests are compelling and the policies are narrowly tailored to achieve the alleged interests).

However, Defendants do not cite to any evidence in their Statement of Facts to support their claimed interests. Defs.' Statement of Facts, Doc. 37 at 25-28. Thus, they fail to establish their burden. Second, even if Defendants were able to establish their alleged interests, the Policy is not narrowly tailored to satisfy those interests.

As a preliminary matter, Defendants repeatedly advance alleged interests (with no real evidence other than speculation or their mere say so) in regulating speakers from the "public" or "all citizens" who are not members of the campus community. Yet, this case is not about the regulation of outsider's expression, but about the University's ban on students' expression without a permit in the very enclave designed to be the market where ideas are freely exchanged. Defendants do not even attempt to allege that these generalized interests apply to students' expression.

To satisfy this prong, a policy must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 475 (1988) (citation omitted). "Although a governmental restriction does not have to be the least restrictive or least intrusive means of regulation, it

may not, under well-established constitutional standards, curtail substantially more speech than is necessary to accomplish its purpose . . . ." *City of Fort Smith v. Krantz*, 160 F.3d 1214, 1222 (8th Cir. 1998). Too often "silencing the speech is . . . the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted). Defendants' Speech Zone Policy flunks this test.

The Speech Zone Policy fails the narrow tailoring requirement because it requires even just a single student to obtain a permit three days in advance to speak anywhere on campus outside the speech zones. Defendants do not even attempt to justify how requiring a single student to obtain a permit three days in advance is narrowly tailored to further any of their alleged interests. *Cf Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) ("We only point out that applying the permit requirement to groups as small as ten persons compounds our conclusion that the parade permit ordinance is not narrowly tailored.")

In a similar case, Texas Tech University employed a policy requiring students to obtain a permit at least two business days before engaging in protected speech on the campus outside of the designated free-speech zones. *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004). Like Defendants, Texas Tech argued that this policy was needed to "preserv[e] an environment suitable for classroom instruction and library study," coordinate events, 'and address "noise and safety" concerns. *Id.* at 869. However, the court held it was not narrowly tailored "because it sweeps too broadly in imposing a burden on a substantial amount of expression that does not interfere with any significant interests of the University." *Id.* at 870; *Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams,* 2012 WL 2160969, at *6–7 (S.D. Ohio June 12,

2012) (finding three-day notice period not narrowly tailored to having a "peaceful and safe" campus). It "is simply unfathomable that a [Arkansas State] student needs to give the [College] advance notice of an intent to [leaflet]. *There is no danger to public order arising out [of] students walking around campus [leafleting].*" *Id.* at \*7 n.5.

Defendants' enforcement of the Policy against Plaintiffs in this case demonstrate that the policy is not narrowly tailored. Ms. Hoggard and her two companions were simply speaking with students on a large, open walkway. Plaintiffs' actions presented no threat to public order or to any University property. Doc. 40-19 at ¶ 10; Doc. 40-20 at ¶ 6; Doc. 35-4 at 104:22-105:14. Neither were they obstructing any walkways or entrances. Doc. 40-19 at ¶ 10; Doc. 40-20 at ¶ 6; Doc. 35-4 at 104:22-105:14. In fact, Ms. Hoggard and her companions chose their specific location near the Student Union *because* it was out of the way. Doc. 35-1 at 95:12-14. Nevertheless, Defendants quickly shut down Plaintiffs' protected speech activities and insisted that Ms. Hoggard and her companions leave. Doc. 35-9; Doc. 35-10.

Defendants assert that *Bowman* supports their argument, but *Bowman* is not controlling for two reasons. First, the permit requirement in *Bowman* did not apply to students. It only applied to persons unaffiliated with the university. *Bowman*, 444 F.3d at 981. Second, the *Bowman* decision is based on the Court's finding that the "University has a significant public safety interest in requiring a permit because of the time and resources necessary to accommodate the crowds that Bowman attracts." *Id.* The Court based its finding on the following facts: (i) the majority of plaintiff's permit requests listed estimated attendance between 50 and 100 people; (ii) the actual attendance was as high as 200 people; and (iii) plaintiff has "demonstrated the capacity to attract a crowd and disrupt the unique educational environment."

