IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

TURNING POINT USA                                                PLAINTIFFS
AT ARKANSAS STATE UNIVERSITY;
and ASHLYN HOGGARD

v.                              NO. 3:17CV00327 JLH

RON RHODES, individually, *et al.*                               DEFENDANTS

## OPINION AND ORDER

This case presents a constitutional challenge to the "Freedom of Expression" policy previously in force at Arkansas State University campus in Jonesboro and the concomitant system-wide policy, which were repealed this spring.[1] The Policy applied to faculty, staff, students, student organizations, and visitors.  Document #40-10 at 3. It designated seven specific areas of the ASU campus as "Free Expression Areas" where individuals could schedule "speaking, demonstrating, and other forms of expression" during certain hours on Monday through Friday. A person who wished to use other areas or other times for "speeches and demonstrations" could request to do so seventy-two hours or more in advance of the event. The Policy also provided that written materials could be distributed in specifically designated "distribution areas," including any of the Free Expression Areas. No stands, tables, or booths were allowed in distribution areas, except in the Free Expression Areas, and only with permission from a specified university official. *Id.* at 3-4.

In the fall of 2017 ASU student Ashlyn Hoggard wanted to start a local chapter of Turning Point USA on the ASU campus.[2] Hoggard, along with Emily Parry, a non-student representative of

---

[1] The plaintiffs refer to these two policies as a single policy being challenged and the Court will proceed likewise unless the context indicates otherwise.

[2] Turning Point USA is a national organization whose mission is, in Hoggard's words, to "[e]ducate students about the importance of fiscal responsibility, free markets, and limited

Turning Point USA, set up a table on the edge of a large, open patio area outside the Reng Student Union in Heritage Plaza on ASU's campus. They began speaking with passing students in an attempt to recruit individuals and start a local Turning Point USA chapter. Hoggard and Parry had not requested permission from any ASU official to set up the table or promote Turning Point USA on the Heritage Plaza patio.

ASU student union administrators Sarah Ponder and Elizabeth Rouse soon approached them, told them that they were not allowed to set up a table where they were, and instructed them to stop their activities.  Two ASU police officers, Terry Phipps and Andrew Thrasher, arrived. After Parry engaged the ASU employees verbally, Phipps issued Parry a citation for violating the Policy and directed her to leave campus. Hoggard and Parry took down their table and stopped their promotion activities that day. Hoggard later succeeded in starting a chapter of the organization at ASU.

This lawsuit commenced. Hoggard and Turning Point USA at ASU sued several ASU officials in their official capacities for injunctive and declaratory relief and in their individual capacities for damages. The plaintiffs claim under 42 U.S.C. § 1983 that the Policy violates the first and fourteenth amendments to the United States Constitution. They challenge the Policy on its face and as it was applied to them. The complaint named as defendants, in their official and individual capacities, the following: Ron Rhodes, Tim Langford, Niel Crowson, Stacy Crawford, and Price Gardner, all members of the Board of Trustees of the Arkansas State University System as of October 2017; Charles Welch, President of the ASU System; Kelly Damphousse, Chancellor of ASU; William Stripling, Vice Chancellor for Student Affairs of ASU; and Martha Spack, Director of Student Development and Leadership of ASU. In February, the Court granted a motion to

government." Document #35-7 at 2.

substitute a new member of the Board, Christy Clark, in her official capacity for former Board member Ron Rhodes in his official capacity. Rhodes remains as a defendant in his individual capacity only. Notably, the plaintiffs have not named Ponder, Rouse, Phipps, or Thrasher as defendants; nor is Parry a plaintiff.

As relief, the complaint requests a declaratory judgment that the Policy and associated practices, facially and as applied, violate the plaintiffs' rights under the first and fourteenth amendments; an injunction prohibiting the defendants from enforcing the Policy and associated practices; compensatory and nominal damages; and attorneys' fees.

The defendants have moved to dismiss the case as moot. The plaintiffs and the defendants have filed cross motions for summary judgment. The Court held oral argument on these motions. The defendants also have filed a supplemental motion for summary judgment addressing an issue that came up at the oral argument—whether the trustees can be individually liable for failing to repeal the Policy. For the reasons that will be explained, the motion to dismiss as moot is granted on all claims except the claim against the defendants in their individual capacities for nominal damages. Based on the doctrine of qualified immunity, summary judgment is granted in favor of the defendants on that claim.

## MOTION TO DISMISS

Article III of the United States Constitution authorizes federal courts to hear cases and controversies. A case is moot, and no longer a case or controversy, when the issues presented are no longer live or the parties no longer have a legally cognizable interest in the outcome. *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 721, 726, 184 L. Ed. 2d 553 (2013)). "Through the passage of time and the occurrence of

irrevocable events, disputes may disappear so that federal courts no longer can grant effective relief."
*McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992).

A request for injunctive relief is moot if the injunctive relief sought would no longer have any meaning for the party seeking it. *See Forbes v. Ark. Educ. Television Comm. Network Found.*, 982 F.2d 289, 289 (8th Cir. 1992) (per curiam); *McFarlin*, 980 F.2d at 1210. Likewise, for a federal court to issue a declaratory judgment, the dispute must call not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts. *Webb v. Smith*, 2018 WL 1401315, at *3, 4:17CV00660-JLH (E.D. Ark. Mar. 20, 2018) (quoting *Ashcroft v. Mattis*, 431 U.S. 171, 172, 97 S. Ct. 1739, 1740, 52 L. Ed. 2d 219 (1977)). If, therefore, a law has been amended or repealed, claims for injunctive or declaratory relief based on the previous version of the law are generally moot because there is no longer a need for court action. *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc). The exceptions to this rule are "rare and typically involve situations where it is virtually certain that the repealed law will be reenacted." *Teague*, 720 F.3d at 977.

