# United States Court of Appeals
## *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 31, 2020

Mr. Christopher Paul Schandevel
ALLIANCE DEFENDING FREEDOM
Suite 250
20116 Ashbrook Place                              3:17-cv-00327-JLH
Ashburn, VA  20147

     RE:  19-3016  Turning Point USA at Arkansas, et al v. Ron Rhodes, et al

Dear Counsel:

     The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

     Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

                                Michael E. Gans
                                Clerk of Court

NDW

Enclosure(s)

cc:   Mr. Travis C. Barham
      Mr. David A. Bruce
      Mr. John J. Bursch
      Mr. Frederick W. Claybrook Jr.
      Mr. John Michael Connolly
      Mr. William S/ Consovoy
      Mr. David Andrew Cortman
      Mr. Jonathan Caleb Dalton
      Mr. James A. Davids
      Mr. Steven W. Fitschen

Mr. Tyson C. Langhofer
Mr. Jim McCormack
Mr. Rodney Paul Moore I
Mr. Clark M. Neily III
Mr. Ethan Christopher Nobles
Mr. Cameron Thomas Norris
Mr. Jeff Puryear
Mr. Jay Remington Schweikert
Ms. Kristen Waggoner
Mr. Ryan Michael Wilson

  District Court/Agency Case Number(s):   3:17-cv-00327-JLH

# United States Court of Appeals
## *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 31, 2020

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  19-3016  Turning Point USA at Arkansas, et al v. Ron Rhodes, et al

Dear Sirs:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellant and appeared on the brief was Christopher Paul Schandevel, of Ashburn, VA. The following attorneys also appeared on the appellant brief;  John J. Bursch, of Washington, DC.,  David Andrew Cortman, of Lawrenceville, GA.,  Kristen Waggoner, of Washington, DC.,  Tyson C. Langhofer, of Ashburn, VA.,  Ethan Christopher Nobles, of Benton, AR.,  Jonathan Mark Larcomb, of Ashburn, VA.

Counsel who presented argument on behalf of the appellee and appeared on the brief was Jeff Puryear, of Jonesboro, AR. The following attorneys also appeared on the appellee brief;  Rodney Paul Moore, I, of Little Rock, AR.,  Ryan Michael Wilson, of Jonesboro, AR.

The following attorneys appeared on the amicus brief of The Cato Institute in support of Plaintiffs-Appellants: Clark M. Neily, III, of Washington, DC., and Jay Remington Schweikert, of Washington, DC.

The following attorneys appeared on the amicus brief of Young Americans for Liberty, National Legal Foundation, and Pacific Justice Institute, in support of Plaintiffs-Appellants: Frederick W. Claybrook, Jr., of Washington, DC., Steven W. Fitschen, of Chesapeake, VA., James A. Davids, of Chesapeake, VA., and David A. Bruce, of Silver Spring, MD.

The following attorneys appeared on the amicus brief of Speech First, Inc. in support of the Plaintiffs-Appellants: William S. Consovoy, of Arlington, VA., John Michael Connolly, of Arlington, VA., and Cameron Thomas Norris, of Arlington, VA.

The judge who heard the case in the district court was Honorable J. Leon Holmes. The judgment of the district court was entered on August 19, 2019.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

NDW

Enclosure(s)

cc:  MO Lawyers Weekly

District Court/Agency Case Number(s):  3:17-cv-00327-JLH

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3016

_____

Turning Point USA at Arkansas State University; Ashlyn Hoggard

*Plaintiffs - Appellants*

v.

Ron Rhodes, In his individual capacity (Originally named in his individual and
official capacities as member of the Board of Trustees of the Arkansas State
University System); Tim Langford, Dr., Individual and official capacities as
member of the Board of Trustees of the Arkansas State University System; Niel
Crowson, Individual and official capacities as member of the Board of Trustees of
the Arkansas State University System; Stacy Crawford, Individual and official
capacities as member of the Board of Trustees of the Arkansas State University
System; Price C. Gardner, Individual and official capacities as member of the Board
of Trustees of the Arkansas State University System; Charles L. Welch, Individual
and official capacities as member of the Board of Trustees of the Arkansas State
University System; Kelly Damphousse, Chancellor of Arkansas State University, in
his individual and official capacities; William Stripling, Vice Chancellor for
Student Affairs of Arkansas State University, in his individual and official
capacities; Martha Spack, Director of Student Development and Leadership for
Arkansas State University, in her individual and official capacities; Christy Clark,
In her official capacity as a member of the Arkansas State University System Board
of Trustees (Originally named as Ron Rhodes)

*Defendants - Appellees*

------------------------------

Speech First, Inc.; Young Americans for Liberty; The National Legal Foundation; Pacific Justice Institute; Cato Institute

*Amici on Behalf of Appellants*

————————

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

————————

Submitted: June 18, 2020
Filed: August 31, 2020

————————

Before LOKEN and GRASZ, Circuit Judges, and CLARK,[1] District Judge.