*Id.* The *Bowman* Court held that "[u]nder these circumstances, the permit requirement is justified." *Id.*

None of those factors are present here. Instead, Defendants' Speech Zone Policy applies to students as well as non-students. The policy does not just apply to large groups. Doc. 1-2; Doc. 1-3; Doc. 35-2 at 8:8-17:13. Rather, it requires all students to obtain a permit 72 hours in advance to speak anywhere on campus, other than the speech zones, even for a single student. Doc. 1-2 at 2-3; Doc. 1-3 at 2; Doc. 35-2 at 8:8-17:13. Defendants enforced the Speech Zone Policy against Plaintiffs even though they were not: (i) attracting a crowd, (ii) blocking any entrance or exit to any buildings, (iii) impeding access to the buildings or parking lots, or (iv) blocking the free flow of traffic on the sidewalks. Doc. 40-19 at ¶ 10; Doc. 40-20 at ¶ 6; Doc. 35-4 at 104:22-105:14. Accordingly, Defendants' Speech Zone Policy is not narrowly tailored because it requires even a couple of students to obtain a permit to speak 72 hours in advance in virtually all public places on campus. Doc. 1-3 at 2; Doc. 35-2 at 107:5-13.

Defendants also argue the restrictions are narrowly tailored by mischaracterizing the policy at issue. Defendants allege, without support, that the only policy being challenged is one small unwritten aspect of their Speech Zone Policy, in which they purport to limit Heritage Plaza for use only by RSOs. This argument is wrong for two reasons. First, Plaintiffs are challenging the entire Speech Zone Policy which requires a prior permit to speak anywhere on campus. Second, Defendants rely heavily on *Ball v. City of Lincoln*, 870 F.3d 722 (8th Cir. 2017) to support their argument. Defs.' MSJ Brief, Doc. 36 at 16-18. However, *Ball* is inapplicable and distinguishable.

First, and most obviously, the Court found that the Plaza in *Ball* was a "nonpublic forum," that was never open for "expressive activities by the public."

*Ball*, 870 F.3d at 736. In contrast, the University outdoor grounds are at least an unlimited designated forum as Defendants admit. Defs.' MSJ Brief, Doc. 36 at 19, 23. Even limiting the analysis to just Heritage Plaza that Defendants allege is reserved for RSOs, *Ball* is inapplicable because 1) Defendants admit the plaza is open for student expression but prohibit some students from using it, 2) Defendants' purported rationales for limiting the plaza to some students are viewpoint based and unreasonable, and 3) Defendants still retain unbridled discretion within this area.

Unlike in *Ball*, where the plaza was reserved only for Arena vendors, and not for the public, under Defendants' alleged policy Heritage Plaza is reserved for students, just not all students. Defs.' MSJ Brief, Doc. 36 at 1, 3-4, 15-16. Defendants claim their unwritten policy is to permit only students affiliated with a registered organization to use Heritage Plaza, but students unaffiliated with an RSO may not. Defs.' MSJ Brief, Doc. 36 at 1, 3-4, 15-16. But, as the Supreme Court has made clear:

> Speech restrictions based on the identity of the speaker are all too often simply a means to control content. . . . By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340–41 (2010) (citations omitted).

Defendants' purported rationales for its unwritten policy at Heritage Plaza demonstrate that the purpose is to control the content that students hear, to deprive some student expression of "the worth, standing, and respect" that other student expression may experience through the use of the forum. *Id.* at

28

340–41 (citations omitted). Defendants' post hoc rationale for their exclusion of Ms. Hoggard and TPUSA-ASU from Heritage Plaza, while permitting other student organizations to speak there is that they want students to feel "comfortable," "welcome," and to not expect to have "something pushed on [them]." Defs.' MSJ Brief, Doc. 36 at 14-15. This rationale might make sense if Defendants excluded all expressive activity from this area, but they did not. Their unwritten policy is that it is specifically designated for student organization expression, but Defendants retain discretion to decide which students speak there and when.