Here, the plaintiffs ask the Court to enjoin the defendants from enforcing the Policy. Document #1 at 20. They also seek a declaratory judgment that the Policy and associated practices violate their constitutional rights. *Id.* Their requests for injunctive and declaratory relief revolve entirely around the Policy and ASU's enforcement of the Policy.

As the Court previously mentioned, however, the Policy has been repealed. In March the Arkansas General Assembly passed the FORUM Act,[3] which prohibits state-supported universities

---

[3] The full title of the act is "Forming Open and Robust University Minds (FORUM) Act," 2019 Ark. Acts 184. It is codified at Ark. Code Ann. § 6-60-1001, *et seq.*

from limiting expressive activities to only designated areas. Soon afterwards, the ASU Board of Trustees repealed the Policy. Document #57-2. The defendants contend that the case is therefore moot.

There is no reasonable expectation that the Board will reenact the earlier version—doing so would violate the FORUM Act. *See Phelps Roper*, 697 F.3d at 687. Nor is there any evidence that the state will repeal the FORUM Act. *See Teague*, 720 F.3d at 977-78. An injunction prohibiting the defendants from enforcing the Policy thus would have no meaning because the Policy is no longer in effect and cannot be enforced against the plaintiffs or anyone else. A declaratory judgment would not adjudicate the parties' present rights pertaining to the Policy because it no longer exists and no one has any rights under it. The plaintiffs' claims for declaratory and injunctive relief are moot. As the claims against the defendants in their official capacities sought only declaratory and injunctive relief, all official-capacity claims are dismissed.

All the plaintiffs' facial challenges to the former Policy are also moot. *See Phelps-Roper*, 697 F.3d at 687. When a statute, ordinance or policy has been repealed, a plaintiff's facial challenge to it could remedy nothing — she is in no jeopardy that it will be enforced against her, and she has no legally cognizable interest in its constitutionality. In *Phelps-Roper*, the plaintiff's facial challenge to previous versions of a city ordinance became moot after the city amended it. *Id.* at 687. The court held that even the plaintiffs' "request for nominal damages does not give them standing to challenge the first two versions of the ordinance because they cannot revive an otherwise moot claim against 'a regime no longer in existence.'" *Id.* (quoting *Morrison v. Bd. of Educ.*, 521 F.3d 602, 611 (6th Cir. 2008)). Many other courts have dismissed facial challenges as moot based on changed circumstances. *Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002) (holding that after

ordinance was repealed "[t]he question of overbreadth [did] not present a live case or controversy" and the facial overbreadth challenge was moot); *Advantage Media, LLC v. City of Eden Prairie*, 405 F. Supp. 2d 1037, 1046 n.5 (D. Minn. 2005) ("Further, the [challenged] provisions were removed from the code . . . which renders plaintiff's facial challenge and corresponding request for injunctive relief moot." (citing *Coral Springs St. Sys., Inc. v. Sunrise*, 371 F.3d 1320, 1346 (11th Cir. 2004); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1256–57 (10th Cir. 2004))); *Phelps-Roper v. Heineman*, 710 F. Supp. 2d 890, 908-09 (D.  Neb. 2010) (dismissing as moot facial challenge to statute because there was no risk it could be applied to the plaintiff); *Rock for Life-UMBC v. Hrabowski*, 643 F. Supp. 2d 729, 741 (D. Md. 2009) (dismissing as moot a facial challenge to the constitutionality of a university policy amended after litigation commenced); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 867 n.5 (N.D. Tex. 2004) (same). The facial challenges to the former Policy are moot and therefore dismissed.

The defendants argue that the plaintiffs' claims for damages also are moot. It is well established that changed circumstances do not render moot claims for damages that arise from violations of the plaintiff's own constitutional rights. *See Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 803 (8th Cir. 2006); *see also Watlington v. City of McCrory, Ark.*, 2:17CV00002-DPM, Document #31, (E.D. Ark. Aug. 3, 2017). In *Advantage Media*, the city amended its municipal sign code after Advantage sued the city for denying its sign permit application. Because the alleged deficiencies in the code were remedied after the action commenced, the request for injunctive relief was moot. *Id*. at 803. Advantage had standing however because, as the Eighth Circuit explained, "Advantage might be entitled to nominal damages if it could show that it was subjected to unconstitutional procedures." *Id.* Similarly, in *Watlington*, the city repealed the

challenged ordinance soon after the plaintiffs filed their complaint, making the plaintiffs' request for injunctive relief moot, but Judge Marshall explained that the entire case was not moot inasmuch as the plaintiffs sought damages for the police chief's enforcement of the allegedly unconstitutional ordinance against them. *Watlington*, 2:17CV00002, Document #31 at 2.

These cases and others stand for the proposition that even if changed circumstances render a request for injunctive relief moot, the case itself is not moot if the plaintiff could recover damages—even nominal damages—for a constitutional violation. *See also Stevenson v. Blytheville Sch. Dist. No. 5*, 800 F.3d 955, 964-65 (8th Cir. 2015) (although the Arkansas General Assembly amended the statute at issue, mooting the claim for injunctive relief, "the appellants could potentially recover money damages for any constitutional violation arising from" a violation of the former statute) (citing *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004)); *McFarlin*, 980 F.2d at 1211 (although student's graduation rendered her claim for preliminary injunctive relief moot, the entire case was not moot because plaintiffs could "advance the damages claim on behalf of their daughter against the defendants for allegedly depriving [their daughter] of civil rights"); *Forbes*, 982 F.2d at 289 ("The underlying case is not moot. The complaint contains a prayer for money damages.").