————————

GRASZ, Circuit Judge.

Ashlyn Hoggard and Turning Point USA sued Arkansas State University, its administrators, and its trustees for violating their rights under the Free Speech Clause of the First Amendment. The district court[2] granted summary judgment to the defendants. We affirm.

## I. Background

### A. Factual Background

————————

[1]The Honorable Stephen R. Clark, Sr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

Appellate Case: 19-3016   Page: 2   Date Filed: 08/31/2020 Entry ID: 4950747

Just outside the Reng Student Union, Arkansas State University student Ashlyn Hoggard set up a small table. She was accompanied by Emily Parry, a non-student representative for Turning Point USA ("Turning Point"), an organization focused on promoting free markets, limited government, and individual liberty. Hoggard and Parry aimed to recruit students for a local Turning Point chapter, which they hoped could become a registered student organization at Arkansas State. But in short order, two University administrators, Sarah Ponder and Elizabeth Rouse, approached the table to investigate.

Rouse told Hoggard and Parry they could not "table" at their present location. (We will call this area the "Union Patio.") If Hoggard and Parry wanted to set up a table and display their signage ("Free Market, Free People," "Big Government Sucks"), Rouse explained, they could do so elsewhere — specifically, in a campus "Free Expression Area," one of which was less than 100 yards away. In response, Parry expressed her views about the constitutionality of Free Expression Areas and other campus-speech restrictions. University Police Officer Terry Phipps quickly arrived at the scene and ordered Parry to leave campus. Hoggard was told to take down her table. Her recruiting efforts — at least at her Union Patio informational table — were done for the day.

## B.  University Policies

Hoggard blames several University policies for her inability to table at the Union Patio. She points to three policies in particular, which we outline briefly here.

Arkansas State University's Freedom of Expression Policy ("System Policy") permits individual Arkansas State University campuses — including the Jonesboro campus Hoggard attended — to establish "Free Expression Areas" and impose reasonable time, place, and manner restrictions on their use. It further explains that Arkansas State "has not opened its campuses as public forums."

-3-

The Jonesboro campus has its own Freedom of Expression Policy ("Campus Policy"). It explains that the Jonesboro campus "is not a public forum open for assembly and expression of free speech." But it establishes several Free Expression Areas throughout campus, which can be used for speeches, demonstrations, and expressive activities. According to the Campus Policy, anyone can use the Free Expression Areas, regardless of viewpoint, so long as they get advance permission and adhere to reasonable time, place, and manner restrictions. Other areas of campus may be used for speeches, marches, and demonstrations, so long as the University receives advance notice and grants permission.

Finally, as an outgrowth of the Campus Policy, the Jonesboro campus has an unwritten policy restricting tabling at the Union Patio to registered student organizations and University departments ("Tabling Policy"). A student's application to create a registered student organization must be first approved by the University. For approval, a student organization seeking registration must have five members, a faculty or staff advisor, and a constitution. And while the application form for an organization to become registered indicates that only registered student organizations and University departments can use certain tables *inside* the Union, it is silent on Union Patio tabling restrictions. It is unclear whether the average Arkansas State student even knew about this unwritten Tabling Policy.

## C. Procedural History

Hoggard and Turning Point sued the University, its trustees, and various administrators in federal court. They sought injunctive relief under 42 U.S.C. § 1983, claiming both the System and Campus policies violated due process and unconstitutionally infringed upon freedoms guaranteed by the First Amendment. Hoggard further alleged that the University trustees and administrators were liable for damages.

-4-

In the midst of this litigation, the State of Arkansas passed the Forming Open and Robust University Minds (FORUM) Act. *See* Ark. Code Ann. §§ 6-60-1001 to 1010. According to this new law, state universities cannot carve out "free speech zones" for expressive conduct prohibited in other outdoor campus areas; in effect, all outdoor campus areas are "public forums" for students. Ark. Code Ann. § 6-60-1005. Arkansas State University, according to the FORUM Act, must therefore permit more expressive conduct than do the System and Campus Policies.[3]

Following this change in Arkansas law, the district court granted the defendants' motion for summary judgment. According to the district court, the passage of the FORUM Act mooted Hoggard's request for injunctive relief. The district court also rejected Hoggard's § 1983 due-process and First-Amendment damages claims, finding that the defendants were entitled to qualified immunity because they had not violated a clearly established right.[4] Now, on appeal, Hoggard challenges the district court's ruling — she argues University administrators and trustees violated her clearly-established constitutional right to free speech, and they are not, therefore, immune from

---

[3]We note that, while the Jonesboro campus' Tabling Policy is unwritten, the FORUM Act now requires speech regulations be made "public in [universities'] handbooks, on their websites, and through their orientation programs." Ark. Code Ann. § 6-60-1007; *see also* § 6-60-1005 (requiring a state university's time, place, and manner restrictions on speech be "published" and prohibiting them from preventing students from "spontaneously and contemporaneously assembl[ing], speak[ing], and distribut[ing] literature").