Further, Defendants' alleged "interests" in regulating speech to make students feel "comfortable" and "welcome" are not constitutionally permissible. As the Supreme Court has "said time and again . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) (cleaned up) (collecting cases); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) ("Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails."); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Cohen v. California*, 403 U.S. 15, 25–26 (1971) ("[T]he State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. . . . Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.").

The purported rationales are not even rational because Defendants admit

that TPUSA-ASU may now use the same space they were kicked out of, to do the exact same thing they were kicked out for doing—tabling, passing out information and recruiting members. It cannot be said that the rationales related to a welcoming and comfortable environment are applicable to TPUSA one day, but not the next based only on an administrative decision regarding RSO status. Indeed, unless Defendants police the content of RSOs' expression to make sure they never make someone feel uncomfortable or unwelcome or push membership on other students, the rationales Defendants purport to further regarding welcome and comfortable environments cannot be rationally furthered.

Even if Heritage Plaza is a designated public forum, as Defendants allege (and not a nonpublic forum as in *Ball*) the unwritten policy still permits the complete use of discretion which violates the viewpoint neutrality principle. Defendants used that discretion to deny Plaintiffs access to the forum, which constitutes viewpoint-discrimination. *Supra* Section I.C; II.A.3.a.

Defendants' reliance on the district court opinion in *Rock for Life* for the proposition that "[a] university's decision to relocate a student's protected speech display from one outside location to another outside location on campus is constitutional" (Defs.' MSJ Brief, Doc. 36 at 18) is wrong on the law. On appeal, the Fourth Circuit vacated that portion of the summary judgment order holding that fact issues precluded summary judgment on that issue. *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 555 (4th Cir. 2010). In that case, the Court held that "it appears the defendants were motivated by both content-based and content-neutral reasons when they denied Rock for Life access to the Commons Terrace. A content-based restriction of speech withstands constitutional scrutiny only when narrowly tailored and necessary to serve a compelling state interest. Even were we to find UMBC's interest in

protecting the safety of its students compelling, acquiescence to a heckler's veto would still fail under strict scrutiny, for the defendants must employ the least restrictive means available to further that interest." *Id.* at 552–53. The Court only upheld the standing and mootness decisions of the district court but then remanded for further fact finding on whether the university's decision was content based. *Id.* at 555.

### 4. The Policy does not leave open ample alternative means of communication.

Defendants' Speech Zone Policy fails to "leave open ample alternative channels of communication." *Ward*, 491 U.S. at 802; *Bell v. City of Winter Park*, 745 F.3d 1318, 1322 (11th Cir. 2014) (same). Instead, Defendants' Speech Zone Policy requires students to obtain a permit before speaking *anywhere* on campus. Doc. 1-2; Doc. 1-3; Doc. 35-2 at 8:8-17:13. Thus, the policy does not leave open *any* alternative channel of communication for students to speak with other students on campus. Plaintiffs have no acceptable means of "reaching their intended audience" unless they receive prior permission from the Defendants. This prior permission requirement destroys the "opportunity for spontaneity" on the campus, as students are not free to engage other students in regard to real-time national or campus issues. *Cf. Watchtower Bible & Tract Soc'y of N.Y.,* 536 U.S. 150, 167-68 (2002) (the government may not ban spontaneous expression).

Defendants attempt to justify this requirement by again focusing solely on the restriction that only RSOs and University departments are allowed to use Heritage Plaza. Defendants argue that non-RSOs have plenty of alternative channels of communication because the rest of the campus remains open to them for expressive activities. Defendants' argument completely ignores the fact that the Policy requires prior permission before engaging in expressive

activities anywhere on campus, not just Heritage Plaza. Thus, the Policy does not leave open ample alternative channels of communication because the entire campus is covered by the Policy.