In this case, the complaint seeks damages from all remaining defendants in their individual capacities. Document #1 at 21. Accordingly, the passage of the FORUM Act and the Board's subsequent repeal of the Policy does not moot the claim for damages caused by its enforcement.[4]

---

[4] The defendants briefly argue that the Policy was not applied to Hoggard. Document #36 at 38-39. This argument fails at the summary judgment stage. The University officials who directed Hoggard and Parry to stop their activities informed them that they could do what they were doing only by reserving a "free speech area" — which the Policy allows for. Document #1-6; Document #40-3 at 0:35-2:25 (video recording). Taking these facts in the light most favorable to Hoggard, the

The defendants next argue that Hoggard's claim for compensatory damages is foreclosed because she disclaimed any interest in compensatory damages in her deposition. Document #58 at 6. If a party abandons a claim for compensatory damages, the former claim cannot rescue an otherwise moot case. *See* 13C Charles Alan Wright, Arthur R. Miller, & Edward Cooper, Federal Practice & Procedure § 3533.3 (3d ed.). At her deposition Hoggard was repeatedly asked whether she wanted monetary damages from this lawsuit. She ultimately answered "no, I just want the policy changed." Document #35-1 at 41.

Assuming, without deciding, that Hoggard's deposition testimony amounts to abandonment of compensatory damages,[5] her claim is not moot because the complaint also seeks nominal damages. Even a claim for nominal damages for constitutional violations suffices to avoid mootness. *See Advantage Media, LLC*, 456 F.3d at 803 (challenges were not moot because plaintiff "might be entitled to nominal damages if it could show that it was subjected to unconstitutional procedures"); *see also* 13A Federal Practice & Procedure § 3533.3 ("The very determination that nominal damages are an appropriate remedy for a particular wrong implies a ruling that the wrong is worthy of vindication by an essentially declaratory judgment. A valid claim for nominal damages should avoid mootness.") (footnotes omitted).

The defendants argue that *Advantage Media* was implicitly overruled by *Phelps-Roper*, where the Eighth Circuit said that a claim for nominal damages did not give the plaintiffs standing to challenge on free-speech grounds repealed versions of an ordinance, stating that a request for

_____

Policy was applied to her.

[5] The Court notes that in her response to the motion to dismiss, Hoggard, through her attorneys, states that she still seeks damages. Document #61 at 10, 15-16.

nominal damages does not "revive an otherwise moot claim against 'a regime no longer in existence.'" *Phelps-Roper*, 697 F.3d at 687 (quoting *Morrison*, 521 F.3d at 611). Although the *Phelps-Roper* opinion can be read to say that a request for nominal damages never preserves a challenge to a repealed law from mootness, the facts in *Phelps-Roper*, and in *Morrison*, are distinguishable from the facts here. In *Phelps-Roper*, the plaintiffs never engaged in any picketing that would have been prohibited. *See Phelps-Roper*, 697 F.3d at 685. Likewise, in *Morrison*, the plaintiff never engaged in speech prohibited by the school policy at issue. *Morrison*, 521 F.3d at 605. In both cases, the as-applied claim was based only on the allegation that the plaintiffs' free speech rights had been chilled, not that the allegedly unconstitutional ordinance or policy had been enforced against the plaintiffs. In *Advantage Media*, the ordinance was enforced against the plaintiff.

Thus, *Advantage Media* and *Phelps-Roper* can be reconciled as follows: *Advantage Media* stands for the proposition that when a statute, ordinance or policy has been enforced against a plaintiff, repeal of the policy does not moot the plaintiffs' as-applied claim for nominal damages; whereas *Phelps-Roper* stands for the proposition that when a statute, ordinance or policy has not been enforced against a plaintiff, repeal of the policy moots the plaintiffs' as-applied claim for nominal damages. As the Sixth Circuit said in *Morrison*, "No readily apparent theory emerges as to how nominal damages might redress past chill." *Morrison*, 521 F.3d at 610. Here, as in *Advantage Media*, the now-repealed ASU Policy was enforced against Hoggard. If the Policy was unconstitutional, her constitutional rights were violated. Because the facts of *Phelps-Roper* and the facts of *Advantage Media* are distinguishable, and because the Eighth Circuit did not explicitly overrule *Advantage Media*, *Advantage Media* remains binding precedent; and it is directly on point, whereas *Phelps-Roper* is not.

9

The defendants' motion to dismiss on mootness grounds is granted in part and denied in part. The plaintiffs' claims for injunctive and declaratory relief are moot and therefore dismissed. All claims against the defendants in their official capacities are correspondingly dismissed. The plaintiffs' claims challenging the Policy on its face are dismissed. The plaintiffs' claim for nominal damages for the enforcement of the Policy against them is not moot.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Remaining are challenges to the former Policy as it was applied to the plaintiffs. The remaining defendants are the individual members of the ASU Board of Trustees as of October 11, 2017, in their individual capacities: Ron Rhodes, Tim Langford, Niel Crowson, Stacy Crawford, and Price Gardner; Charles Welch, the President of the ASU system; Kelly Damphousse, Chancellor of ASU; William Stripling, Vice Chancellor for Student Affairs of ASU; and Martha Spack, Director of Student Development and Leadership at ASU.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. A movant is entitled to summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A

10

moving party may satisfy its initial burden by pointing out to the district court that the nonmoving party lacks the evidence to prove an essential element of its case. *Bedford v. Doe*, 880 F.3d 993, 996-97 (8th Cir. 2018). If this burden is satisfied, the nonmoving party must submit evidentiary materials of specific facts showing the presence of a genuine dispute for trial, such that a jury could reasonably find in that party's favor. *See id.* at 997.

The defendants first argue that they are entitled to summary judgment because none of them was personally involved in causing the alleged injuries. Document #36 at 39-40. To establish that a state official is personally liable under section 1983, a plaintiff must prove that the official acting under color of state law caused the deprivation of the plaintiff's constitutional right. 42 U.S.C. § 1983; *see Clay v. Conlee*, 815 F.2d 1164, 1169-70 (8th Cir. 1987). Vicarious liability does not apply, so a plaintiff must prove that each defendant's individual actions violated the constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009); *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

The defendants point out that none of them was personally involved in enforcing the Policy against Hoggard. Document #36 at 39-40; Documents #67 and 68. No evidence shows that any of the defendants created or authored the Policy at issue, nor does evidence show that any of them applied it against Hoggard. No defendant was present at the incident with Hoggard and Parry. No defendant received, processed, or denied a request by Hoggard to use the area. None of them directly or indirectly ordered Hoggard and Parry to cease their activities and for Parry to leave campus. The Court must therefore consider whether the conduct by the individual defendants as administrators and trustees constituted sufficient personal involvement in the plaintiffs' injuries.