[4]The district court also determined that four of the defendants — all University administrators — could not be held liable, as they were not "individually involved in enforcing the Policy against Hoggard." Hoggard challenges this determination on appeal. But because all remaining defendants are entitled to qualified immunity (as we explain below), we need not decide whether these administrators were involved enough to otherwise be liable under § 1983.

-5-

suit. Our analysis focuses solely on whether the University's administrators and trustees can be liable for money damages under 42 U.S.C. § 1983.

## II. Analysis

Section 1983 allows citizens to sue state officials for violating their "rights, privileges, or immunities secured by the Constitution and laws." According to Hoggard, the University administrators and trustees (i.e., the state officials who created and enforced state-university policies) violated her First Amendment free speech rights and should be liable for her damages.

The district court, however, granted summary judgment to the defendants under the qualified immunity doctrine. "Qualified immunity shields public officials from liability for civil damages if their conduct did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We must therefore determine "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant[s'] alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). And our analysis will proceed in that order — we will first examine whether Hoggard's rights were violated and will then turn to whether those rights were clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . .").

We review de novo the grant of summary judgment and view the record and draw all reasonable inferences therefrom in the nonmoving party's favor. *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 876 (8th Cir. 2020).

-6-

## A. Violation of a Federal Statutory or Constitutional Right

### 1. Forum Analysis

The First Amendment guarantees a right of free speech.  *See* U.S. Const. amend. I.  But while the First Amendment's text prohibits laws "abridging the freedom of speech," the freedom of speech enjoyed by citizens is not absolute.  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).  The Constitution does not give Hoggard "unfettered latitude" to speak and set up tables "wherever and whenever [s]he might choose." *Ball v. City of Lincoln*, 870 F.3d 722, 729 (8th Cir. 2017).  Rather, the State of Arkansas, "no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *United States v. Grace*, 461 U.S. 171, 178 (1983)).  As such, the First Amendment does not require Arkansas to "freely . . . grant access to all who wish to exercise their right to free speech" on its property "without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985)).  Thus, the legality of speech restrictions on state property "turns on the nature of the property involved and the restrictions imposed." *Id.*

To determine the nature of the property involved, we undertake a "forum analysis." *Bowman v. White*, 444 F.3d 967, 974 (8th Cir. 2006).  This is because the law generally tolerates speech restrictions in some forums to a greater extent than in others.  For example, the government's ability to restrict speech is sharply circumscribed in "traditional" and "unlimited designated" public forums. *Id.* at 975–76.  When an area is traditionally open for free expression, or is designated as a forum for all speakers and topics, we subject speech restrictions in such areas to heightened scrutiny. *Id.*  At the opposite end of the spectrum, some government property is "not by tradition or designation a forum for expressive activities by the

-7-

public."  *Ball*, 870 F.3d at 730 (quoting *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 46 (1983)).  "The government retains much broader discretion to restrict expressive activities" in these "nonpublic forum[s]."  *Id.*

The Union Patio, where Hoggard set up her informational table, lies somewhere between these two extremes.  The district court implied, and Hoggard no longer contests, that the University had "limit[ed] the expressive activity" permitted on the Union Patio "to certain kinds of speakers or to the discussion of certain subjects." *Bowman*, 444 F.3d at 976 (quoting *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004)).  The Union Patio is therefore a "limited designated public forum," in which speech restrictions must be "reasonable" and "viewpoint neutral."  *Id.*

## 2. Restrictions at Issue

We must identify the restrictions in play before we examine their reasonableness and neutrality.  No restriction specifically listed in the System or Campus Policies was enforced against Hoggard.  She was not in a Free Expression Area.  Nor did she attempt to set up a table elsewhere.  Nobody told her to leave campus, or to quit talking about Turning Point and its views.  Rather, Hoggard was instructed to take down her table because the Union Patio was reserved for registered student organizations and University departments.  Only the unwritten Tabling Policy was enforced against Hoggard, and thus, only the Tabling Policy's constitutionality is properly at issue.