Defendants' Speech Zone Policy is an unconstitutional prior restraint because it grants unbridled discretion to Defendants, is not content- or viewpoint-neutral, is not narrowly tailored, and does not leave open ample alternative means of communications. Thus, Defendant are not entitled to summary judgment on Plaintiffs' First Amendment free speech claim.

### III. Defendants are not entitled to summary judgment because the Speech Zone Policy violates Plaintiffs' Fourteenth Amendment Due Process rights.

A regulation is void-for-vagueness under the Due Process Clause if it "forbids or requires the doing of an act in terms so vague that [students] of common intelligence must necessarily guess at its meaning and differ as to its application." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). A policy is vague if it fails to "give [students] of ordinary intelligence a reasonable opportunity to know what is prohibited," lacks "explicit standards for those who apply [it]," or chills constitutional freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *accord City of Chi. v. Morales*, 527 U.S. 41, 56 (1999). Here, "a more stringent vagueness test should apply" as these policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord Stephenson*, 110 F.3d at 1308-09.

The Speech Zone Policy requires students to obtain a permit before engaging in "speaking, demonstrating, and other forms of expression." Doc. 1 at ¶¶ 89-99; Doc. 1-3; Doc. 35-9 at 00:01-01:05;  Doc. 35-10 at 0:34-2:20. Although the Policy does not define any of these terms, Defendants argue that the common usage of these terms conveys a clear meaning to the reader of the

policy as to the type of activity that is covered. Defendants' argument is contradicted by the testimony of Defendants Spack and Stripling.

Defendant Spack was read the language from the Policy stating, "[u]se of this area for speaking, demonstrating and other forms of expression will be scheduled[...]" and asked what the term "speaking" means under the policy. Defendant Spack stated, "[w]ell, all of these are not defined in the policy." Doc. 35-3 at 39:23-25. She offered no definition of her own and did not refer to common usage. Most telling was Defendant Spack's answer to the question, "if there's not a definition, who makes the determination that what somebody is doing is giving a speech versus somebody engaging in a conversation with a group of friends?" She stated, "I guess then that would be our department or university police or whoever is having that interaction with the person that's in question." Doc. 35-3 at 47:3-9.

Defendant Stripling offered no more clarity when he was asked how many people constituted a demonstration or a march. He stated, "I don't know." Doc. 35-2 at 72:8-12. He was then offered examples of what could be considered other forms of expression including an anti-abortion T-shirt or a MAGA hat and he surmised, "I guess anything could be a form of expression." Doc. 35-2 at 109:11-111:14. The testimony of both Defendants proves that any definition under the Policy must be entirely subjective or at least too elusive for seasoned university administrators charged with interpreting the Policy.

Further, Defendants' enforcement of the Policy against Plaintiffs demonstrates these significant ambiguities. While Ms. Hoggard and her guest were "engaging students in conversation," Defendants stated that "they were in violation of the Speech Zone Policy because they were talking with students outside of the speech zones." Doc. 35-9 at 00:01-01:05; Doc. 35-10 at 0:34-2:20. The Policy does not provide any criteria or definition that allows students to

distinguish between expression that Defendants would consider a casual conversation with other students (which is allegedly allowed under the Policy without prior permission) and expression that would be considered "speaking" and thus would require the students to obtain Defendants' prior permission. Doc. 1-3; Doc. 35-2 at  62:11-63:24, 98:8-110:23, 103:7-104:5.