***Defendants Welch, Damphousse, Stripling, and Spack***

The claims against administrators Welch, Damphousse, Stripling, and Spack rest on their responsibility and authority for enforcing ASU policies. Document #1 at ¶¶ 34, 41, 48, and 58. General supervisory authority over a state entity's operations, alone, is insufficient to connect a state official to a plaintiff's injury under section 1983. *Jackson v. Nixon*, 747 F.3d 537, 545 (8th Cir. 2014). At least one federal court has held that a university administrator's liability cannot rest simply on the administrator's "ultimate responsibility for all policies promulgated by" the university. *See Rock for Life-UMBC*, 643 F. Supp. 2d at 742.

In response to the defendants' motion for summary judgment, the plaintiffs contend that the administrator defendants were personally involved in the alleged deprivation of Hoggard's constitutional rights because they authorized the Policy's enforcement generally. Document #49 at 48. Specifically, the plaintiffs note that defendants Stripling and Spack were responsible for enforcing the policy— Spack's office reviewed free speech area reservation requests, and Spack reported to Stripling, the Vice Chancellor for Student Affairs. *Id.* (citing, *e.g.*, Document #35-3 at 5; Document #35-2 at 3). The plaintiffs do not explain how defendants Welch and Damphousse are personally responsible for Hoggard's alleged injury, nor do they point to any evidence connecting them to it.

The Policy required use of Free Expression Areas to be scheduled, and for certain requests to be made, through the Vice Chancellor for Student Affairs or the Director of Student Development and Leadership. Document #1-3 at 2-3. As of October 11, 2017, those individuals were Stripling and Spack. That these two individuals were charged with approving and scheduling reservations of Free Expression Areas might connect them to a reservation denial. But Hoggard admitted in her

12

deposition that she never made a request to either Stripling or Spack to engage in any expressive activity on the ASU campus.

Nothing in the record shows that Stripling, Spack, Welch, or Damphousse was individually involved in enforcing the Policy against Hoggard. Because the plaintiffs have not shown that any of these individuals caused a deprivation of their constitutional rights, summary judgment must be granted on all claims in favor of Stripling, Spack, Welch, and Damphousse.

### Defendants Rhodes, Langford, Crowson, Crawford, and Gardner

The plaintiffs' claims against the members of the Board of Trustees, in their individual capacities, rest on the trustees' policymaking authority for the ASU system. Document #1 at ¶¶ 25-29. A state official may be liable if he creates, applies, or interprets a policy or directive that leads to a constitutional violation. *Jackson*, 747 F.3d at 543-45 (citing *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)); *Marchant v. City of Little Rock, Ark.*, 741 F.2d 201, 205 (8th Cir. 1984). *See also Messimer v. Lockhart*, 702 F.2d 729, 732 (8th Cir. 1983) (holding that a department of corrections director may be liable for failing to change a particular prison's allegedly unconstitutional policy based on the director's statutory responsibility to supervise the administration of all corrections facilities). *Cf. Brown v. Mo. Dep't of Corr.*, 353 F.3d 1038, 1040 (8th Cir. 2004) (dismissing supervisory employees because the complaint did not allege "facts that would suggest personal involvement, tacit authorization, or a policy directive" for the conduct at issue).

The ASU Policy originated in 1998. *See, e.g.*, Document #40-10 at 5; Document #40-9 at 17. None of the individual trustee defendants was involved in authoring or approving the Policy because none was on the Board of Trustees at that time. Document #67-1 at 2.

At a June 23, 2009, Board of Trustees meeting, however, Rhodes moved for the Board to

adopt an ASU system-wide policy governing the establishment of free expression policies on each campus within the ASU system.  Document #69-1 at 3. The Board adopted that system-wide policy as one of many system policies it adopted shortly after the Arkansas State University System came into being.[6] Document #40-9 at 12, 18. The June 2009 system policy required each ASU campus to establish procedures governing freedom of expression. Document #69-1 at 7.

The plaintiffs' complaint mentions this ASU system policy and included the system-wide policy as an exhibit. Document #1-2. The complaint states that ASU enacted the Freedom of Expression Policy at issue in this case "[a]s mandated by the ASU System" policy. Document #1 at ¶ 77. Thereafter, the complaint states that it refers to the two policies "collectively" as one "Speech Zone Policy" that is being challenged. *Id.* The complaint therefore seems to assume that the 2009 ASU system-wide policy caused the enactment of the Policy at ASU Jonesboro or otherwise caused the plaintiffs' alleged harm.[7]

By the time the system-wide policy came into being, however, the Freedom of Expression Policy had existed at ASU Jonesboro for more than a decade. There is no evidence that the 2009 system-wide policy led to any changes to the campus policy. Although the 2009 system-wide policy states that it supercedes the 1998 policy, *see id.* at 9, the record reflects that the ASU policy remained

---

[6] None of the current Board defendants other than Rhodes was on the Board of Trustees in 2009. Document #67-1 at 2.