According to unrebutted testimony, tabling at the Union Patio is reserved for University departments and registered student organizations.  The application form for registering a student organization requires five members, a constitution, and an advisor. Such requirements might constitute viewpoint discrimination if they could not be met due to an organization's views.  But that is not the case here.  Hoggard does not allege viewpoint discrimination.  And, at least as applied to her, the Tabling Policy was not

-8-

viewpoint-discriminatory. True, the Tabling Policy favors the viewpoints of officially-recognized groups over unrecognized groups and individuals. But the Supreme Court has described such favoritism as status-based discrimination, rather than viewpoint-based discrimination. *Perry*, 460 U.S. at 48–49.[5] And because status-based distinctions are "inherent and inescapable" in limited public forums, "[t]he touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." *Id.*

So our focus, in this case, is the Tabling Policy's reasonableness. Our inquiry takes into account "all surrounding circumstances." *Powell v. Noble*, 798 F.3d 690, 701 (8th Cir. 2015). In particular, we must consider (1) the University trustees' and administrators' expertise in creating educational policies; (2) the purpose served by the forum; and (3) the alternative channels of communication available to Hoggard in light of the policies. *See id.* ("A restriction must be reasonable in light of the purpose which the forum at issue serves and the reasonableness of a restriction on access is supported when substantial alternative channels remain open for the restricted communication.") (internal quotation and alteration omitted); *see also Widmar v. Vincent*, 454 U.S. 263, 276–77 (1981) (deferring to a university's judgments about academic affairs, while reviewing the constitutionality of speech restrictions).

### 3. Educational Expertise

We will not "substitute our own notions of sound educational policy for those of the school authorities which we review." *Albright ex rel. Doe v. Mountain Home*

---

[5]Again, this is not to say a policy favoring speech of recognized groups could not be challenged on the basis of viewpoint discrimination. If the group's status (upon which forum access is predicated) depends on what views it holds, viewpoint-discrimination may be at issue. But that is not the case here.

-9-

*Sch. Dist.*, 926 F.3d 942, 948 (8th Cir. 2019) (quoting *Special Sch. Dist. No. 1, Minneapolis Pub. Sch. v. R.M.M. ex. rel. O.M.*, 861 F.3d 769, 771–72 (8th Cir. 2017)).  How, and whether, to run a registered student organization program or to maintain the Union Patio is largely up to the defendants' discretion, which for the most part we leave unquestioned.  However, we retain authority to determine "whether a public university has exceeded constitutional constraints, and we owe no deference to universities when we consider that question." *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 686 (2010).

### 4. Justification of the Forum's Restrictions in Light of its Purpose

With this in mind, we turn to the defendants' justification for the Tabling Policy. According to the defendants, the Union Patio is "unique."  The University's policies "afford privileges to [registered student] organizations to use that space," which are not afforded to other organizations and individuals.  The Union, defendants say, is the "living room of campus."  It is where students eat, hang out, and attend meetings.  And so the area outside the Union — the Union Patio — is supposed to remain a comfortable area — an area in which students need not worry about whether they'll be harassed by pushy buskers, hucksters, and pamphleteers.[6]

This might reasonably justify excluding non-University individuals from speaking at the Union Patio.  *Cf. Bowman*, 444 F.3d at 980–83 (citing, as reasons for speech restrictions, safety concerns about persons unaffiliated with the university). But unlike the plaintiff in *Bowman*, Hoggard was a student — she belonged on campus.

---

[6]The defendants put forward no other justification for the policy.  We therefore assume, for purposes of this appeal, that no other justification for the policy exists. *Richardson*, 957 F.3d at 876 ("We . . . view[] the record in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor").

-10-

She was, to use the defendants' phrase, a "part of [the] campus community." She presumably paid the Student Union Fees supporting maintenance of the Student Union and aspects of the registered student organization program. We fail to see why restricting Union Patio tabling to registered student organizations is any more conducive to creating a "comfortable," "living-room" atmosphere within the Union than opening Patio tabling to all students and groups thereof. The First Amendment protects the rights of both groups *and individuals*. *See Healy v. James*, 408 U.S. 169, 180–85 (1972) (requiring courts to examine First Amendment implications when state colleges restrict the speech and associational rights of non-recognized student groups); *see also McCutcheon v. FEC*, 572 U.S. 185, 206 (2014) ("The whole point of the First Amendment is to afford *individuals* protection against . . . infringements [on free speech in the name of the public good].") (emphasis added).