The Speech Zone Policy is also vague in its geographical scope. Doc. 1-3; Doc. 35-2 at 112: 23-25; 114:16-18; Doc. 35-3 at 37:7-9, 38:1-10, 39:23-25. Five lawns, one amphitheater, and one plaza are designated as Free Speech Zones, yet none of these areas are described with specificity or by any sort of dimensions. Doc. 1-3; Doc. 35-2 at 112: 23-25; 114:16-18; Doc. 35-4 at 37:7-9, 38:1-10, 39:23-25. Even a student attempting to comply with one of the Speech Zones cannot ascertain when she has wandered from the permitted area into a non-Speech area. Doc. 35-3 at 83:8-20. These zones are in no way marked or cordoned off so that a student would necessarily know that she is speaking within or outside of a permissible zone on campus. Doc. 35-2 at 112: 23-25; 114:16-18; Doc. 35-4 at 37:7-9, 38:1-10, 39:23-25. In fact, when asked to outline the borders of the speech zones, Defendants specified different sizes and different locations for the zones. Doc. 35-2 at 118:10-134:11; Doc. 35-3 at 51:7-67:23; Doc. 35-4 at 33:9-48:23; Doc. 40-18. Astonishingly, Defendant Spack acknowledged that the only way to determine the exact dimensions would be to hire a surveyor. Doc. 35-3 at 89:8-17.

The Speech Zone Policy relies upon vague terms and fails to provide any definitions to guide students and administrators when interpreting the Policy. Thus, "[students] of common intelligence must necessarily guess at [the policy's] meaning"; officials will "necessarily . . . differ as to [their] application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The Defendants' Speech Zone Policy is demonstrably vague. Therefore, Defendants are not entitled to

summary judgment on Plaintiffs' Fourteenth Amendment claim.

## IV. Defendants violated clearly established law and are not entitled to qualified immunity.

In the First Amendment context, Defendants' claim of qualified immunity triggers a three part analysis:

> (1) whether the plaintiffs have asserted a violation of a constitutional or statutory right;
> (2) if so, whether that right was clearly established at the time of the violation; and
> (3) whether, given the facts most favorable to the plaintiffs, there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right.

*Burnham v. Ianni*, 119 F.3d 668, 673–74 (8th Cir. 1997) (en banc). When "a motion for summary judgment based on qualified immunity" is before the court, "the court ordinarily must look at the record in the light most favorable to the party [plaintiffs] opposing the motion, drawing all inferences most favorable to that party." *Id.* at 673 (cleaned up).

Defendants advance two arguments in support of their motion for summary judgment based on qualified immunity: they allege 1) that under *Bowman* and *Ball*, the law applicable to this case was not clearly established, Defs.' MSJ Brief, Doc. 36 at 40-41; and 2) that some of the Defendants were not involved in the October 11, 2017 incident. Defs.' MSJ Brief, Doc. 36 at 40. It is unclear, but Defendants appear to limit their qualified immunity argument to the actions that took place on October 11, and do not address whether Defendants' actions in implementing and enforcing of the Speech Zone Policy as it applies to the students every day are protected by qualified immunity. *See* Defs.' MSJ Brief, Doc. 36 at 40-41 (alleging that "no action by any defendant on October 11, 2017 was objectively unreasonabl[e]."). Of course, Plaintiffs claims are not limited to the October 11 incident. *See supra* Section II.A.1. Regardless qualified immunity is not warranted because 1) the Speech Zone Policy as

35

applied to Plaintiffs and on its face is overbroad and discriminates based on content and viewpoint, 2) Defendants Stripling and Spack have specifically admitted to content-based enforcement of the Policy, and 3) each Defendant is responsible for the enactment or enforcement of the Speech Zone Policy.

### A. It is clearly established that prior restraints that grant unbridled discretion discriminate based on viewpoint and are unconstitutional.

Defendants "bear[] the burden of proving that the plaintiffs' First Amendment rights were not clearly established." *Burnham*, 119 F.3d at 674. The Eight Circuit "has taken a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry." *Id.* at 677. "In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue." *Id.*; *see also Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) ("The Supreme Court has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution.") (cleaned up). Constitutional violations can be based on either actions or omissions, and "the precise action or omission in question" does not have "to have been held unlawful" for the law to be clearly established. *Burnham*, 119 F.3d at 677. If there is not a case directly on point "a court should look to all available decisional law including decisions of state courts, other circuits and district courts." *Id.* (cleaned up).