[7] Other than this assumed connection between the two policies, the system policy itself is not meaningfully challenged in this case. At the summary judgment stage the plaintiffs only mention the Policy at ASU and in fact refer to it, and only it, as the "Speech Zone Policy" being challenged. *E.g.*, Document #41 at 9 (plaintiff's motion); Document #49 at 9 (plaintiff's response to defendants' motion). Only in response to the defendants' supplemental motion for summary judgment do the plaintiffs state that "[t]he ASU System Speech Zone Policy and the ASU Speech Zone Policy comprised the "Speech Zone Policy" challenged by Plaintiffs in their complaint and enforced by Defendants to suppress Plaintiffs' speech." Document #68.

in place and that the relevant ASU officials continued to use it without interruption to schedule reservations of Freedom of Expression Areas on the ASU campus. *See* Document #40-9 at 9-18; Document #40-11 at 7-10. Assuming, however, that Rhodes's participation in the adoption of the system-wide policy is sufficient personal involvement to render him potentially liable, for reasons that will be explained, he is protected by qualified immunity.

Aside from Rhodes, the plaintiffs have not pointed to any specific actions taken by the individual Board of Trustee members—other than generally failing to repeal the Policy—that connects them to its enforcement against Hoggard. Their claims therefore turn on whether the individual trustees can be held liable based on their failure as general ASU policymakers to repeal the Policy.

In *Messimer v. Lockhart*, the plaintiff claimed that a prison warden's policy of confining protective custody inmates together violated his constitutional rights. 702 F.2d at 732. Under state law, the state department of corrections director had the statutory authority to change the policy. *Id.* The Eighth Circuit held that the complaint stated a claim against the director who "may be responsible for his own failure to act." *Id.* The *Messimer* case has not been overruled and has been relied on for the same proposition as recently as 2014. *See Jackson*, 747 F.3d at 544 (holding that complaint alleged sufficient personal involvement as to the Missouri Department of Corrections director based on his statutory responsibility to implement and enforce the policies at issue); *see also Langford v. Norris*, 614 F.3d 445, 464 (8th Cir. 2010) (explaining that defendants who designed or oversaw the prison medical grievance procedure could be liable if the unwieldy procedure caused the denial of constitutionally adequate treatment).

Arkansas law charges the Board of Trustees with the management and control of ASU. Ark.

Code Ann. § 6-65-202. The bylaws of the Board of Trustees provide the same, and they identify further functions of the Board of Trustees in its exercise of that management and control. Document #40-7 at 3. According to the bylaws the Board of Trustees must, among many other things, "determine major policy," "review existing policy," and "[e]stablish substantive institutional policy for the operation of" ASU. *Id.* The *Messimer*, *Jackson*, and *Langford* cases are not precisely on point because they involved prison policies and operations, but they lend support to the theory that the individual trustees were sufficiently personally involved in injuries caused by the ASU Policy based merely on their duty to determine, review, and establish policies for ASU.

Assuming, for the purposes of the defendants' motion for summary judgment, that the trustees were personally involved in causing Hoggard's alleged injuries, they are nevertheless entitled to summary judgment on the basis of qualified immunity.

The defense of qualified immunity protects government officials who act reasonably. The rule serves "to excuse an officer who makes a reasonable mistake in the exercise of his official duties." *Dillard v. City of Springdale*, 930 F.3d 935, ___ (8th Cir. 2019) (quoting *Edwards v. Baer*, 863 F.2d 606, 607 (8th Cir. 1988)). It attaches so long as the official did not violate a clearly established right of which a reasonable person standing in the official's shoes would have known. *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018); *Robinson v. Payton*, 791 F.3d 824, 830 (8th Cir. 2015).

At the summary judgment stage the plaintiff bears the burden to show that the facts, viewed in her favor, demonstrate the deprivation of a constitutional or statutory right that was clearly established at the time of the deprivation. *Parrish*, 594 F.3d at 1001. An individual government official is entitled to qualified immunity if no genuine dispute of material fact exists "regarding

16

whether the officials' actions, even if unlawful, were objectively reasonable 'in light of the legal rules that were clearly established at the time [their actions were] taken.'" *Id.* (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). Courts may exercise their discretion in deciding whether to first address whether the facts make out a deprivation of a constitutional right or whether the right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 242, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009); *Morgan v. Robinson*, 920 F.3d 521, 524-27 (8th Cir. 2019) (en banc).

A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Morgan*, 920 F.3d at 524. Although the official's very action need not have previously been held unlawful, in light of preexisting law the unlawfulness of the official's action must be apparent. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002). "This requires a high 'degree of specificity.'" *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (quoting *Mullenix v. Luna*, 577 U.S. __, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255 (2015) (per curiam)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Austell v. Sprenger*, 690 F.3d 929, 936 (8th Cir. 2012) (quotation omitted). Indeed, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. __, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (quoting *Mullenix*, 577 U.S. __, 136 S. Ct. at 308). The defense therefore gives officials some "breathing room to make reasonable but mistaken judgments" and "some leeway when acting in legally murky environments." *Estate of Walker*, 881 F.3d at 1060.

In this case it is unclear when the plaintiffs contend the trustees should have known to repeal the Policy. Even assuming that the officials' failure to repeal the Policy—and therefore their involvement in causing the plaintiffs' injury—took place as late as the day it was enforced against

17

Hoggard and through the day before it was repealed, they are entitled to qualified immunity. As will be explained, the relevant binding authority did not place the constitutional question beyond debate such that every reasonable official in the trustees' positions would have known that the failure to repeal the Policy, and its being subsequently enforced against Hoggard in the manner that it was, violated the constitution.