### 5. Availability of Alternative Forums

The record is unclear about the availability of alternative forums. Part of the trouble is that the Tabling Policy is unwritten. This, in itself, does not pose a First Amendment problem. *Families Achieving Indep. & Respect v. Neb. Dep't. of Soc. Servs.*, 111 F.3d 1408, 1415 (8th Cir. 1997) (en banc). The problem, rather, comes from the Tabling Policy's vagueness, coupled with the ambiguities surrounding the University's enforcement of its speech policies. *See id.* As an initial matter, nobody seems to know where the Tabling Policy came from; it's as if it simply emerged from the bureaucratic aether. And while it is clear and undisputed that tabling outside the Union is restricted, the availability of alternative channels of communication remains unclear. The deposition testimony is loaded with murky questions and murkier answers. Can two students sitting at a Union Patio table talk to other students passing by? According to one defendant, it depends on whether their speech is "offensive." Could a student group — officially recognized or otherwise — approach other students outside the Union Patio to talk politics? Apparently, it "depends" on whether the

-11-

University receives complaints.  What about distributing written material?  The Campus Policy does not mention the Union Patio as an appropriate place for distribution, but — as one defendant explained — registered student organizations can distribute pamphlets there while non-registered groups and individuals cannot.  In this light, one might reasonably infer, as we are required to do, that the availability of Hoggard's alternative communicative channels depended on the "offensiveness" of Hoggard's speech and how University administrators chose to enforce the unwritten and ambiguous aspects of the various policies at play.  *See Richardson*, 957 F.3d at 876 ("We . . . view[] the record in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor."); *see also Minn. Majority v. Mansky*, 708 F.3d 1051, 1060 (8th Cir. 2013) (acknowledging potential § 1983 liability for deliberate indifference toward a state policy's selective enforcement).

There are, of course, a few channels of communication clearly available to Hoggard.  Two immediately come to mind.  First, Hoggard, by herself and without tables, signs, or literature, could have approached individual students practically anywhere on campus to discuss economic freedom, small government, and forming a Turning Point chapter.  She could have done this in person or through social media.  Second, she could have set up her table in a Free Expression Area.

The first alternative amounts to little.  Telling Hoggard she can still associate with her peers to discuss politics is not the same as providing an alternative forum.  Rather, it is simply a recognition of her basic First Amendment rights.

The second alternative amounts to a presumptively-unconstitutional prior restraint on speech.  *See Bowman*, 444 F.3d at 980 (finding a university's requirement of obtaining permission before using an unlimited designated public forum a prior restraint, which bears the "heavy presumption of unconstitutionality").  The Free Expression Areas on campus are unlimited designated public forums, but a speaker

-12-

must get prior permission from the school in order to use them. It is unclear how far in advance this permission must be sought. Rouse told Hoggard that 24-hour notice was required, but the written System and Campus Policies say no such thing. We recognize that we have upheld similar prior restraints when a non-student's speech, crowd control, and safety concerns were at issue. *Id.* at 983. But none of those factors are present here; Hoggard was a student, and the defendants never cited crowd control or safety to justify treating students representing registered student organizations differently from their unaffiliated peers. We have not identified a case in which we allowed a university to impose a prior restraint on a student wishing to use an unlimited public forum.

## 6. Constitutionality of Restrictions

When we consider these factors together, we find that the Tabling Policy, as applied to Hoggard, is unconstitutional. We defer to the defendants' judgment about the importance of establishing a space serving as the campus "living room," as well as their determination that students should feel comfortable in the space in which they eat, meet, and socialize. But this legitimate university interest bears no rational relationship to the distinction between registered student organizations and individual students when it comes to using the Union Patio. Compare Hoggard's case to *Perry*, in which the Supreme Court upheld a limited-public-forum restriction permitting mailroom access to one teachers' union but not another. 460 U.S. at 38–39. The restriction in *Perry* was found reasonable, at least in part, because of the two unions' different obligations and responsibilities — one exclusively represented all the school district's teachers, and the other was a rival vying for support. *Id.* at 51–53. The union serving as the teachers' exclusive bargaining representative had compelling reasons to use the school's mailroom that the other union did not. *Id.* Unlike in *Perry*, registered student organizations do not have obligations and responsibilities more directly tied to the forum's use than do individual Arkansas State students.

-13-

In short, we cannot find the distinction between registered student organizations and individual students reasonable, when the sole justification offered for the distinction provides no meaningful reason for differentiating the two. At least in this case, the (limited) availability of alternative forums and the defendants' educational expertise cannot compensate for the weak justification (i.e., creating a comfortable, living-room atmosphere) the defendants offer for their status-based discrimination. This is not to say, of course, that distinguishing between registered student organizations, unregistered organizations, and individual students is irrational *per se*. Public schools are free to restrict forum access when they have a nondiscriminatory reason for doing so. *See*, *e.g.*, *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 335 (8th Cir. 2011). There may be good reasons for distinguishing between registered student organizations and other members of the university community for purposes of accessing a particular university forum. But such reasons have not been presented in this case. Thus, we conclude Hoggard put forward sufficient facts to show a constitutional violation.