Here, it is well established that 1) the open areas of public universities are treated as at least unlimited designated forums for *students* if not public forums for anyone, and 2) that a prior restraint that allows unbridled discretion to discriminate based on viewpoint, such as Defendants enforce at the University, is unconstitutional even in more restricted forums.

36

As the *Burnham* court noted en banc, "[a]s a basic matter, the Supreme Court stated in 1969 '[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Burnham*, 119 F.3d at 677 (quoting *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969)). When it comes to the *students'* expression on campus, it is clear that the generally accessible outdoor areas are at least "designated public fora." *Bowman*, 444 F.3d at 979, and strict scrutiny applies to restrictions on free expression. *Id.* at 980.[4]

In addition, it is clearly established that unbridled discretion as it relates to a permit policy for expression violates the First Amendment. *Supra* Section I.C; II.A.3.a. Specifically, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (cleaned up) *quoting Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–151 (1969). The permit process here does not contain "narrow, objective, and definite standards

---

[4]*See also Roberts v. Haragan*, 346 F. Supp. 2d 853, 861 (N.D. Tex. 2004) ("to the extent the campus has park areas, sidewalks, streets, or other similar common areas, these areas are public forums, at least for the University's students, irrespective of whether the University has so designated them or not. These areas comprise the irreducible public forums on the campus."); *accord Justice for All v. Faulkner,* 410 F.3d 760, 766-69 (5th Cir. 2005); *Smith v. Tarrant Cnty. Coll. Dist.,* 694 F. Supp. 2d 610, 625 (N.D. Tex. 2010) ("Typically, at least for the students of a college or university, the school's campus is a designated public forum."); *Univ.* & *Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't,* 100 P.3d 179, 190 (Nev. 2004) ("Typically, when reviewing restrictions placed on students' speech activities, courts have found university campuses to be designated public forums."); *Williams,* 2012 WL 2160969, at *4 (S.D. Ohio June 12, 2012) (noting that the Sixth Circuit found such campus locations to be designated public fora (citing *McGlone v. Bell,* 681 F.3d 718, 732 (6th Cir. 2012)); *Hays Cnty. Guardian,* 969 F.2d at 116); *Pro-Life Cougars v. Univ. of Hous.,* 259 F. Supp. 2d 575, 681-82 (S.D. Tex. 2003).

to guide" the Defendants. *Supra* Section I.C.1; II.A.3.a; *Pls. Mem. in Support of MSJ*, Section I.C.1.

Despite these well-established principles, Defendants argue that they may impose a permit policy that does not include narrow and definite criteria. Yet, it is impossible to distinguish the discretion Defendants grant themselves from the discretion to discriminate in permits that the Supreme Court has struck down repeatedly. *E.g. Forsyth Cty.*, 505 U.S. at 131; *City of Lakewood*, 486 U.S. at 764; *Shuttlesworth*, 394 U.S. at 150–151. The difference cannot be that *university* officials are granted wider latitude to discriminate, since it is also well established that "state colleges and universities are not enclaves immune from the sweep of the First Amendment," and "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

Defendants' reliance on *Bowman* and *Ball* is misplaced as neither case addresses the issue of unbridled discretion, and they are both distinguishable. *Supra*, Section I.C; II.A.3.a. Specifically, the Court in *Bowman* did not purport to address the issue of unbridled discretion in licensing at all, and that case was precisely limited to an as-applied challenge to a different policy by a non-student with a history of drawing large, disruptive crowds. *Id.* No reasonable official could rely on *Bowman* to assume that years of Supreme Court precedent regarding unbridled discretion in prior restraint situations is permissible because the *Bowman* Court did not address the issue at all.

## B. Defendants admit they consider the content of students' speech when enforcing the Policy.

The court in *Forsyth*, explained the rationale behind the First Amendment's prohibition on permit requirements that are not limited and that grant

discretion. "The reasoning is simple: If the permit scheme involves 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' by the licensing authority, 'the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.'" *Forsyth*, 505 U.S. at 131.