The first amendment, which the Supreme Court has made applicable to the states through the fourteenth amendment, provides that Congress shall make no law abridging the freedom of speech. Const. Amend. I; *Gitlow v. People of the State of N.Y.*, 268 U.S. 652, 45 S. Ct. 625, 69 L. Ed. 1138 (1925). Despite the fact that the first amendment seemingly imposes an absolute prohibition on laws that abridge the freedom of speech, the Supreme Court has repeatedly held that free speech is not an absolute right; and the application of the first amendment to every state and local governmental entity—including schools, prisons, and a vast array of other governmental bodies—makes it impossible for the prohibition to be absolute. *See Gresham v. Rutledge*, 198 F. Supp. 3d 965, 968-69 (E.D. Ark. 2016).[8]

---

[8] Smolla says that absolutism is too simplistic to be a viable method of addressing "modern First Amendment conflicts." Rodney A. Smolla, 1 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 2.50 (April 2019 update). That phrase suggests that something has changed in "modern" times that renders absolutism no longer able to decide first amendment issues. Smolla's answer to the question of what has changed is that the courts did not develop first amendment jurisprudence until after World War II. *Id.* The development of modern first amendment jurisprudence thus closely follows the incorporation of the first amendment into the fourteenth amendment, making it applicable to the states. *See Stromberg v. California*, 283 U.S. 359, 368, 51 S. Ct. 532, 535, 75 L. Ed. 1117 (1931) ("the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech"); *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940) (same). In other words, the temporal sequence suggests that the proliferation of free speech cases that cannot be resolved by "absolutism" is due more to the expansion of the first amendment beyond a prohibition simply on Congress than to ambiguities in the terms "abridge" and "freedom of speech."

According to the federal appellate courts, the constitutionally permitted extent to which the government may control expressive activities on its property turns on the nature of the property involved and the restrictions imposed. *Ball v. City of Lincoln, Nebraska*, 870 F.3d 722, 729 (8th Cir. 2017) "The Supreme Court 'has adopted a forum analysis as a means of determining when the [g]overnment's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). The extent to which the government can control access therefore depends on the relevant forum.

A traditional public forum is an area that has historically and traditionally been available for public expression and that has the physical characteristics of a public thoroughfare. *Id.* at 730 (citing *Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006)). Quintessential examples are streets, sidewalks, and public parks. *Id.* In such areas the government's ability to restrict speech is the most circumscribed: any content-based restriction on speech must be "necessary to serve a compelling state interest" and must be "narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794 (1983). Still, the government may impose content-neutral time, place, and manner restrictions on speech in traditional public forums as long as the restrictions are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id*. The government at times intentionally opens up other public property for public discourse; that is, in areas other than traditional public forums, the government may designate its property as a public forum by making it generally open to the public as a place for expressive activity. *Id.* As long as it does so, the government is bound by the same standards as in traditional public forums. *Id.* at 46, 103 S. Ct. at

19

955. Finally, if government property is not traditionally and has not been designated a forum for expressive activities by the public, then the government may restrict or control access to a greater degree. *Id.* In such areas, not only may the government may establish time, place, and manner regulations on speech, it may reserve the forum for whatever the government's intended purpose may be, "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

Identifying government property as the appropriate type of forum—and so determining the extent to which the government may restrict speech there—is no easy task. And which type of forum best describes a public university campus, or certain parts of the campus, is a particularly vexed question. *See Hershey v. Goldstein*, 938 F. Supp. 2d 491, 508-10 (S.D.N.Y. 2013) (collecting cases); *compare Bowman*, 444 F.3d at 776 (holding that the university spaces at issue were "unlimited designated public fora"), *with Bowman*, 444 F.3d at 983 (Bye, J., concurring) (opining that the university spaces at issue "should be recognized as traditional public fora"); *compare Ball*, 870 F.3d at 736 (holding entirety of a plaza area was a nonpublic forum), *with Ball*, 870 F.3d at 737-38 (Melloy, J., dissenting) (opining that part of the plaza area was a traditional public forum). Some courts have declined to use the complex forum analysis in what is ultimately a search for sensible results—particularly where the area at issue does not appear to fit neatly into one of the Supreme Court's forum classifications. *See Gilles v. Blanchard*, 477 F.3d 466, 473-74 (7th Cir. 2007) (declining to use the forum "template" to resolve the case where the case at issue falls between the cracks of the forum analysis).

Recognizing the difficulty of the issue is not to say that first amendment law, according to the federal appellate courts, is never clearly established and that qualified immunity always protects

state actors in their individual capacities. At times the law is, according to the courts, clearly established, and university officials who transgress its bright lines are on the hook for money damages. *See, e,g.*, *Burnham v. Ianni*, 119 F.3d 668, 675-77 (8th Cir. 1997) (en banc). Here, however, the unlawfulness of failing to repeal the policy would not have been apparent to reasonable trustees standing in the defendants' shoes.

Two Eighth Circuit cases primarily guide the Court's analysis here. The Eighth Circuit previously upheld, for the most part, the University of Arkansas's analogous campus-wide policy regarding use by speakers of its campus facilities and space. *Bowman*, 444 F.3d at 983. That policy required, among other things, non-university entities, like Bowman, to make reservations in advance of using campus space. *Id.* at 972. It also imposed a three-day advance notice requirement before using the space. *Id. Bowman* held that the outdoor areas at issue on the University of Arkansas campus were unlimited designated public forums because the university had long permitted speech, by both university and non-university entities, at the locations at issue. *Id.* at 979. There was no evidence the policy was not content neutral, and so the question became whether the time, place, and manner restrictions on the property were narrowly tailored to meet one or more of the university's proffered government interests.

The Eighth Circuit answered that three of the four relevant restrictions were constitutional. The requirement that non-University entities obtain a permit before using the outdoor space was lawful even though it was a prior restraint, against which there is a heavy presumption of unconstitutionality. *Id.* at 980. The policy did not delegate overly broad discretion to officials, and it did not allow the denial or revocation of permits on the basis of content—it applied to all nonprofit non-university entities, and permits could be denied or revoked only for limited reasons. *Id.* at 980-

21

81. The permit requirement did not burden substantially more speech than necessary to further the university's interests in ensuring public safety, minimizing disruption of the educational setting, and coordinating the use of limited space by multiple entities. *Id.* at 981. The three-day notice requirement was also constitutional despite potentially preventing spontaneous speech—three days was a relatively modest requirement, which allowed the university to plan for exigencies such as security, crowd control, and insurance requirements that might be necessary for a given event. *Id.* at 982.[9]

Like the University of Arkansas policy in *Bowman*, the ASU Policy required speakers to schedule their use of campus space for speaking and to provide the University with advance notice of their intent to do so, and, like that policy, the ASU Policy applied to all individuals and entities. The Policy similarly sought to serve legitimate interests, comparable to those in *Bowman*, namely, assuring equal opportunity for speech, preserving order within the university community, protecting university property, and providing a secure environment for exercising freedom of expression. Document #1-3. Reasonable university trustees in the positions of the members of the ASU Board of Trustees could have understood *Bowman* to mean that permit and advance notice requirements for speakers on a university campus may be used without violating the first amendment—even if the campus areas are designated public forums—and that failing to repeal ASU's similar Policy would not violate a clearly established constitutional right.