## B. Clearly Established First Amendment Rights

The ultimate success of Hoggard's § 1983 claim, however, depends on whether it was "sufficiently clear that every reasonable official would have understood" that, by preventing Hoggard from Union Patio tabling, he or she was violating the First Amendment. *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotations and alterations omitted). That is, we must determine whether the right violated by the defendants was "clearly established" at the time of the violation. *Id.* We do not "define clearly established law at . . . a high level of generality." *Id.* at 665 n.5 (quotation omitted). "Rather, we look for a controlling case or 'a robust consensus of cases of persuasive authority.' There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond

-14-

debate.'" *Dillard*, 961 F.3d at 1052 (internal citation omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011).

The rights at issue here — Hoggard's rights under the First Amendment — were not clearly established.  The case most closely on point, *Bowman v. White*, may have given a reasonable impression that the Tabling Policy was constitutionally acceptable.  444 F.3d 967.  While we find *Bowman* distinguishable from the case at hand, the scope of Hoggard's First Amendment right to "table" at the Union Patio was not "beyond debate" on October 11, 2017.  *Dillard*, 961 F.3d at 1052.

*Bowman* was also an Arkansas campus speech case.  In *Bowman*, we upheld several complained-of speech restrictions imposed in an unlimited public forum.  444 F.3d at 983.  Given the stricter scrutiny involved in unlimited-public-forum cases and the fact that the case involved a presumptively-unconstitutional prior restraint, an official might have reasonably believed the Tabling Policy — which regulated a more loosely-scrutinized *limited* public forum and did not directly involve a prior restraint — was permissible.  This view of *Bowman*, however, ignores the critical fact that the *Bowman* plaintiff was a non-student, and the speech restrictions were justified by compelling safety and administrative concerns.  *Id.* at 980–83.  Nonetheless, the defendants could have reasonably viewed *Bowman* as permitting the Tabling Policy; *Bowman*'s distinguishability does not mean the defendants "knowingly violate[d] the law."  *Dillard*, 961 F.3d at 1052 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

Hoggard cites other cases attempting to show the First Amendment violation was "clearly established."  But her cases are inapposite.  Most of them simply do not involve limited public forums, which insulates against a reasonable official's knowledge that unjustified limited-public-forum distinctions between students and

-15-

registered student organizations are impermissible.[7] Another of Hoggard's cases, *Thomas v. Collins*, involved a content-based restriction and did not undertake a forum analysis. 323 U.S. 516 (1945). She also cites cases about officials allegedly possessing overly-broad discretion to enforce speech restrictions. *See Douglas v. Brownell*, 88 F.3d 1511, 1521–23 (8th Cir. 1996) (rejecting § 1983 plaintiff's similar arguments for lack of evidence of defendant's selective enforcement); *see also Minn. Majority*, 708 F.3d at 1060 (rejecting a selective-enforcement argument because the plaintiff failed to allege deliberate indifference to the selective enforcement). But these overly-broad-discretion cases do not "clearly establish" the Tabling Policy's unconstitutionality, because the Tabling Policy's unconstitutionality stems from its unjustified distinction between registered student organizations and other students, not from the way officials exercised their discretion by enforcing it against Hoggard.

In short, Hoggard failed to identify "controlling authority" or "a robust consensus of cases of persuasive authority" that "placed the . . . constitutional question beyond debate at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (quoting *al-Kidd*, 563 U.S. at 741–42). Her First

---

[7]*See Ball*, 870 F.3d 722 (nonpublic forum's restrictions upheld); *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 516 (D.C. Cir. 2010) (public forum); *Knowles v. City of Waco*, 462 F.3d 430, 433 (5th Cir. 2006) (public forum); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006) (designated public forum); *Bowman*, 444 F.3d 967 (designated public forum); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 604–05 (6th Cir. 2005) (public forum); *Burk v. Augusta-Richmond Cty*, 365 F.3d 1247, 1249 (11th Cir. 2004) (public forum); *Cmty for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1391 (D.C. Cir. 1990) (public forum); *see also Douglas v. Brownell*, 88 F.3d 1511, 1521 (8th Cir. 1996) (examining a prior restraint's constitutionality and whether a speech restriction was "narrowly tailored"); *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir. 1981) (examining a prior restraint and applying "the most exacting scrutiny" to a speech restriction).