In this case, not only does the Policy facially permit the exercise of discretion through the appraisal of facts and formation of an opinion by Defendants, Defendants Stripling and Spack (both 30(b)(6) representatives of the Board), admit that they exercise that discretion when considering whether to deny a request to speak pursuant to the Policy, and that they consider the content of the expression when making those decisions. *Supra* Section I.C.2.

Thus, Defendants' own admissions demonstrate that not only do they retain unbridled discretion in the permitting process, they exercise that discretion to discriminate based on content which is impermissible under strict scrutiny.

## C. Each Defendant is directly responsible for the existence or enforcement of the Speech Zone Policy.

As demonstrated, Defendants admit that they enforce the Policy in a content-discriminatory manner. Further, the Policy is facially unconstitutional. *Supra* Section II.A. Nevertheless, Defendants argue that "no action" taken "by any defendant on October 11, 2017 was objectively unreasonabl[e]." Defs.' MSJ Brief, Doc. 36 at 41. This is demonstrably incorrect.

Because the law is clearly established, it was objectively unreasonable for the Board of Trustees to maintain this Policy. It is well established that when a university implements a speech restriction, the "[u]niversity has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar v. Vincent*, 454 U.S. 263, 267 (1981).

39

Defendants in this case, from the Board of Trustees to each official that continues to enforce the Policy, failed to meet their obligations under applicable constitutional norms. Specifically, the Board of Trustees as an entity approved the unconstitutional Policy, and the current Board of Trustees as individuals failed to repeal this Policy but continue to authorize its enforcement. Doc. 1 at ¶¶ 24-30; Doc. 1-2; Doc. 1-3; Doc. 35-2 at 8:8-17:13; Doc. 40-6 at ¶¶ 18-19; Doc. 40-7; Doc. 40-19 at ¶ 24.

Defendants Stripling and Spack are responsible for the actual enforcement of the Policy, Doc. 35-2 at 6:2-8:4, 30:11-22; Doc. 35-3 at 5-7:5, 13:2-13, 21:20-22, and the undisputed facts demonstrate that they both personally and through their authorized representatives enforce the Policy in a content-discriminatory manner. *Supra* Section I.C.; II.A.3.a.

In sum, the law regarding overbroad regulations, unbridled discretion, and content discrimination in unlimited designated fora has been clearly established for years in a manner that gives clear guidance to officials. It is unreasonable for an official to think that universities are exempt from these First Amendment principles. Defendants violated these principles by passing, failing to repeal, and enforcing in a content-discriminatory manner a policy that is facially unconstitutional under well-established law.

## V. Plaintiffs have standing because the Speech Zone Policy is a prior restraint on their speech, and Defendants' unbridled discretion chills Plaintiffs' speech.

Defendants violated the free speech rights of Ms. Hoggard and TPUSA-ASU by refusing to allow them to speak on October 11, 2017 and by implementing the Speech Zone Policy that chills their expression. Because Defendants refuse to correct their unconstitutional Policy, Plaintiffs' injury can only be redressed by a favorable decision.

Defendants argue that Plaintiffs lack standing because "[n]o specific

provision of the Policy was actually applied to Ms. Hoggard or TPUSA at ASU." Defs.' MSJ Brief, Doc. 36 at 38. First, the Court already determined that Plaintiffs have standing. Order Denying Motion to Dismiss, Doc. 20 at 3. Second, this misconstrues the law. No specific unconstitutional application is necessary for standing to challenge an overbroad and content-discriminatory policy. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth*, 505 U.S. at 129.

Third, the assertion that the Complaint does not challenge the policy used to silence the students on October 11, and that "the complaint does not challenge the lawfulness of the actual reason why [the students] were" silenced, Defs.' MSJ Brief, Doc. 36 at 38, is demonstrably false and contrary to the weight of evidence. This Court already concluded that "the complaint makes clear that Hoggard and Turning Point are challenging the policy as a whole and as applied to their conduct when they were asked to leave by the university employee and campus police officer." Order Denying Motion to Dismiss, Doc. 20 at 3. Furthermore, to the extent it is relevant, the facts in this case clearly demonstrate that the Speech Zone Policy was the policy applied to the students on October 11. *Supra* Section I.B.