---

[9] The Eighth Circuit also held that a ban on non-university entities during final examinations and commencement activities was constitutional. *Id.* The only aspect of the University of Arkansas's policy that was held unconstitutional was a five-day cap on which a speaker could speak per semester — this part of the policy was not narrowly tailored to achieving its interest in fostering diversity and avoiding monopolization of space because the policy could just as easily allow the plaintiff more days to speak if the space was not already being used. *Id.* at 981-82.

Another Eighth Circuit decision—decided less than two months before the incident at issue in this case—further demonstrates that it was reasonable for officials standing in the defendants' shoes not to repeal the Policy. In *Ball v. City of Lincoln, Nebraska*, the Eighth Circuit held that an outdoor plaza—owned by the city but managed by an entertainment venue company—was a nonpublic forum where the government was minimally restricted. 870 F.3d 722, 736 (8th Cir. 2017). This was true despite that the plaza area possessed physical features that made it look like a public forum and that it was physically accessible to the public. *Id.* at 731-33. It was primarily a venue for commercial use by the arena, a means to facilitate safe access for its patrons, a security screening area, and a gathering place for arena patrons. *Id.* The Eighth Circuit noted that there was no evidence that the plaza was used for public expression or that it was made available for expressive activity by the public. *Id.* at 735. The City's principal purpose with respect to the plaza was to protect the rights of arena tenants, to allow for crowd management and safety, to provide a gathering place for arena patrons, and to provide an area for security screening—not to be open to the public for expressive activities. *Id.*

The defendants argue that, like the plaza in *Ball*, Heritage Plaza is a nonpublic forum where the government may more broadly restrict speech. The plaintiffs say that *Ball* does not support ASU's position because, unlike the plaza in *Ball*, Heritage Plaza has long been open for expressive activities by the public. The defendants contend, however, that ASU did not open Heritage Plaza—where Hoggard and Parry set up their table—for expressive activity by the public, but restricted expressive activity to only certain types of speech.

According to the defendants, as a matter of practice, Heritage Plaza is not generally available to the public for expressive activities; thus, it is not a traditional or designated public forum.

23

Document #50 at 2-4. They point to the deposition and declaration testimony of Elizabeth Rouse, the university employee who is charged with booking reservations for the space around the Reng Student Union. Document #35-5 at 2. Rouse testified that only Registered Student Organizations and ASU departments were allowed to reserve that area. *Id.*; Document #35-4 at 14, 18-19. In her deposition Rouse identified Heritage Plaza as available only for Registered Student Organizations to reserve. Document #34-4 at 18-19; *see also* Document #35-13 (satellite image). She specified a nearby but separate grassy area along Caraway Road as an area available for general reservation under the Policy. Document #34-4 at 18-19; *see also* Document #35-13.

The plaintiffs argue that the Policy itself disputes Rouse's testimony because, they say, the Policy lists the area where Hoggard and Parry set up their table as a Free Expression Area open to reservation by anyone. The Policy, however, confirms Rouse's testimony because it describes the third Free Expression Area as "Heritage Plaza east of Reng Student Union *at Caraway Road*"—the location specified by Rouse—and not anywhere in Heritage Plaza. Document #1-3 at 3.

The plaintiffs next point out that the Policy allows "other areas of the campus," besides the Free Expression Areas, to be reserved if any individual or group desires to use them. *Id.* at 2. They say that this reference to "other areas of campus" for speech by any individual or group means that Heritage Plaza is not limited to only specific groups. But the fact that other areas of campus may be reserved by anyone does not contradict the defendants' evidence that, as a matter of ASU practice, Heritage Plaza may be reserved only by university-affiliated groups.

Finally, the plaintiffs argue that a non-university-affiliated speaker held an event in Heritage Plaza on October 11, 2017, belying ASU's contention that only university-affiliated speakers are allowed there. Document #50 at 3-4. But, as explained above, it is undisputed that anyone may

24

reserve the separate grassy area at the end of Heritage Plaza along Caraway Road, and Rouse's unrebutted deposition testimony reflects that the other speaker was at the end of Heritage Plaza. Document #35-4 at 25.

In short, the plaintiffs have failed to present evidence to create a genuine dispute as to whether ASU has reserved Heritage Plaza—including the patio portion where Hoggard and Parry set up their table—for speech by only certain university-affiliated speakers, and that it is not generally open for expressive activity by the public. *See Perry Educ. Ass'n*, 460 U.S. at 46, 103 S. Ct. at 955. In *Ball*, that the plaza was not open for expressive activity by the public informed the Eighth Circuit's holding that it was a nonpublic forum. *Ball* therefore further supports the conclusion that the defendants did not transgress a bright line of first amendment case law when it failed to repeal the Policy that effectively restricted speech in the Heritage Plaza patio.