-16-

Amendment right to access a limited public forum, which she was unjustifiably denied, was not "clearly established" at the time. Granting qualified immunity was therefore appropriate.

## III. Conclusion

We find that the Tabling Policy, as it was enforced against Hoggard, violates the First Amendment. The defendants' restriction of Union Patio access to registered student organizations has no rational relationship to their proffered justification. As such, the Tabling Policy's enforcement against Hoggard on October 11, 2017, was unreasonable and unconstitutional. But the defendants may reasonably have not understood this at the time. We find the defendants were properly granted qualified immunity and we therefore affirm the district court's grant of summary judgment.

LOKEN, Circuit Judge, concurring.

I agree that defendants acting in their individual capacities did not take action that violated Hoggard's clearly established First Amendment rights. Therefore, defendants are entitled to qualified immunity from Hoggard's § 1983 damage claims, the only claims at issue on appeal. I join Part II.B. of the court's opinion and concur in the decision to affirm the grant of summary judgment.

I cannot join Part II.A. because it ignores -- explicitly in footnote 4 on page 5 -- the fundamental principle that § 1983 damage liability is personal and therefore Hoggard must prove that each "defendant's unconstitutional action was the 'cause in fact' of [her] injury." Clark v. Long, 255 F.3d 555, 559 (8th Cir. 2001) (quotation omitted); see Cox v. Sugg, 484 F.3d 1062, 1066 (8th Cir. 2007) (absolving university administrators on this ground); see generally Doran v. Eckhold, 409 F.3d 958, 965 (8th Cir.) (en banc), cert. denied, 546 U.S. 1032 (2005). As Hoggard presented insufficient

-17-

evidence of these defendants' personal involvement in denying her access to the Union Patio, I would pass over the question of a constitutional violation -- an issue largely if not entirely mooted when Arkansas enacted the FORUM Act -- and simply decide the appeal on the clearly established issue.

The summary judgment record establishes that Hoggard was poorly treated by Sarah Ponder and Elizabeth Rouse, mid-level University administrators.  In the modern university, it is all too common for *petits fonctionnaires*, arbitrarily enforcing broad rules and policies, to take action that may be politically correct but is not viewpoint neutral.  When such actions trample a student's constitutionally protected right of free speech, those responsible should be held accountable.  But Hoggard did not sue Ponder or Rouse, perhaps because Turning Point's attorneys saw "bigger fish to fry" in a facial attack on multiple University policies.  The FORUM Act mooted this *cause célèbre*. Plaintiffs labored on, now accusing the highest ranking University trustees and administrators of being personally involved in a single episode in which their underlings applied an unwritten Tabling Policy to deny student Hoggard use of a table on the Union Patio to recruit other students to join an as-yet unregistered student organization.  The court says their individual involvement does not matter and proceeds to broadly condemn a "policy" that, for all the record reveals, may have been an *ad hoc* creation of Ponder and Rouse to further their personal notions of what student speech was appropriate for the "living room of campus."  This is not our proper role in deciding § 1983 appeals raising sensitive constitutional issues.

I would agree with much, perhaps all, of the court's analysis in Part II.A. if the record established that University policymakers authorized and approved a Tabling Policy enforced to deter protected student speech, like the action taken against Hoggard.  But Part II.A. addresses a hypothetical, not this case.  I therefore

-18-

suggest that, as precedent, Part II.A. be treated as a thoughtful but not controlling advisory opinion.

_____

## Abigail Temple

| | |
|---|---|
| **From:** | ca08ml_cmecf_Notify@ca8.uscourts.gov |
| **Sent:** | Tuesday, September 1, 2020 10:09 AM |
| **Subject:** | Re-send: 19-3016 Turning Point USA at Arkansas, et al v. Ron Rhodes, et al "Signed Opinion Filed" (3:17-cv-00327-JLH) |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

**Eighth Circuit Court of Appeals**

**Amended 09/01/2020 10:08:55: Notice of Docket Activity**

The following transaction was filed on 08/31/2020

| | |
|---|---|
| **Case Name:** | Turning Point USA at Arkansas, et al v. Ron Rhodes, et al |
| **Case Number:** | 19-3016 |
| **Document(s):** | Document(s) |

**Docket Text:**
OPINION FILED - THE COURT: James B. Loken, L. Steven Grasz and Stephen R. Clark, Sr.
AUTHORING JUDGE:L. Steven Grasz (PUBLISHED),
CONCUR BY: James B. Loken [4950747] [19-3016]--[Edited 08/31/2020 by NDW] Edited to add publishing letter. (Nicole Wagstaff)

**Notice will be electronically mailed to:**

Mr. Travis C. Barham: tbarham@ADFlegal.org, ppaulk@adflegal.org
Mr. John J. Bursch: jbursch@adflegal.org, rshier@wnj.com
Mr. Frederick W. Claybrook, Jr.: rick@claybrooklaw.com, rclaybrook@nicholsliu.com
Mr. John Michael Connolly: mike@consovoymccarthy.com
Mr. William S/ Consovoy: will@consovoymccarthy.com
Mr. David Andrew Cortman: dcortman@adflegal.org, ppaulk@adflegal.org
Mr. Jonathan Caleb Dalton: cdalton@ADFlegal.org, slucas@adflegal.org
Mr. Steven W. Fitschen: nlf@nlf.net, dmyers@nlf.net
Mr. Tyson C. Langhofer: tlanghofer@adflegal.org, dhardin@adflegal.org
Mr. Jim McCormack, Clerk of Court: ared_appeals@ared.uscourts.gov
Mr. Rodney Paul Moore, I: rpmoore@wlj.com, apye@wlj.com
Mr. Ethan Christopher Nobles: ethan@nobleslawfirm.com
Mr. Cameron Thomas Norris: cam@consovoymccarthy.com
Mr. Jeff Puryear: jpuryear@wpmfirm.com, scook@wpmfirm.com
Mr. Christopher Paul Schandevel: cschandevel@adflegal.org, ceville@adflegal.org
Mr. Jay Remington Schweikert: jschweikert@cato.org
Ms. Kristen Waggoner: kwaggoner@adflegal.org, arossiter@adflegal.org, ceville@adflegal.org

Mr. Ryan Michael Wilson: rwilson@wpmfirm.com, scraig@wpmfirm.com

**Notice will be mailed to:**

Mr. David A. Bruce
205 Vierling Drive
Silver Spring, MD 20904

Mr. James A. Davids
NATIONAL LEGAL FOUNDATION
524 Johnstown Road
Chesapeake, VA 23322

Mr. Clark M. Neily, III
CATO INSTITUTE
1000 Massachusettes Avenue, N.W.
Washington, DC 20001

The following document(s) are associated with this transaction:
**Document Description:** Counsel Opinion Letter
**Original Filename:** /opt/ACECF/live/forms/NikiWagstaff_193016_4950747_CounselOpinionLetters_285.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=08/31/2020] [FileNumber=4950747-1]
[77e36048f5fb019a85e8e4f57ef3c7dbab6be18e38ba24d66dea6938fad0aeec172d3d31804729097377486e8a5ad017a9
a7f59a758bbdd96d91baf6f2fa4a89]]
**Recipients:**

- Mr. Travis C. Barham
- Mr. David A. Bruce
- Mr. John J. Bursch
- Mr. Frederick W. Claybrook, Jr.
- Mr. John Michael Connolly
- Mr. William S/ Consovoy
- Mr. David Andrew Cortman
- Mr. Jonathan Caleb Dalton
- Mr. James A. Davids
- Mr. Steven W. Fitschen
- Mr. Tyson C. Langhofer
- Mr. Jim McCormack, Clerk of Court
- Mr. Rodney Paul Moore, I
- Mr. Clark M. Neily, III
- Mr. Ethan Christopher Nobles
- Mr. Cameron Thomas Norris
- Mr. Jeff Puryear
- Mr. Christopher Paul Schandevel
- Mr. Jay Remington Schweikert
- Ms. Kristen Waggoner
- Mr. Ryan Michael Wilson

**Document Description:** Letter To Publishing
**Original Filename:** /opt/ACECF/live/forms/NikiWagstaff_193016_4950747_LettersToPublishing_284.pdf

**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=08/31/2020] [FileNumber=4950747-2]
[0426eb0ed7520812cf20e084c14753a50ec4e4cdf8242e60274bcb269662d3e1d60bf80dacde1ad984c11a3d1a5422ebc4
863c58b5de29756db05b9b5a582dab]]
**Document Description:** Opinion
**Original Filename:** 193016P.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=08/31/2020] [FileNumber=4950747-0]
[0be1628f4086d2c5b8ab2f9310115a6bfa010b3668bf2b84541d572e7b09fa8e3b9bd6c6da438ec7afb4881fc39282f3cac4
1672090e12bc02dd620348cf4c4c]]


The following information is for the use of court personnel:


**DOCKET ENTRY ID:** 4950747
**RELIEF(S) DOCKETED:**
  for publication
  concurrence
**DOCKET PART(S) ADDED:** 6602600, 6602601, 6602602, 6602603