Defendants also allege that Plaintiffs' claims are now moot because TPUSA at ASU received RSO status last fall. Defs.' MSJ Brief, Doc. 36 at 39. But, Plaintiffs' complaint challenges not only the as-applied denial of the right to speak outside Reng Student Union, but the constitutionality of the Speech Zone Policy on its face. Doc. 1 at ¶¶ 144-66. Plaintiffs' facial challenge seeks the right to speak anywhere on campus without being required to receive prior permission. Receiving RSO status does nothing to address the Speech Zone

Policy's unlawful prior restraint on free speech which applies to the entire campus, nor does it remedy the past harm to Plaintiffs based on Defendants' application of the policy to their speech.

To allege that Plaintiffs lack standing to challenge a prior restraint that limits their speech and subjects them to a discretionary permit system is incredible. Apparently, thirty years after the Supreme Court reiterated this principle, "it [still] bears repeating that 'in the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.'" *City of Lakewood*, 486 U.S. at 764 (cleaned up).

Plaintiffs have standing in this case based not only on past harm, but based on the threat of future enforcement as well. Thus, Defendants are not entitled to summary judgment on Plaintiffs' claims.

<u>CONCLUSION</u>

While Defendants have created confusion by misconstruing the Speech Zone Policy, the record facts are not materially disputed and the case is simple: Defendants impose a prior restraint on students' speech that is overbroad, that grants unbridled discretion to discriminate based on viewpoint, and that Defendants admit they enforce in a content discriminatory manner. The policies are inherently vague in violation of the Fourteenth Amendment. The principles at issue here are not novel; they are well-established and provide guidance to reasonable decision makers. Nonetheless, Defendants continue to enforce these policies in violation of well-established law. Thus, Ms. Hoggard

and TPUSA-ASU respectfully request this court deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted this the 19th day of February 2019,

*/s/ Jonathan Larcomb*

TYSON C. LANGHOFER*
ARIZONA BAR NO.032589
JONATHAN LARCOMB*
VIRGINIA BAR NO. 44274
ALLIANCE DEFENDING FREEDOM
440 1ST NW
WASHINGTON, D.C. 20001
TELEPHONE: (480) 388-8205
tlanghofer@ADFlegal.org

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, Georgia 30043
Telephone:  (770) 339–0774
Facsimile:  (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

Ethan C. Nobles
Arkansas Bar No. 95048
Nobles Law Firm
149 S. Market
Benton, AR 72015
Telephone: (501) 794-9742
Fax: (501) 641-7057
ethan@NoblesLawFirm.com

* Admitted *pro hac vice.*

*Attorneys for Plaintiffs*

43

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2019, I electronically filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

DELENA C. HURST
ASSOCIATE GENERAL COUNSEL
ARKANSAS STATE UNIVERSITY SYSTEM
501 WOODLAND DR., #600
LITTLE ROCK, AR 72201
TELEPHONE: (501) 660-1009
dhurst@asysystem.edu

RODNEY P. MOORE
WRIGHT, LINDSEY & JENNINGS LLP
200 WEST CAPITOL AVENUE, SUITE 2300
LITTLE ROCK, AR 72201
TELEPHONE: (501) 371-0808
rpmoore@wlj.com

JEFFREY W. PURYEAR
RYAN M. WILSON
WOMACK PHELPS PURYEAR MAYFIELD & MCNEIL, P.A.
P.O. BOX 3077
JONESBORO, AR 72403
TELEPHONE: (870) 932-0900
jpuryear@wpmfirm.com
rwilson@wpmfirm.com

*Attorneys for Defendants*

Respectfully submitted on this the 19th day of February, 2019.


*/s/ Jonathan Larcomb*
Jonathan Larcomb
*Attorney for Plaintiffs*