The plaintiffs have not met their burden to demonstrate that the right at issue was clearly established. *See Morgan*, 920 F.3d at 524. The only cases to which they can point are non-binding district court cases. *See Clayton Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534 (N.D. Tex. 2009); *Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575 (S.D. Tex. 2003); *Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*, 2012 WL 2160969 (S.D. Ohio June 12, 2012). A "robust consensus" of persuasive authority can perhaps dictate that law is clearly established. *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019) (quoting *Wesby*, 138 S. Ct. at 589). But a handful of district court cases is not robust consensus, *see id.* at 1023, and the strong Eighth Circuit precedent to the contrary further shows that these cases do not represent a robust consensus. *Bowman* and *Ball* show that Rhodes, Langford, Crowson, Crawford, and Gardner acted well within the breathing room accorded them as public officials in making the decision—even if mistaken—not

25

to repeal the Policy. Summary judgment is therefore granted in favor of the defendants on the plaintiffs' first amendment claims.

The plaintiffs also claim a violation of their fourteenth amendment right to due process of law. They say that the Policy violated their right to due process because its terms "speaking, demonstrating, and other forms of expression" are vague and undefined. Vague regulations are impermissible under the due process clause because they fail to provide adequate notice of prohibited conduct and they allow for arbitrary and discriminatory enforcement. *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (citing *Smith v. Goguen*, 415 U.S. 556, 572-73, 94 S. Ct. 1242, 1247, 39 L. Ed. 2d 605 (1974); *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322 (1926)). "A stringent vagueness test applies to a law that interferes with the right of free speech." *Id.* at 1309. Nevertheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Adam & Eve Jonesboro LLC v. Perrin*, No. 18-2818, *7-*8 (8th Cir. Aug. 12, 2019) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010)).

In an as-applied vagueness challenge, such as this one, the Court must consider the particular facts at hand because a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder*, 561 U.S. at 18-19, 130 S. Ct. at 2719. This general rule applies equally to expressive conduct. *Id.* at 19, 130 S. Ct. at 2719. Thus, even if the scope of a statute or regulation is not clear in every application, if the terms are clear in their application to a plaintiff's conduct, the vagueness challenge must fail. *Id.* at 21, 130 S. Ct. at 2720.

A regulation is unconstitutionally vague, and therefore void, if it does not provide a person

of ordinary intelligence with fair notice of what it prohibits or requires. *See id*. at 20-22, 130 S. Ct. at 2720-21. Courts have traditionally relied on the common usage of statutory language, judicial explanations of its meaning, and previous applications of the statute to the same or similar conduct in order to determine whether an ordinance is unconstitutionally vague. *Stephenson*, 110 F.3d at 1309.

The plaintiffs' claim that the individual trustees violated their fourteenth amendment right to due process of law fails for the same reason as their first amendment claim. Taking into account the specific facts of this case, the plaintiffs have not demonstrated that enforcing the Policy against Hoggard violated a clearly established right. *See Estate of Walker*, 881 F.3d at 1061 (reversing the denial of qualified immunity because the district court defined the constitutional right in question too generally; the issue of whether the right was clearly established must be particularized to the case).

Instead, the activities in which Hoggard engaged comfortably fall within the scope of the Policy terms "speaking, demonstrating, and other forms of expression." Although it is undisputed that the Policy does not define those terms, the Policy as a whole reveals their meaning. *See* Document #1-3. The introduction explains that the Policy serves to balance university operations with ASU's commitment to affording opportunities for "protests and demonstrations." The section describing how to reserve Free Expression Areas is entitled "Speeches and Demonstrations." All these words signify formal methods of expression, and they inform the words "speaking, demonstrating, and other forms of expression" mentioned in the Policy. A person of ordinary intelligence would know that the Policy embraces setting up a table to promote a non-university political organization and soliciting membership into it. Moreover, considering any "previous

applications of the [Policy] to the same or similar conduct," there is no evidence the Policy has ever been enforced against, for example, merely casual conversations or study groups. *See Stephenson*, 110 F.3d at 1309.

The plaintiffs note that it is difficult to determine whether the Policy applies to hypothetical situations. They point to ASU officials' deposition testimony revealing uncertainty as to whether the Policy would apply in gray areas, such as to students wearing "Make America Great Again" hats. "Whatever force these arguments might have in the abstract, they are beside the point" in this as-applied challenge. *Holder*, 561 U.S. at 22, 130 S. Ct. at 2721. Hoggard and Parry's actions readily fall within the Policy's ambit, and so the plaintiffs' case presents no such vagueness problem. *See id.* at 23, 130 S. Ct. at 2721.

The plaintiffs have not cited a case in which similar language was held unconstitutionally vague as applied to similar conduct, nor have they otherwise met their burden to demonstrate that the right at issue was clearly established. *See Morgan*, 920 F.3d at 524. Summary judgment is therefore granted in favor of the remaining defendants on the plaintiffs' fourteenth amendment claims.

## CONCLUSION

For the reasons explained, the plaintiffs' claims are dismissed as moot except for their claims against the defendants in their individual capacities for damages for the enforcement of the now-repealed ASU Freedom of Expression Policy against them. The motion to dismiss is therefore GRANTED IN PART and DENIED IN PART. Document #57. The ASU administrators—Charles Welch, Kelly Damphousse, William Stripling, and Martha Spack—did not participate in the enforcement of the Policy against the plaintiffs, and they cannot be liable absent personal

participation. Therefore, summary judgment is granted in their favor on the plaintiffs' claims against them in their individual capacities. The ASU trustees—Ron Rhodes, Tim Langford, Niel Crowson, Stacy Crawford, and Price Gardner—are protected by the doctrine of qualified immunity from the plaintiffs' claims against them in their individual capacities for failing to repeal the campus policy and for Rhodes's participation in adopting the system-wide policy. They are entitled to summary judgment on that basis. The defendants' motion for summary judgment is GRANTED as to the plaintiffs' damage claims against them in their individual capacities. Document #35. The defendants' supplemental motion for summary judgment is DENIED. Document #67. The plaintiffs' motion for summary judgment is DENIED. Document #40.

IT IS SO ORDERED this 19th day of August, 2019.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE